## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEURALMAGIC, INC. | ) |
| *Plaintiff,* | ) ) ) |
| v. | ) ) **Civil Action No. 20-10444** |
| FACEBOOK, INC. AND ALEKSANDAR ZLATESKI | ) ) |
| *Defendants.* | ) ) **Jury Trial Demanded** |
| | ) ) ) ) ) ) |

## COMPLAINT

Plaintiff NeuralMagic, Inc. ("Neural Magic" or the "Company"), by and through its undersigned attorneys, Quinn Emanuel Urquhart & Sullivan LLP, for its claims against Defendants, Facebook, Inc. ("Facebook") and Aleksandar Zlateski ("Zlateski," and, collectively, "Defendants") hereby states as follows.

## NATURE OF THE ACTION

1.      Neural Magic is a small start-up co-founded by MIT professor Nir Shavit and MIT research scientist Alex Matveev in 2017 and based in Somerville, MA.  One of Neural Magic's technologies—a set of computer algorithms encompassed within a machine compiler— is the result of decades of research on neural networks and artificial intelligence.  These algorithms have the potential to revolutionize the field of artificial intelligence ("AI"), in part by allowing complicated mathematical functions to run efficiently on commodity-based

computers—using no specialized hardware.  These algorithms will also allow research scientists to use much larger data sets, heretofore a severe limitation on the advancement of machine learning.   Indeed, Neural Magic's technology is a key to unlocking the next wave of advancements in many fields: from healthcare and cancer screening, to how customers shop online and identify items of interest.  This technology can also help bring AI to the masses by reducing barriers of hardware scarcity and cost.

2.      Defendant Aleksandar Zlateski was a trusted part of the Neural Magic team almost from its inception; he was Neural Magic's first employee.  As Technology Director at Neural Magic, Zlateski had access to all of Neural Magic's trade secrets, confidential, proprietary information, and business plans for the future.  And, critically, he had access to and helped author the software for one of Neural Magic's prized jewels: the source code of its compiler that encapsulates Neural Magic's above-described algorithms.

3.      In July 2019, Zlateski left Neural Magic to work in a capacity that he represented, and Neural Magic understood, was unrelated to the particular compiler work he had done for the Company.  While Facebook is one of the largest users of artificial intelligence in the world—and a potential customer of Neural Magic's—Neural Magic trusted Zlateski to honor non-disclosure and non-compete agreements he had entered in connection with his work at Neural Magic, and Neural Magic believed it had nothing to fear from his anticipated work in an unrelated area of artificial intelligence.

4.      That trust was misplaced.  Less than six months later, in December 2019, Facebook announced that it had published to the world—as open source—a compiler that, investigation would later reveal, includes the same proprietary algorithms that form the heart of Neural Magic's technology and intellectual property.  At the time, Facebook even publicly

thanked Zlateski for his role in cracking this key problem for Facebook's continued advancement in the world of artificial intelligence, writing in their release notes for the misappropriated compiler algorithms that the "team would like to acknowledge and greatly appreciates the contributions of @zlateski to sparse kernels and unified code cache."

5.      Zlateski breached the non-disclosure and non-competition agreement he signed with Neural Magic as Technology Director.  Moreover, Zlateski and his new employer Facebook engaged in acts and conduct in the Commonwealth of Massachusetts that violate Massachusetts trade secrets laws, Chapter 93A, and the Defend Trade Secrets Act of 2016.  Facebook has refused repeated requests to cease these acts and remove misappropriated material from its own code.  Neural Magic has therefore been forced to bring these claims to protect its intellectual property.

## **PARTIES**

6.      Plaintiff Neural Magic is a Delaware corporation, with its corporate headquarters in Somerville, Massachusetts.

7.      Defendant Facebook is a Delaware corporation with a principal place of business at 1 Hacker Way, Menlo Park, California.  Facebook maintains offices in Cambridge, Massachusetts.

8.      Defendant Aleksandar Zlateski is a natural person who, on information and belief, resides at 211 N End Ave Apt 3K New York, NY 10282.  Zlateski worked as a Neural Magic employee in Massachusetts for over a year pursuant to the employment contract he signed with Neural Magic, governed by Massachusetts law.  During that time, he helped develop the proprietary algorithms and trade secrets that are the subject of this action.

**JURISDICTION & VENUE**

9.      This is an action for trade secret misappropriation under state trade secrets law and the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836 *et seq*.), and state and common law claims for breach of contract, tortious interference with contractual relations and prospective contractual relations, unjust enrichment, and unfair trade practices.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), 1338(b), and 1367(a).

10.     This Court has personal jurisdiction over Facebook, Inc. Facebook maintains offices in Cambridge, MA.  Furthermore, Facebook transacts business in Massachusetts, has caused tortious injury to Neural Magic in Massachusetts, has an interest in using or possessing real property in Massachusetts, and contracts to supply services or things in Massachusetts.

11.     This Court has personal jurisdiction over Aleksandar Zlateski.  Aleksandar Zlateski resided in Massachusetts, performed services for a Massachusetts company, Neural Magic, and entered into a contract in Massachusetts governed by Massachusetts law, forming the foundation for many of the claims at issue here.  Zlateski worked on the algorithms and trade secrets that form the basis for this action during his time at Neural Magic in Massachusetts.  Furthermore, Zlateski has transacted business with Neural Magic in Massachusetts, has served as Technology Director of Neural Magic in Massachusetts, maintains a stake in Massachusetts-based Neural Magic, and has caused tortious injury to Neural Magic in Massachusetts.

12.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and 1391(c).  Aleksandar Zlateski is a former resident of Massachusetts, a substantial part of the events giving rise to the claims alleged herein occurred in Massachusetts, and Facebook, Inc. has a regular and established place of business in Massachusetts.

## FACTUAL ALLEGATIONS

A.      Neural Magic's Founding

13.     Nir Shavit is the CEO & Co-Founder of Neural Magic.  He is a Professor of Computer Science at the Massachusetts Institute of Technology.  Over the course of his more than three-decade career, Professor Shavit has worked tirelessly to advance computer processing. In 2016, after a long and successful career in the field of multicore processing, Professor Shavit embarked on a new challenge—the development of artificial intelligence systems to reconstruct the connectivity of neural tissue in brains.

14.     While Professor Shavit and Matveev were working in their MIT Lab running tests on a large set of neurobiology data, they discovered that, with the right algorithms, they could run neural networks on these large neurobiological datasets using only standard computers without specialized hardware.  In particular, Professor Shavit and Matveev realized that they could achieve these exceptional speeds on standard computers that have much higher memory capacities.  That was the birth of Neural Magic, and together Professor Shavit and Matveev founded the company in 2018 to bring their vision to fruition and to the marketplace.

15.     After extensive multicore computing research, testing, analysis, and refining of the algorithms that Professor Shavit initially developed in his neurobiology lab, the novel algorithms, techniques, design patterns, optimization strategies, and formulas (collectively, the "Neural Magic Algorithms") at the heart of Neural Magic were created.  The Neural Magic Algorithms enable certain types of neural networks to run in a highly-efficient manner on commodity Central Processing Units ("CPUs")—something found on every laptop and desktop—instead of specialized chips like GPUs. Through these novel algorithms, and the unique way in which they work together to overcome obstacles experts in the field viewed as

impassable, Neural Magic is shattering the hardware barriers that were impeding the field of machine learning and artificial intelligence.  This breakthrough represents an incredible value proposition with implications throughout medicine, the online economy, and artificial intelligence, and is poised to make machine learning more accessible and affordable, and to unlock the next great wave of machine learning research.

16.     Indeed, the investment community recognized the significance of this breakthrough.  Neural Magic has raised $20 million from respected investors including Comcast Ventures, NEA, Andreessen Horowitz, Pillar VC, and Amdocs Ventures.

17.     Defendant Aleksandar Zlateski was an MIT post-doctoral researcher in a computer vision group when Professor Shavit and Matveev founded Neural Magic.  Excited about the possibilities of turning CPU-based neural network computation into a commercial product, Zlateski joined Neural Magic as its first employee, becoming the full-time Technology Director of Neural Magic on March 19, 2018.  As Technology Director, Zlateski was offered a base salary of $165,000 per year, and was also granted an option to purchase shares of the company's stock.

B.     Neural Magic Protects Its Trade Secrets

18.     One of Neural Magic's key technologies, its secret sauce, are its algorithms—proprietary and heretofore confidential techniques that enable commodity multicore machines, that is, servers with multiple computing units, to execute complex mathematical operations in a computationally and storage-efficient manner.  Those trade secrets bring the company significant value, and as such, Neural Magic guards those algorithms closely.  When onboarding any employee—including Zlateski, Neural Magic's first employee—Neural Magic highlights the need for confidentiality with a confidentiality and non-disclosure agreement.

19.     As part of the Neural Magic offer, Zlateski signed a non-disclosure agreement. Zlateski agreed that he would "not at any time, whether during or after the termination of [his] engagement by the Company, reveal to any person or entity any of the trade secrets or confidential, proprietary or other non-public information concerning the organization, business, finances or assets of the Company . . . including but not limited to information related to Company inventions, research, testing, manufacturing, production, marketing, supplies, suppliers, consultants, strategic partners, products, designs, methods, know-how, techniques, systems, processes, software programs and/or code, works of authorship, customer and collaborator lists, projects, plans, proposals, any Developments, and the notes, memoranda, reports, lists, records, drawings sketches, specifications, data, documentation or other materials of any nature containing such trade secret or confidential information (the "Confidential Information").

20.     Zlateski further agreed that any inventions he created—either alone or with others—"during [his] engagement by the Company" that "relates to the business of the Company . . . results from tasks assigned to [him] by the Company or results from the Confidential Information or use of facilities, premises or personal property . . . [of] the Company" are the "sole and absolute property of the Company."

21.     Neural Magic protects its trade secrets and confidential, proprietary information through a variety of mechanisms.  Neural Magic uses its secure computer network with a VPN protocol and SSH keys used to login required for any access, physical servers in a secure location protected by firewall software, and secure office space with electronic keycards required for entry.  It further requires execution of non-disclosure agreements by all employees.

C.     Aleksandar Zlateski Enjoyed Full and Unfettered Access to Neural Magic's Trade Secrets, Research, and Development as Technology Director

22.     Once Zlateski signed the non-disclosure agreement and expressed his understanding of the need to keep all information about the company confidential, Zlateski became a part of the small and trusted Neural Magic team.  As a member of that team, Zlateski enjoyed unfettered access to the research and algorithms that Neural Magic was working so tirelessly to refine.

23.     Zlateski benefitted greatly from the mentoring and tutelage provided by Professor Shavit, Dr. Matveev, and other members of the Neural Magic team.  These scientists worked together and collaborated to address many of the most challenging problems in the field of artificial intelligence, and to practically implement solutions to these problems, one such solution being the Neural Magic Algorithms at issue here.

24.     As part of his work at Neural Magic, Zlateski co-authored software code that implemented the Neural Magic Algorithms.  That source code is one expression of those Algorithms and, as such, that code is a physical embodiment of Neural Magic's trade secrets.

25.     In marketing its products and services, Neural Magic does not reveal this source code—or the trade secrets contained therein—to its customers or partners.  None of this information was publicly available, and it was only made available to Zlateski through his role as Technology Director of Neural Magic.

D.     Zlateski Leaves Neural Magic to Work for Facebook

26.      After almost a year and a half at Neural Magic, Zlateski informed Neural Magic that he had received a new position at Facebook to work on technology that Zlateski assured Neural Magic would not be related to his work at Neural Magic.

27.     Given the supposedly different nature of Zlateski's role at Facebook, Neural Magic presumed Zlateski did not plan to violate his non-compete obligation.   Neural Magic nonetheless reminded Zlateski of the need to keep all Neural Magic proprietary information and trade secrets strictly confidential.

E.      Zlateski and Facebook Publish Neural Magic's Secret Code to the World

28.     In November 2019, Facebook—with no notice to Neural Magic—published code (on GitHub, an open-source software development platform that anyone can access online for free) disclosing the Neural Magic Algorithms.

29.     A month later, and once again unknown to Neural Magic at the time, at an AI Developers Conference (the TVM conference in Seattle), Facebook announced it had disclosed to the whole world—and made open source—an algorithm that would enable neural networks to run efficiently on commodity Central Processing Units (CPUs); later investigation by Neural Magic would reveal, however, that its open source implements the very same algorithms as the Neural Magic Algorithms.

30.     At that time, and once again unknown to Neural Magic at the time, Facebook employee Bram Wasti described the sudden increase in speed and performance in Facebook's software, and said it was thanks to "some work done by Aleks Zi," using shorthand for Zlateski's last name.   He explained that this code significantly sped up Facebook's most popular neural network executions.

31.     On or around January 18, 2020, a LinkedIn post from Facebook employee Jongsoo Park alerted Dr. Matveev at Neural Magic to the fact that Facebook and Zlateski had misappropriated the Neural Magic Algorithms.   Notes accompanying Mr. Park's LinkedIn post credited Zlateski for his contributions "to sparse kernels"—a high-level reference to work

Zlateski had performed in developing Neural Magic's Algorithms.  This area was completely outside the work that Zlateski said he would be pursuing at Facebook.

32.     Upon subsequently reviewing the open source code that Facebook published on GitHub, Neural Magic realized—for the first time—that Zlateski had misappropriated the Neural Magic Algorithms and given them to Facebook.  And Facebook had published these algorithms to the world in the form of its open source compiler that implements (and embodies) the Neural Magic Algorithms.  Facebook referred to its compiler as the "Sparse GEMM JIT"—but this code in pertinent part implements the Neural Magic Algorithms.

33.     GitHub maintains the entire modification history of every file posted on its website.  The GitHub modification history for the Sparse GEMM JIT shows that the initial submitter is the lead of the FBGEMM software package at Facebook, Jongsoo Park, and Zlateski is listed as the first "reviewer" of the code.

34.     The code and compiler Facebook posted to GitHub implement the same Neural Magic Algorithms used in Neural Magic's compiler code, to achieve the same computational and storage efficiencies running on commodity hardware (CPUs).  Indeed, Neural Magic has tested the Facebook compiler side-by-side against its compiler, and the results from this direct comparison establish that the algorithms implemented in the Facebook compiler are the Neural Magic Algorithms.  As explained below, Neural Magic subsequently informed Facebook of this testing and these test results, but Facebook has not changed course, forcing Neural Magic to take the present action.

F.      Facebook Refuses to Remove Neural Magic's Compiler from GitHub

35.     Despite direct and conclusive evidence that Facebook's newly published compiler uses Neural Magic's Algorithms, Facebook has refused to remove from GitHub the compiler containing Neural Magic's trade secrets.

36.     On January 22, 2020, counsel for Neural Magic sent letters to both Facebook and Zlateski identifying the offending GitHub publication and asking for its removal pending investigation and further discussion between Neural Magic, Facebook, and Zlateski.

37.     In a series of letters, counsel for Facebook and Zlateski flatly refused to take down the code or agree to cease further use of Neural Magic's proprietary and confidential information that Zlateski misappropriated as a Facebook employee.

38.     Neural Magic can only see what Facebook has already published to GitHub, which includes further Neural Magic technology in addition to the said compiler.  Zlateski could disclose (and on information and belief has disclosed) even more to Facebook, for use internally or in future open source releases.  Those continued disclosures would further damage Neural Magic's business and market opportunities.  Trade secrets at risk of further disclosure (perhaps already disclosed) include trade secret techniques used by Neural Magic to run fully connected neural networks and convolutional neural networks at speed and to speed up the training of such networks.

## COUNT I

### (Misappropriation of Trade Secrets and Confidential Information (M.G.L. c. 93 § 42))
### (*Facebook, Inc., Aleksandar Zlateski*)

39.     The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

40.     Aleksandar Zlateski was Technology Director at Neural Magic and is a former employee of Neural Magic.  He was and is under a contractual obligation not to use or disclose Neural Magic's confidential or proprietary information, including all trade secrets.   As Technology Director, Zlateski had access to and did access Neural Magic's trade secrets and confidential proprietary information, including, most critically for present purposes, Neural Magic's Algorithms.  As noted above, the Neural Magic Algorithms comprise performance engineering techniques reflected in Neural Magic's unpublished compiler to improve efficiency; as well as algorithms, design patterns, optimization strategies, and formulas developed by Neural Magic in the course of developing compiler code and related code for various machine architectures, including code for the AVX2 and AVX512 instruction sets.  This information was held in strict confidence and confidentiality by Neural Magic and was only made available to Zlateski in his capacity as Neural Magic's Technology Director.  Prior to the acts complained of herein, Neural Magic's Algorithms—its trade secrets—were not generally known to others in the industry.  Further, Neural Magic does not publish or disclose these algorithms, and Neural Magic products or services that implement the Neural Magic Algorithms do so without the algorithms themselves being made public or otherwise generally available.

41.     Consistent with standard industry practices, Neural Magic took reasonable and appropriate measures to protect and maintain its trade secrets, including, but not limited to, having its employees and any entities or individuals that performed work on its behalf sign

confidentiality and non-disclosure agreements prohibiting use and/or removal of any materials containing confidential, proprietary information from its premises except in the pursuit of Neural Magic's business, limiting access to its offices, limiting access to its computer systems, and configuring computers to use high levels of encryption.

42.     Neural Magic has expended significant resources to develop its trade secrets and other confidential and proprietary information, to offer a breakthrough compiler that—by implementing the Neural Magic Algorithms—allows users to build and exploit their neural networks on commodity CPUs as opposed to specialized, hard-to-use, and expensive GPU hardware.  Neural Magic's trade secrets and confidential and proprietary information derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  These trade secrets and confidential, proprietary information are highly valuable to Neural Magic and to others who do not know or have access to them.

43.     As just one example of the value of Neural Magic's trade secrets, Intel recently purchased the Israel artificial intelligence company Habana Labs for $2 billion on the promise of performance speed upgrades for machine learning that provide 2-3x over Nvidia's GPUs.  The Neural Magic Algorithms at issue herein—when implemented in the Neural Magic compiler—offer comparable performance enhancements on CPUs. Unlike these accelerators, Neural Magic's CPU solution will deliver speedups while eliminating the severe memory constraints associated with these devices and enable neural networks to run anywhere, from laptops to servers, not just in large data centers.

44.     Aleksandar Zlateski misappropriated or unlawfully took, carried away, concealed, used and/or copied trade secrets and other confidential proprietary information from Neural Magic and disclosed Neural Magic's trade secrets and other confidential proprietary information to Facebook, GitHub, and GitHub's users in direct violation of Zlateski's confidentiality agreement with Neural Magic.

45.     On information and belief, Facebook knew, or should have known, prior to the open source release of the Facebook Sparse GEMM JIT, that Zlateski's work on that compiler (directly or indirectly) was a misappropriation of Neural Magic's Algorithms.   Indeed, Facebook's steadfast refusal to take down the offending compiler code (which embodies and implements the Neural Magic Algorithms), even when faced with proof of this theft, demonstrates not only the value to Facebook of the Neural Magic Algorithms– it also demonstrates Facebook's blatant disregard  of Neural Magic's work and valued intellectual property.

46.     On information and belief, Facebook, Inc. knowingly received the benefits from the disclosure and/or use of Neural Magic's trade secrets.  Aleksandar Zlateski and Facebook, alone or in concert, used improper means, in breach of Aleksandar Zlateski's contractual obligations to Neural Magic, to acquire Neural Magic's trade secrets and other confidential, proprietary information.

47.     As a direct and proximate result of Zlateski's and Facebook's misappropriation of trade secrets and other confidential and proprietary information, Neural Magic has suffered and will continue to suffer irreparable harm and other damages, including, but not limited to, loss of value of its trade secrets.  Neural Magic is entitled to injunctive relief and monetary damages, including enhanced damages pursuant to the statute.

## COUNT II

**(Violation of the Defend Trade Secrets Act of 2016 (18. U.S.C. § 1836))**
**(*Facebook, Inc., Aleksandar Zlateski.*)**

48.     The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

49.     Neural Magic is the owner of trade secrets that Aleksandar Zlateski and Facebook misappropriated and are now using and disclosing.  These trade secrets are used in, or intended for use in, interstate or foreign commerce.

50.     As Technology Director and a former employee of Neural Magic, Aleksandar Zlateski was under a contractual obligation not to use or disclose Neural Magic's confidential or proprietary information, including all trade secrets.

51.     Neural Magic took reasonable measures to protect and maintain the secrecy of its trade secrets and confidential and proprietary information.  These protections include, but are not limited to, having its employees and any entities or individuals that performed work on its behalf sign confidentiality and non-disclosure agreements prohibiting removal of any materials containing confidential, proprietary information from its premises except in the pursuit of Neural Magic's business, limiting access to its offices, encrypting forms of electronic storage, and limiting access to its computer systems through a variety of mechanisms, including mechanisms discussed herein.

52.     Due to these security and confidentiality measures, Neural Magic's confidential and proprietary trade secret information is not available for others in the field of neural networks and CPU optimization—or any other field—to use through any legitimate means.

53.     Neural Magic has expended significant resources to develop its trade secrets and other confidential and proprietary information, to offer a breakthrough compiler that allows users

to build neural networks that more efficiently utilize CPUs.  Neural Magic's trade secrets and confidential and proprietary information, derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. These trade secrets and confidential, proprietary information are highly valuable to Neural Magic and to any other person or entity that wants to enter the field of artificial intelligence.

54.     Aleksandar Zlateski and Facebook knew, or had reason to know, that the trade secrets at issue herein had been acquired from Neural Magic through improper means including, without limitation, Zlateski's breach of his non-disclosure obligations.  Zlateski and Facebook disclosed Neural Magic's trade secrets to GitHub and the public at large in direct violation of Zlateski's contractual obligations to Neural Magic.

55.     On information and belief, Facebook, Inc. knowingly received the benefits from the disclosure and/or use of Neural Magic's proprietary information.  Aleksandar Zlateski and Neural Magic thus in concert used improper means, in breach of Aleksandar Zlateski's contractual obligations to Neural Magic, to acquire Neural Magic's trade secrets and other confidential, proprietary information.

56.     On information and belief, if Defendants are not enjoined, Defendants will continue to misappropriate and use Neural Magic's trade secrets for their own benefit and to Neural Magic's detriment.

57.     As a direct and proximate result of Zlateski's and Facebook's misappropriation of Neural Magic's trade secrets and other confidential and proprietary information, Neural Magic has suffered and will continue to suffer irreparable harm and other damages, including but not limited to, loss of value of its trade secrets.  Neural Magic is therefore entitled to civil seizure of

property, injunctive relief, monetary damages for its actual losses, and monetary damages for unjust enrichment where damages for its actual losses are not adequately addressed.

## COUNT III

### (Unfair Business Methods (M.G.L. c. 93A § 11)) (*Facebook, Inc., Aleksandar Zlateski*)

58.     The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

59.     At all times relevant to this action, Neural Magic has been engaged in trade or commerce within the meaning of M.G.L. c. 93A, § 11.

60.     Aleksandar Zlateski and Facebook, Inc. engaged in a course of conduct designed to unfairly harm Neural Magic, to Facebook's advantage, through their business transactions with Neural Magic.  Zlateski's and Facebook's unfair conduct included, but is not limited to stealing Neural Magic's trade secrets—algorithms in Neural Magic's GEMM JIT source code, including performance engineering techniques reflected in that source code to improve efficiency; as well as algorithms, design patterns, optimization strategies, and formulas developed by Neural Magic in the course of developing compiler code and related code for various machine architectures, including code for the AVX2 and AVX512 instruction sets—and publishing them publicly and for free.  These acts and practices of Zlateski and Facebook constitute unfair methods of competition or unfair or deceptive acts and practices and business transactions that occurred primarily and substantially within Massachusetts within the meaning of M.G.L. c. 93A § 2.

61.     These unfair methods of competition or unfair or deceptive acts or practices were intentional, willful, and knowing.

62.     As a direct and proximate result of Zlateski's and Facebook's unfair and deceptive acts and conduct as aforesaid, Neural Magic has suffered and will continue to suffer substantial and irreparable harm and other damages, including, but not limited to, loss of value of trade secrets, loss of customers, loss of investors, and loss of key hires or potential key hires. Neural Magic is entitled to three times its actual damages and its reasonable attorneys' fees and costs incurred in this action.

## COUNT IV

### (Breach of Contract (Non-Disclosure and Non-Competition Agreement)) (*Aleksandar Zlateski*)

63.     The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

64.     In March 2018, Neural Magic engaged Aleksandar Zlateski to serve as Technology Director on behalf of Neural Magic.

65.     As part of this engagement, Neural Magic and Aleksandar Zlateski entered into a valid, enforceable, Non-Disclosure Agreement and Non-Competition Agreement in March 2018 governed by Massachusetts law.  The confidentiality agreement survived termination, and the non-competition agreement had a one-year term.

66.     Under the Non-Disclosure and Non-Competition Agreement, Zlateski agreed, among other things, that he would not use any of the confidential information gained through his work at Neural Magic for any purpose, other than for the benefit of Neural Magic.  Zlateski further agreed that, among other things, that he would not directly compete with Neural Magic for a period of one-year following his termination.

67.     In 2018 and 2019, Zlateski, as an employee of Neural Magic, performed work on behalf of Neural Magic, gaining access to confidential and trade secret information, including

but not limited to the source code for Neural Magic's compiler, and other technical know-how. This information was guarded and protected by Neural Magic, including by limiting access to its offices, password protecting its computers, and through execution of Non-Disclosure Agreements like the one with Zlateski.

68.     Neural Magic has expended significant resources to develop its trade secrets and other confidential, proprietary information.  Neural Magic's trade secrets and confidential proprietary information derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  These trade secrets and confidential, proprietary information are highly valuable to Neural Magic and to any other person or entity that wants to enter the field of artificial intelligence.

69.     In 2019, while the terms of the Non-Disclosure Agreement and Non-Competition Agreement were still in effect, Zlateski became an employee of Facebook.

70.     On information and belief, Zlateski used the information gained from being a Technology Director at Neural Magic to develop the technology and source code for Facebook, including the source code in the Sparse GEMM JIT.

71.     On information and believe, within 1-year of working for Neural Magic, Zlateski performed work for Facebook that directly competed with Neural Magic.

72.     Neural Magic has fully performed all of its obligations under the Non-Disclosure and Non-Competition Agreement.

73.     Because of Zlateski's breach of his contractual obligations under the Non-Disclosure and Non-Competition Agreement, Neural Magic has been and will continue to be irreparably harmed.

74.     Zlateski's actions are the direct and proximate cause of Neural Magic's damages.

75.     Neural Magic is entitled to injunctive relief and damages.

## COUNT V

**(Tortious Interference with Advantageous Contractual Relations)**
**(*Facebook, Inc.*)**

76.     The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

77.     Neural Magic and Aleksandar Zlateski are parties to a certain Non-Disclosure and Non-Competition Agreement.  Specifically, Neural Magic and Zlateski entered into a valid, enforceable Non-Disclosure and Non-Competition Agreement in March 2018, governed by Massachusetts law, under which Zlateski agreed that he would not use any of the confidential information gained through his work on behalf of Neural Magic for any purpose, other than for the benefit of Neural Magic.

78.     Facebook willfully interfered with Neural Magic's contractual relations with Zalteski by soliciting him and information from him for Facebook while his Non-Competition Agreement was still in effect, and by seeking disclosure of Neural Magic's trade secrets, and other confidential and proprietary information including technical know-how.

79.     This solicitation constitutes tortious interference with Zlateski's agreement with Neural Magic.

80.     Facebook was aware of Zlateski's Non-Disclosure and Non-Competition obligations to Neural Magic at the time of his solicitation.

81.     Despite Facebook's knowledge of the Neural Magic agreement, and without privilege and in violation of the law, Facebook nevertheless intentionally, with malice, and with improper motive and means, induced Zlateski to breach his Non-Disclosure and Non-

Competition Agreement by joining Facebook's AI Group and disclosing aforementioned confidential information to Facebook.

82.     As a direct and proximate cause of Facebook's actions, Neural Magic's business has suffered and continues to suffer actual legal damages.

## COUNT VI

### (Unjust Enrichment)
### (*Facebook, Inc., Aleksandar Zlateski*)

83.     The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

84.     Based on the conduct alleged in this Complaint, Facebook and Zlateski unjustly and knowingly enriched themselves at the direct expense of Neural Magic.

85.     Facebook's and Zlateski's economic benefit is a direct and proximate result of their unjust and unconscionable conduct in using confidential, proprietary, and trade secret information from Neural Magic obtained through Zlateski's status as Neural Magic's Technology Director and first employee, to harm Neural Magic and benefit Zlateski and Facebook.

86.     But for Facebook's and Zlateski's unjust and inequitable conduct, Neural Magic would have obtained additional investor funding, maintained additional customers, and maintained its trade secret and confidential proprietary information.

87.     Equity and good conscience require restitution from Facebook and Zlateski. Moreover, to protect Neural Magic's right to recover damages and to prevent the unjust enrichment of Zlateski, a constructive trust should be imposed on all sums unlawfully and inequitably received by Zlateski traceable to this misconduct, including Zlateski's shares of Facebook.

## PRAYER FOR RELIEF

**WHEREFORE**, Neural Magic respectfully requests that this Court enter judgment in its favor and against Facebook and Aleksandar Zlateski, as follows:

A.     A declaration in favor of Neural Magic and against Facebook and Aleksandar Zlateski on each Claim contained herein and a final judgment incorporating the same;

B.     An award of actual damages to Neural Magic in an amount to be proven at trial;

C.     An award of restitution and disgorgement of ill-begotten profits;

D.     An award of three times Neural Magic's actual damages for Facebook's and Aleksandar Zlateski's respective violations, including their unfair trade practices;

E.     An award of punitive damages to Neural Magic;

F.     The costs and expenses of the suit incurred herein;

G.     Neural Magic's attorneys' fees reasonably expended in this action;

H.     Seizure of property incorporating Neural Magic's trade secrets;

I.     A constructive trust over the assets and shares of Facebook, including any and all shares owned by Aleksandar Zlateski;

J.     An injunction against Zlateski and Facebook prohibiting any further use of Neural Magic's trade secrets;

K.     Such other and further relief as the Court deems just and appropriate under the circumstances.

## <u>JURY TRIAL DEMANDED</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Neural Magic demands a trial by jury of all issues so triable.


Dated: March 4, 2020

/s/ *Steven Cherny*
Steven Cherny (BBO# 706132) (*application to this Court pending*)
Patrick D. Curran (BBO# 568701)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, MA 02199
Tel: (617) 712-7100
stevencherny@quinnemanuel.com
patrickcurran@quinnemanuel.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 4th day of March, 2020.

/s/ *Patrick D. Curran*
Patrick D. Curran
