**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

NEURAL MAGIC, INC.,

     Plaintiff,

        v.

FACEBOOK, INC. and ALEKSANDAR
ZLATESKI,

     Defendants.

Civil Action No. 1:20-cv-10444-DJC

HIGHLY CONFIDENTIAL – FILED
UNDER SEAL

**<u>DECLARATION OF R. CHRISTOPHER ANDERSON
IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION</u>**

**Table of Contents**

I.     INTRODUCTION ..................................................................................................1

II.    SUMMARY OF OPINIONS ................................................................................1

III.   QUALIFICATIONS .............................................................................................3

IV.    INFORMATION CONSIDERED ........................................................................5

V.     BACKGROUND ..................................................................................................6

       A. Neural Magic, Inc. ("NMI") ........................................................................6
          i.    The "Technological Asset" ....................................................................7
          ii.   Inference Engine 1.0 ..............................................................................8
          iii.  The Market for NMI Inference Engine ..................................................8
          iv.   NMI Pre-Seed and Seed Funding Investors ...........................................9
       B. Facebook, Inc. .............................................................................................10

VI.    SUMMARY OF NMI's ALLEGATIONS AGAINST FACEBOOK ................11

       A. Publication of Source Code Embodying Trade Secrets .................................11
       B. Internal Use of Trade Secrets by Facebook .................................................11

VII.   UNDERSTANDING OF NMI'S REQUEST FOR PRELIMINARY INJUNCTION .........11

VIII.  UNDERSTANDING OF LEGAL PRINCIPLES ..............................................12

IX.    IRREPARABLE HARM .....................................................................................12

       A. Analysis of Dr. Putnam's Irreparable Harm Opinions ...................................12
       B. Facebook and NMI Are Not Competitors .....................................................14
       C. Analysis of Dr. Putnam's Measures of Irreparable Harm ..............................15
          i.    Preliminary Injunction Prohibiting Facebook Internal Use ...................15
          ii.   Preliminary Injunction Prohibiting Facebook Display of Additional Trade
                Secrets ...................................................................................................20
       D. Dr. Putnam Fails to Consider the Effective of the Existing Competition in NMI's
          Target Market ..............................................................................................25
       E. Dr. Putnam Fails To Consider Methods Of Quantifying The Purported Harm .............26
       F. NMI's Failure To Take Actions to Protect Its Purported "Technological Assets"
          Contradicts Dr. Putnam's Opinions ..............................................................27

X.     BALANCE OF HARDSHIPS ............................................................................28

XI.    RESERVATIONS................................................................................................29

List of Schedules

| Schedule Number | Description |
|---|---|
| 1.0 | Curriculum Vitae of Christopher Anderson |

**DECLARATION OF R.C. ANDERSON**                                    **HIGHLY CONFIDENTIAL**
**CIVIL ACTION NO: 20-10444**                                       **FILED UNDER SEAL**

## I.    INTRODUCTION

1.    I am a Partner in the Austin, Texas office of StoneTurn Group, LLP, a global advisory firm. I have been retained in this matter by Latham and Watkins LLP on behalf of Facebook, Inc. and Aleksandar Zlateski (collectively "Defendants") to:

> (1) Review, evaluate, and address the opinions of Dr. Jonathan Putnam contained in his declaration dated April 9, 2020;

> 2) Assess whether Neural Magic, Inc. ("NMI") will suffer irreparable harm if the Court does not enjoin Facebook's internal use of certain purported NMI trade secrets or public disclosure of these purported trade secrets; and

> (3) Weigh the balance of the harm to Facebook if an injunction is granted versus the harm to NMI if an injunction is not granted;

My qualifications are listed below.

## II.    SUMMARY OF OPINIONS

2.    ***Overall View of Dr. Putnam's Opinions***:  Dr. Putnam's opinions are not the product of a rigorous fact-based analysis, but instead consist primarily of a generic essay on the characteristics of and inherent risks to seed-stage technology startups.  In purporting to apply those generic opinions to the specifics of this case, Dr. Putnam fails to analyze relevant information and documents regarding NMI that would ordinarily be in the possession of an early stage start up, and even fails to draw upon publicly available information about Facebook that makes clear that the types of supposedly irreparable harm he identifies are not likely to occur absent the injunctive relief NMI requests.  Instead, Dr. Putnam must make numerous implausible assumptions about the future in order to opine that NMI may suffer any of the harms that he later describes are irreparable, e.g. loss of customer relationships, loss of market share, price erosion, future threats and an unfair head start.  Such a nonspecific and speculative assessment does not demonstrate that NMI is likely to be irreparably harmed absent a preliminary injunction.

3.    ***Irreparable Harm***:  Dr. Putnam has not shown that absent the requested forms of injunctive relief, NMI is likely to suffer irreparable harm in the interim period before the anticipated trial in this matter.[1]

4.    First, all of the irreparable harm that Dr. Putnam opines could happen to a hypothetical startup company if its trade secrets are misappropriated is premised on the assumption that the misappropriation is done by a competitor, who then enters the market with a competing product created with the misappropriated trade secrets and takes customers, market share, erodes price, and takes potential investment dollars.  There is no such risk of harm from Facebook's alleged internal use of NMI's purported trade secrets, because NMI and Facebook are not competitors, neither direct nor indirect.  The two companies do different things, target different markets and have different customers.  And while I understand Facebook uses artificial intelligence ("AI") internally in its operations, it does not offer or sell a product that competes in any way with the products and/or services NMI intends to sell when/if NMI launches commercially viable software.  In addition, I understand that Facebook also does not have any plans or intentions to compete with NMI in the deep learning market.[2]  As a result, even if Facebook were to use NMI's purported trade secrets internally, it would not result in the harm Dr. Putnam discusses, as Facebook cannot take customers, revenue or market share away from NMI.  Similarly, Facebook is not soliciting investor dollars like NMI, nor is it in the market offering a competing product to NMI.  Therefore, in my opinion, Facebook's alleged internal use of NMI's purported trade secrets does not pose a threat to any potential future investments by potential investors in NMI.

5.    In my opinion, the alleged harm caused by Facebook's own internal use of NMI's purported trade secrets is not irreparable because there are quantifiable measures of harm (i.e., damages remedies) to adequately compensate NMI for Facebook's alleged wrongful use of NMI's purported trade secrets (e.g., lost software license fee or reasonable royalty).  Dr. Putnam does not consider any of these established ways to quantify harm in his report.

---

[1] Justia.com, "Actual and Proximate Cause" (https://www.justia.com/injury/negligence-theory/actual-and-proximate-cause/).  I understand the proximate cause standard requires that the alleged wrongful acts are the primary cause of the plaintiff's purported harm in as much as "the injuries were the natural and direct consequence of the proximate cause, without which the injuries would not have occurred."

[2] Declaration of Dr. Jongsoo Park in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction, dated April 23, 2020  ("Park Declaration") at ¶¶ 10-11.

**DECLARATION OF R.C. ANDERSON**                    **HIGHLY CONFIDENTIAL**
**CIVIL ACTION NO: 20-10444**                              **FILED UNDER SEAL**

6.      Based upon my review of the documents and data produced by the parties in this matter as well as my review of publicly-available information, I have not seen documents or data suggesting that Facebook's alleged display of computer source code purportedly embodying Plaintiff's trade secrets has harmed NMI, or would harm NMI in the future.  I understand that the source code at issue was posted on November 1, 2019 and then taken down in March 2020.  Even though the allegedly secret source code was posted on a public forum for almost five months, I have seen no information supporting Dr. Putnam's opinions that NMI has lost any customers, market share, revenue or financing opportunities.  Moreover, in order for Dr. Putnam to opine that such harms are likely to occur in the future absent the requested injunctive relief, he is required to make numerous implausible assumptions about events that must occur pending trial on the merits, none of which are likely to occur.  Accordingly, Dr. Putnam has not cited to any information that suggests any of the irreparable harms that he points to in the abstract for a seed-stage startup are actually likely to occur absent an injunction.

7.      ***Balance of Hardships***:  In my opinion, should the Court enjoin Facebook from using NMI's alleged trade secrets, Facebook is likely to suffer greater harm and hardship than NMI will if the Court does not issue a preliminary injunction.  As previously explained, NMI will not be irreparably harmed if the Court denies NMI's request for a preliminary injunction.  However, if the Court broadly enjoins Facebook as NMI requests, including enjoining Facebook from legitimate use of sparse matrix multiplication and neural networks that were developed before Dr. Zlateski arrived at Facebook, the impact to Facebook is likely to be far reaching and significant and markedly larger than the potential harm (i.e., damages) NMI will suffer from Facebook's alleged unauthorized use.

## III.    QUALIFICATIONS

8.      I have earned a Master of Business Administration degree with a concentration in Finance and Accounting from Texas A&M University and a Bachelor of Arts degree in Economics from the University of Texas at Austin.  For the past 20 years, I have worked as a financial professional, including as a consultant on licensing, economic damages, valuation, and forensic accounting.  In addition to my consulting experience, I analyzed the financial, operational and clinical impacts of

offering new medical technologies for Houston Methodist Hospital and worked as a financial analyst for an international oilfield equipment manufacturer.

9.      Following my experience as a financial analyst in the medical and oil and gas industries, I have primarily worked for clients and counsel on intellectual property ("IP") consulting and complex commercial dispute projects.  My consulting projects have included providing economic and valuation analyses in support of licensing negotiations, and determination of economic damages in patent, trademark, trade dress, copyright, and trade secret disputes.  I have served as a licensing consultant for inventors, corporate licensors, as well as for research organizations and non-profits such as California Institute of Technology, Texas Scottish Rite Hospital for Children and the University of Texas, among others.

10.     I also hold several professional certifications and credentials relevant to my consulting work.  Specifically, I am a member of the Licensing Executives Society ("LES")[3] and have earned the Certified Licensing Professional ("CLP")[4] credential administered by that organization. I am also a member of the Institute of Management Accountants and hold the Certified Management Accountant[5] and Certified Financial Manager[6] credentials administered by that organization.[7] I am

---

[3] Established in 1965, the LES is a professional society comprised of nearly 5,000 members engaged in the transfer, use, development, manufacture and marketing of intellectual property.  LES is a member society of the Licensing Executives Society International, Inc., with a worldwide membership of over 9,000 members in 30 national societies, representing over 90 countries.  (www.lesusacanada.org)

[4] The CLP program "is a professional designation intended to distinguish those who have demonstrated experience, proficiency, knowledge and exposure to licensing and commercialization of intellectual property through involvement in patenting, marketing, valuation, IP law, negotiation, and intellectual asset management." (www.licensingcertification.org)

[5] Certified Management Accountant (CMA) is a certification in financial accounting and strategic management. CMA is a globally recognized credential with a special focus on corporate finance and management accounting. This professional certification is offered by the Institute of Management Accountants (IMA). Institute of Certified Management Accountants (ICMA) is a division within IMA which awards CMA certification.

[6] A Certified Financial Manager is a professional accounting designation for individuals who have passed the CFM exam and met the Institute of Management Accountants requirements. Candidates must complete a bachelor's degree in accounting, finance, or degree with similar course work including financial and economic concepts related to managing and operating a business including management, managerial accounting, corporate finance, ethics, and decision-making. They must also obtain at least two years of professional or managerial experience. In addition to the formal education requirements, candidates must pass the four-part exam and the written communication requirements before accreditation is granted.

[7] The IMA is one of the top associations for financial professionals. The IMA's mission is education and development in management accounting and finance, advocacy of the highest ethics and best business practices, and providing a forum for research. The IMA is a global membership association of accountants and financial professionals who work at nonprofit, private and public companies, and academic institutions (www.imanet.org).

**DECLARATION OF R.C. ANDERSON**                    **HIGHLY CONFIDENTIAL**
**CIVIL ACTION NO: 20-10444**                       **FILED UNDER SEAL**

also a member of the National Association of Certified Valuators and Analysts ("NACVA") and have earned the Certified Valuation Analyst ("CVA") designation granted by the organization.[8]

11.     I attend and am active in the litigation, damages, and licensing programs of the Intellectual Property Owner's Association and LES and have given presentations on topics related to IP and commercial damages through programs offered by the Texas Society of Certified Public Accountants (Houston Chapter), Institute of Management Accountants (Houston Chapter), ABA, and LES, among others.  In addition, I have made several damages presentations to law firms and corporations in Dallas, Houston, Washington D.C., and St. Louis, as well as internal training presentations for employees of StoneTurn on economic damages.

12.     A copy of my current curriculum vitae, which summarizes my qualifications and professional experience and lists my expert designations, and testimony over the preceding four years, is attached as **Schedule 1.0**.

13.     StoneTurn charges $525 per hour for time I spend consulting and assessing damages and time that may be spent testifying related to my damages analysis.  Neither my, nor my staff's, nor StoneTurn's compensation is affected in any way by either the conclusions I have reached or the outcome of this lawsuit.

## IV.     INFORMATION CONSIDERED

14.     I considered information from a variety of sources, including (i) information submitted by Neural Magic in support of its Motion for Preliminary Injunction including the accompanying declarations and exhibits; and (ii) information from independent research.

---

[8] NACVA, an organization comprised of more than 7,000 CPAs and other valuation and consulting professionals, supports the users of business and intangible asset valuation services and financial forensic services, including damages determinations of all kinds and fraud detection and prevention, by training and certifying financial professionals in these disciplines. NACVA trains and certifies CVAs to perform business valuations as a service to both the consulting community and the users of their services. Through training and rigorous testing, CVAs demonstrate they are qualified to provide capable and professionally executed valuation services. NACVA's valuation designations, including the CVA designation, are the only valuation credentials accredited by the National Commission for Certifying Agencies. (www.nacva.com.)

15.     The information I obtained through independent research includes information from the American Institute of Certified Public Accountants ("AICPA"), the U.S. Securities and Exchange Commission ("SEC"), trade press, and other publicly available sources.

16.     In addition, I have considered information contained in the declarations of Dr. Jongsoo Park and Mr. Nicholas Wong.

17.     The information I have considered is listed in the footnotes and other citations contained in this declaration.  I reserve the ability to consider further discovery in this case, including, for example, declarations, transcripts of depositions, and documents produced, if any.


## V.     BACKGROUND

18.     In the paragraphs below, I explain the relevant facts in this matter as I understand them. My understanding of these facts has been informed by, and is based on, the pleadings, declarations, and documents that are part of the record in this matter, as well as publicly available information.

### A.     Neural Magic, Inc. ("NMI")

19.     Based in Somerville, Massachusetts, I understand that NMI was founded in 2017 or 2018 by MIT professor Nir Shavit and MIT computer scientist Alex Matveev.[9]  I understand that Mr. Shavit and Dr. Matveev founded NMI with the goal of making "the power of deep learning simple, accessible, and affordable for anyone" through the development of "algorithms that enable convolutional neural networks to run on commodity [central processing units (CPUs)] – at [graphics processing unit (GPU)] speeds and better."[10]  As explained in more detail in subsequent

---

[9] Complaint at 1; Venture Beat, "Neural Magic raises $15 million to boost AI inferencing speed on off-the-shelf processors," Wiggers, Kyle, November 6, 2019 (https://venturebeat.com/2019/11/06/neural-magic-raises-15-million-to-boost-ai-training-speed-on-off-the-shelf-processors/); BostInno, "MIT Spinoff Neural Magic Snags $15M to Take on Hardware Industry Heavyweights," Kalyanaraman, Srividya (https://www.americaninno.com/boston/bostinno-bytes/mit-spinoff-neural-magic-snags-15m-to-take-on-hardware-industry-heavyweights/). (It is worth noting that the Complaint in this matter states that NMI was founded in 2017; however, the Venture Beat and BostInno articles state the company was founded in 2018.)
[10] https://neuralmagic.com/about/.

**DECLARATION OF R.C. ANDERSON**                                   **HIGHLY CONFIDENTIAL**
**CIVIL ACTION NO: 20-10444**                                          **FILED UNDER SEAL**

sections, I understand this "idea" as described by Dr. Putnam is the concept around which NMI was founded and what it hopes to exploit and eventually bring to market.[11]

20.     Industry articles quoting NMI personnel indicate that NMI's goal is to "take[] on industry heavyweights—NVIDIA, AMD, Asus and more—" that manufacture "specialized accelerators" and graphics processing units ("GPU") used for "machine learning" and "deep learning workloads."[12]   I understand the company's concept is to effectively make GPU's manufactured by "industry heavyweights" obsolete by virtually transferring the same computing power to less expensive central processing units ("CPU") using computer software.

i.     The "Technological Asset"

21.     Dr. Putnam, relying solely on the allegations in the Complaint, describes a "set of algorithms" NMI purportedly developed as a "technological asset."[13]   According to the Complaint, these algorithms are how NMI supposedly converted "the idea into an asset.[14]   The Complaint alleges that these algorithms "result from many years of research on parallel computing at MIT" and are "encompassed within a single neural network execution (or run-time) engine."[15]   The Complaint alleges that these algorithms are a critical part of NMI's attempt to commercialize NMI's "idea" of enabling "'deep learning' models…to run efficiently on general purpose" CPUs. For discussion purposes in this declaration, I refer to this "set of algorithms" as the "NMI Algorithms."

22.     According to the Complaint, NMI protects its purported intellectual property (i.e., the NMI Algorithms) by keeping them secret.   Dr. Putnam also asserts that secrecy is the means by which NMI prevents competitors from using the NMI Algorithms.[16]   I understand that relying upon secrecy to exclude others from using the NMI Algorithms is predicated on the notion that others

---

[11] *See*, generally, Putnam Declaration at 6-7, 16, 36.  (Dr. Putnam repeatedly uses the term "idea" to describe the bases for founding startups, and in his words, "the reason for forming a startup is to create a vehicle by which to bring that new idea to market.")

[12] BostInno, "MIT Spinoff Neural Magic Snags $15M to Take on Hardware Industry Heavyweights," Kalyanaraman, Srividya (https://www.americaninno.com/boston/bostinno-bytes/mit-spinoff-neural-magic-snags-15m-to-take-on-hardware-industry-heavyweights/).

[13] Putnam Declaration at 9. (The Oxford dictionary definition of an algorithm is "a process or set of rules to be followed by calculations or other problem-solving operations, especially by a computer.")

[14] Putnam Declaration at 7, 9-10.

[15] Putnam Declaration at 9-10.

[16] Putnam Declaration at 30.

cannot reverse engineer or otherwise decode the underlying processes and rules written into the software code of the runtime engine.

23.     These purported trade secrets do not convey to NMI the right to exclude potential competitors from entering the market or from copying or otherwise exploiting its "idea," as would be the case with a patent.  NMI's exclusivity, if any, could only exist to the extent that the NMI Algorithms are secret, difficult to uncover or reproduce and were not previously known.

### ii.     Inference Engine 1.0

24.     I understand that NMI describes its first product as the "Inference Engine 1.0" ("Inference Engine").  A BostInno article indicated that NMI "plans to sell software subscriptions [packaged as] downloadable products priced based on the computational capacity needed."[17]   However, I further understand that, despite being in business for roughly three years, NMI has not commercialized the Inference Engine (or any other product), has not developed any paying customers, and has not earned any revenue from the sale of any products.[18]  Based on the available information, including NMI's own website, it is unclear as to if and when NMI intends to release the Interface Engine as well as the market in which NMI plans to participate, its potential target customers, or the competitors against whom it will compete for sales and market share.

### iii.     The Market for NMI Inference Engine

25.     Although not stated explicitly, NMI presumably views itself as a competitor in the market for optimization software for Artificial Intelligence ("AI") systems, otherwise known as the "deep learning market."[19]   Several competitors currently inhabit this market and are working to satisfy, or create, the demand, if any, for products and services related to deep learning.  Unlike NMI, some of these companies are relatively established, having a defined product/service for sale that

---

[17] BostInno, "MIT Spinoff Neural Magic Snags $15M to Take on Hardware Industry Heavyweights," Kalyanaraman, Srividya (https://www.americaninno.com/boston/bostinno-bytes/mit-spinoff-neural-magic-snags-15m-to-take-on-hardware-industry-heavyweights/).
[18] Putnam Declaration at 34, 37 and Figure 1.
[19] Venture Beat, "Neural Magic raises $15 million to boost AI inferencing speed on off-the-shelf processors," Wiggers, Kyle, November 6, 2019 (https://venturebeat.com/2019/11/06/neural-magic-raises-15-million-to-boost-ai-training-speed-on-off-the-shelf-processors/).  Based upon the CapitalIQ™ database, the primary industry classification for NMI is Application Software; however, CapitalIQ did not assign, or otherwise associate, any Standard Industrial Classification (SIC) codes to NMI.

generates revenue.[20]  Notably, Facebook is not a competitor in this market.  I understand market participants include, at least, the following companies:[21]

- Skymind[22];

- Indico[23];

- HyperVerge[24];

- Realityengines.AI[25];

- Deeplite[26];

- Unitx[27]; and

- Clarifai.[28]

      iv.     <u>NMI Pre-Seed and Seed Funding Investors</u>

26.     In late February 2018, NMI raised $5 million in a pre-seed round of investment from Pillar VC, Andreessen Horowitz and New Enterprise Associates based on a post-money valuation of $13.5 million.[29]  Subsequently, in November 2019, NMI raised $15 million through a seed round from an investment group "led by Comcast Ventures with participation from NEA, Andreessen Horowitz, Pillar VC, and Amdocs Ventures."[30]  The $15 million investment was earmarked to hire

---

[20] See, e.g., https://www.darwinai.com/index.html and https://www.welcome.ai/skymind.

[21] https://www.owler.com/company/darwinai.

[22] https://www.welcome.ai/skymind,

[23] https://indico.io/about/#our-story

[24] https://www.hyperverge.co/.

[25] https://realityengines.ai/.

[26] https://www.deeplite.ai/.

[27] https://unitx.tech/.

[28] https://www.clarifai.com/.

[29] Declaration of Bryan House in Support of Neural Magic's Motion for Preliminary Injunction, dated April 9, 2020 ("House Declaration") at 5.

[30] BostInno, "MIT Spinoff Neural Magic Snags $15M to Take on Hardware Industry Heavyweights," Kalyanaraman, Srividya (https://www.americaninno.com/boston/bostinno-bytes/mit-spinoff-neural-magic-snags-15m-to-take-on-hardware-industry-heavyweights/); Venture Beat, "Neural Magic raises $15 million to boost AI inferencing speed on off-the-shelf processors," Wiggers, Kyle, November 6, 2019 (https://venturebeat.com/2019/11/06/neural-magic-raises-15-million-to-boost-ai-training-spee-on-off-the-shelf-processors/).

**DECLARATION OF R.C. ANDERSON**           **HIGHLY CONFIDENTIAL**
**CIVIL ACTION NO: 20-10444**               **FILED UNDER SEAL**

machine learning and software engineers as well as sales and marketing personnel and was based on a company valuation of $45 million.[31]

### B.   Facebook, Inc.

27.    I understand that Facebook was founded in February 2004 in Cambridge, Massachusetts.[32] Facebook is a Delaware corporation with its headquarters in Menlo Park, California.[33]  Facebook is widely known for its social networking platform of the same name.[34]  In addition, Facebook owns and operates subsidiaries such as Instagram, photo-sharing, video-sharing and social networking services, WhatsApp, a messaging application, and Facebook Technologies LLC, which manufactures Oculus virtual reality systems, portable video-calling devices and other products and services.[35]

28.    As of today, I understand that Facebook employs over 49,000 people in offices around the globe, 12,000 of whom are engineers.[36]  I understand that Facebook has a long history of working on machine learning and artificial intelligence.[37]  I further understand that while Facebook is widely recognized as a pioneer of machine learning and artificial intelligence, Facebook does not offer machine learning software for sale and does not market or sell its services as an AI consulting company as Neural Magic appears intent on doing once it releases its "Interface Engine."[38]  Instead, I understand that Facebook uses AI and machine learning, including neural networks, internally to enhance aspects of its services.[39]  For example, I understand that Facebook uses AI and machine learning internally to optimize its targeted advertising and social media offerings.[40]

---

[31] House Declaration at 5.
[32] Declaration of Nicholas Wong in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction, dated April 23, 2020 ("Wong Declaration") at ¶ 2.
[33] Wong Declaration at 1-2.
[34] Wong Declaration at 1-2.
[35] Wong Declaration at 1-2.
[36] Wong Declaration at 1-2.
[37] Park Declaration at ¶¶ 10-11.
[38] Park Declaration at ¶¶ 10-11; Shavit Declaration at 3-4; Facebook, Inc. Form 10-K for the fiscal year end ended December 31, 2019 at 7, 54.
[39] Park Declaration at ¶¶ 10-11.
[40] Park Declaration at ¶¶ 10-11.

**DECLARATION OF R.C. ANDERSON**                     **HIGHLY CONFIDENTIAL**
**CIVIL ACTION NO: 20-10444**                              **FILED UNDER SEAL**

## VI.    SUMMARY OF NMI's ALLEGATIONS AGAINST FACEBOOK

### A.    Publication of Source Code Embodying Trade Secrets

29.    NMI accuses Facebook of misappropriating its purported trade secrets by publishing source code containing said secrets on a website called GitHub in November 2019.[41]  According to NMI, this source code purportedly contains certain of NMI's Algorithms "in the form of [Facebook's] open source compiler" called "'Sparse GEMM JIT'."[42]  NMI alleges that the source code and compiler Facebook published on GitHub use the same NMI Algorithms as in NMI's "compiler code to achieve the same computational and storage efficiencies running on commodity hardware (CPUs)."[43]

### B.    Internal Use of Trade Secrets by Facebook

30.    NMI also alleges that Facebook is incorporating its trade secrets into Facebook's software to increase speed and performance in its "most popular neural network executions."[44]

## VII.    UNDERSTANDING OF NMI'S REQUEST FOR PRELIMINARY INJUNCTION

31.    I understand NMI has filed a motion requesting the Court for an order preliminarily enjoining Facebook and Mr. Zlateski from:[45]

- "Any further internal use of NMI's trade secrets, including NMI's confidential algorithms for sparse matrix execution;

- Any further public disclosure of NMI's trade secrets;

- Any further work by Mr. Zlateski involving Facebook business units connected to machine learning in any fashion, or other business units that would implicate NMI's trade secrets; and

- Any further breach of Mr. Zlateski's contractual obligations to NMI."

32.    I also understand NMI requests "an order requiring cooperation from Facebook in identifying and contacting GitHub users that accessed Neural Magic's trade secrets, and in removing any remaining remnants of Facebook's GitHub publications containing embodiments of

---

[41] Complaint at 9.
[42] Complaint at 10.
[43] Complaint at 10.
[44] Complaint at 9.
[45] NeuralMagic, Inc.'s Motion for Preliminary Injunction, dated April 9, 2020 ("NMI PI Motion") at 1.

Neural Magic trade secrets, as well as immediate return of any and all Neural Magic confidential information and documents in Defendants' possession."[46]

## VIII.   UNDERSTANDING OF LEGAL PRINCIPLES

33.     I am both familiar with and have been informed by counsel of the applicable standards for assessing whether a plaintiff will be, or has been, irreparably harmed if the Court does not grant a preliminary injunction.

34.     I understand that, to obtain a preliminary injunction, a plaintiff must show:  (1) a substantial likelihood of success on the merits; (2) a significant risk of irreparable harm if the injunction is withheld; (3) a favorable balance of hardships; and (4) whether granting or not granting the injunction is consistent with the public interest.

35.     Focusing on the irreparable harm prong, it is my understanding that a preliminary injunction is not warranted unless one adopts the assumption (which may or may not be warranted) that the district court is likely to issue a permanent injunction, and assuming those conditions, that the harm during the interim period is irreparable.

36.     In other words, to assess whether harm is irreparable, one must consider the adequacy of monetary remedies as a means of making the plaintiff whole during the interim period if the Court was to ultimately find the defendant liable for its alleged wrongful conduct.

37.     Thus, a critical aspect of assessing whether the anticipated harm is irreparable is whether the potential harm can be reasonably measured to compensate the plaintiff with monetary damages if the Court finds in its favor.

38.     As stated, while the focus of this declaration is directed to the irreparable harm prong, I also address the issues of balance of hardships within this declaration.

## IX.   IRREPARABLE HARM

### A.   Analysis of Dr. Putnam's Irreparable Harm Opinions

---

[46] NMI PI Motion at 2.

**DECLARATION OF R.C. ANDERSON**                    **HIGHLY CONFIDENTIAL**
**CIVIL ACTION NO: 20-10444**                    **FILED UNDER SEAL**

39.     Dr. Putnam concluded that if the Court does not enjoin Facebook from using NMI's purported trade secrets or from public disclosure of code that contains such purported trade secrets, NMI will be irreparably harmed.[47]   In Dr. Putnam's opinion, this harm will come in the form of, among other things: (i) loss of customer relationships; (ii) lost market share; (iii) price erosion, and; (iv) loss of future investment capital.[48]

40.     As further stated below, Dr. Putnam's opinions that NMI is likely to suffer the identified harm absent injunctions barring either (i) Facebook's internal use of NMI's alleged trade secrets, or (ii) Facebook's future publication of code that contains embodiments of NMI's alleged trade secrets, are unsupported and unsubstantiated, for following reasons:

> (i) Dr. Putnam's opinions regarding the harm that a hypothetical startup company like NMI could suffer if its trade secrets are misappropriated are all premised on the assumption that the misappropriation occurs by a competitor, because Facebook does not compete with NMI's planned future products, Facebook's internal use of NMI's alleged trade secrets cannot cause the harm Dr. Putnam opines could occur;

> (ii) Dr. Putnam fails to demonstrate that NMI has suffered any of the potential harms he identifies to date, despite the fact that Facebook's code allegedly embodying NMI's trade secrets was made publicly available approximately six months ago, and therefore does not explain why such harms are likely to occur between now and trial absent an injunction;

> (iii)  In order for any such harms to occur in the future, Dr. Putnam must make several assumptions about the future of NMI and a hypothetical competitor, all of which must come to pass before NMI could even theoretically suffer any of the harm he identifies, and none of which are supported by facts;

> (iv) Dr. Putnam fails to consider both the environment that NMI is currently operating in and the market it seeks to enter when determining the likelihood of harm absent an injunction; and

---

[47] Putnam Declaration at ¶ 55.

[48] Putnam Declaration at ¶¶ 57-60.  Dr. Putnam also made references to the potential loss of first mover advantage as a hypothetical harm that could befall a startup company as a result of misappropriation by a competitor (*id.* at ¶¶ 45-47) but did not opine that it was likely that NMI would suffer such harm in the absence of an injunction in the case-specific portion of his report (*id.* at ¶¶ 55-60).

(v) Dr. Putnam fails to consider the ways in which NMI can be compensated through money damages if it prevails in its claims against Facebook after trial.

**B.    Facebook and NMI Are Not Competitors**

41.    Dr. Putnam's opinions with respect to the irreparable harm that can occur to a startup if its trade secrets are misappropriated are predicated almost entirely on the presumption that the misappropriation occurs by a competitor, who unfairly uses those trade secrets to enter the market and compete with the startup for customers, market share, price, and investment dollars.  Thus, to the extent he opines that Facebook's internal use of NMI's purported trade secrets could cause the types of potential harm his report outlines, that opinion requires him to assume that NMI and Facebook are competitors in the same market and for the same customers.  This assumption is unsupported by any data or documents because Facebook does not compete with NMI or offer products in the market NMI seeks one day to enter.  NMI does not presently compete with any companies or have any customers or market share because it does not offer a commercial product or service of any kind for sale.  But even the proposed products that NMI seeks to offer (i.e., software solutions for use by companies that use machine learning) are not products that Facebook sells.[49]

42.    More specifically, I understand that Facebook does not offer machine learning software for sale and does not market or sell its services as an AI consulting company.[50]  Despite Dr. Putnam's accusations that Facebook is unlawfully using the NMI Algorithms, he has not identified a single Facebook product or service that will, or presently does, take sales from NMI when, or if, NMI succeeds in creating a commercially viable product.  Accordingly, as rebutted in detail below, each of Dr. Putnam's case-specific opinions about the harm that could befall NMI from Facebook's alleged internal use of its trade secrets are not supported by facts because Facebook's alleged _internal use_ is not for products or services that compete with NMI, and therefore cannot result in any lost customers, lost market share, price erosion, or threat to future funding for NMI, as Dr. Putnam hypothesizes.

---

[49] Park Declaration at ¶¶ 10-11.; Shavit Declaration at 3-4; Facebook, Inc. Form 10-K for the fiscal year end ended December 31, 2019 at 7, 54.
[50] Park Declaration at ¶¶ 10-11.

**DECLARATION OF R.C. ANDERSON**                                    **HIGHLY CONFIDENTIAL**
**CIVIL ACTION NO: 20-10444**                                             **FILED UNDER SEAL**

## C.      Analysis of Dr. Putnam's Measures of Irreparable Harm

43.      Dr. Putnam explains his case-specific irreparable harm opinions in only one brief section of his thirty-seven-page declaration.  Under the heading "Application to Neural Magic" (spanning fewer than five pages), Dr. Putnam lists and explains his opinions with respect to the various types of irreparable harm NMI will suffer if Facebook is not enjoined, including: (i) "Loss of customer relationships"; (ii) "Loss of market share"; (iii) "Price erosion"; (iv) "Future threats"; (v) "Facebook's unfair head start"; (vi) lost venture funding; and (vii) no feasible exit strategy.[51] According to Dr. Putnam, each of these threats to NMI "represent the prospect of a grave wound" to NMI.[52]  In the following paragraphs, I address each  type of irreparable harm in the same order they are presented in Dr. Putnam's declaration.

44.      To begin, Dr. Putnam generically describes these supposed threats to NMI as occurring "in the absence of an injunction," but makes no effort to link the different forms of requested injunctive relief to the purported avoidance of the harm he posits.  This is improper, because any potential harm to NMI absent the requested injunctive relief could be markedly different depending upon the different types of injunctive relief NMI asks the Court to order.  I understand from counsel that NMI has the burden of showing it will suffer irreparable harm absent the Court granting each of the different types of injunctive relief requested.  Accordingly, I have addressed each of his opinions about the potential for irreparable harm with respect to the two separate categories of injunctive relief requested, namely:  (i) prohibiting Facebook from any further internal use of its alleged trade secrets; and (ii) prohibiting Facebook from publicly displaying code that "reflects and relies upon" NMI purported trade secrets.[53]

i.      Preliminary Injunction Prohibiting Facebook Internal Use

a)      Lost Customer Relationships

45.      Dr. Putnam's opinion that NMI will lose customers to Facebook absent a preliminary injunction preventing Facebook's internal use of the alleged trade secrets is baseless and speculative.  Dr. Putnam postulates that "customers who might otherwise have dealt with an unknown quantity like Neural Magic" may instead choose to do business with Facebook, "a better-

---

[51] Putnam Declaration at 31-34.
[52] Putnam Declaration at 31.
[53] NMI PI Motion at 1.

**DECLARATION OF R.C. ANDERSON**                                    **HIGHLY CONFIDENTIAL**
**CIVIL ACTION NO: 20-10444**                                         **FILED UNDER SEAL**

known rival."[54]  As an initial matter, an injunction prohibiting Facebook's *internal use* of NMI's alleged trade secrets would have no influence on customers in the *external* market for NMI's future products.

46.     Facebook also does not sell algorithms or software, generally, or in competition with NMI, and I understand Facebook's *internal use* that NMI seeks to restrain is not for products (e.g., software) sold to third parties.  Further, NMI does not have any customers for its purported trade secrets (i.e., the NMI Algorithm) or for its purported product (e.g., Inference Engine) or service incorporating said trade secrets.  Accordingly, I have seen no information to support Dr. Putnam's opinion that enjoining Facebook's *internal use* of the alleged trade secrets pending a trial will result in any loss of customer relationships for NMI.

b)      Lost Market Share

47.     Dr. Putnam's opinion that NMI will lose market share to Facebook absent a preliminary injunction preventing Facebook's internal use of the alleged trade secrets is also baseless and speculative.  According to Dr. Putnam, as a consequence of losing customers to Facebook—as he previously suggested—NMI will lose sales, "which necessarily implies a reduction in market share."[55]  Again, an injunction prohibiting Facebook's *internal use* of NMI's alleged trade secrets would have no influence on customers, or market share, in the *external* market for NMI's future products.

48.     Dr. Putnam proposes this thesis despite acknowledging that NMI does not have a share of any market because it does not have any commercially viable products.  In addition, Dr. Putnam does not even identify NMI's target market for which it seeks to gain a share or the potential customers NMI plans to target.

49.     Finally, it bears repeating that Facebook does not sell algorithms or software, generally, or in competition with NMI, and I understand Facebook's *internal use* that NMI seeks to restrain is not for products sold to third parties.  Accordingly, I have seen no information to support Dr. Putnam's opinion that enjoining Facebook's *internal use* of the alleged trade secrets pending a trial will result in any loss of market share for NMI.

---

[54] Putnam Declaration at 31.
[55] Putnam Declaration at 31.

c)    Price Erosion

50.    Dr. Putnam's opinion that NMI will suffer an erosion of its prices as a result of Facebook's *internal* use of its alleged trade secrets is baseless and speculative.  According to Dr. Putnam, NMI "must compete with a competitor whose price is zero."[56]  Based on this theory, Dr. Putnam's opinion with respect to price erosion derives from NMI's desire to enjoin Facebook from displaying its alleged secrets and not NMI's request to restrain Facebook's *internal use*.  The premise that Facebook's internal use has, or will, erode NMI's prices for its future products is illogical and economically unsound.

51.    To the extent that Dr. Putnam is of the opinion that Facebook's *internal use* of NMI's purported trade secrets will result in price erosion, that opinion could only result from at least three plainly false assumptions, namely:  (i) that Facebook and NMI are competitors for NMI's future products (ii) that Facebook sells algorithms or software in competition with NMI; and (ii) that NMI sells its purported trade secrets (i.e., the NMI Algorithm) or a product (e.g., Inference Engine) or service incorporating said trade secrets.  Notably, Dr. Putnam provides no factual support for any of these assumptions.

d)    Future Threats

52.    Dr. Putnam's theory of future threats is illogical and speculative in the context of NMI's request to the Court to enjoin Facebook from future *internal use* of its alleged trade secrets. Dr. Putnam's opinion that NMI will be irreparably harmed if Facebook displays code that purportedly embodies certain of NMI's undefined trade secrets (discussed in greater detail below) has no connection to NMI's demand that Facebook stop using the purported secrets for *internal* purposes.

e)    Facebook's Unfair Head Start

53.    Despite following under the same "Application to Neural Magic" heading in his declaration as the preceding subheadings, Dr. Putnam does not state whether NMI will be irreparably harmed if Facebook is not enjoined from *internally* using NMI's purported trade secrets.  Instead, Dr. Putnam proposes four unsupported theories to suggest what Facebook's motivations were for allegedly displaying NMI's purported trade secrets.  None of these theories support his opinion

---

[56] Putnam Declaration at 31.

**DECLARATION OF R.C. ANDERSON**                    **HIGHLY CONFIDENTIAL**
**CIVIL ACTION NO: 20-10444**                              **FILED UNDER SEAL**

that NMI will be irreparably harmed if Facebook is enjoined from its *internal use* of NMI's alleged trade secrets.

54.     Dr. Putnam first proposes an entirely unfounded theory that Facebook somehow weighed the "loss it perceive[d] itself to confront from Neural Magic's demand" against "the gain to Facebook from its ongoing open-source inducement."[57]  This theory, in his opinion, is supported by "Facebook's unwillingness to remove trade secret material for eight weeks."  Dr. Putnam goes on to speculate that Facebook's purported "decision [not to remove NMI's secrets from GitHub] itself indicates that the trade secret information is highly valuable to Facebook, albeit not as a secret."[58]  Dr. Putnam's speculation as to Facebook's purported motives for not removing source code from GitHub is not pertinent to an analysis of potential harm to NMI.  I have reviewed the correspondence between counsel for NMI and counsel for Facebook regarding NMI's request that Facebook ask GitHub to remove the accused code, and contained therein is a far simpler explanation than Dr. Putnam's unsupported speculation about Facebook's motives:  namely, that Facebook did not believe the accused code contained any of NMI's trade secrets.[59]

55.     Dr. Putnam's second unsubstantiated theory for why Facebook allegedly did not "remove the trade secret material" is that failing to remove the code somehow gave Facebook an unfair advantage over NMI and "that unfair advantage grows by the day."  His theory surrounding Facebook's supposed activities "to capitalize on its unfair head start in ways that may cut off Neural Magic's business"[60] is also not only baseless and speculative but also says nothing about how an injunction against Facebook's *internal use* of certain alleged trade secrets will irreparably harm NMI.

56.     Dr. Putnam's third unproven theory for why Facebook allegedly did not "remove the trade secret material" is that "Facebook seeks to transform the technology startup lifecycle from one of market exclusivity, possessed by Neural Magic, to one of imitation and competition…" that will benefit Facebook and harm NMI.[61]  Dr. Putnam's theory that Facebook is a saboteur of the

---

[57] Putnam Declaration at 32.
[58] Putnam Declaration at 32.
[59] Declaration of Patrick Curran in Support of Plaintiff Neuralmagic, Inc.'s Motion for Preliminary Injunction, dated April 9, 2020 Decl., Exs. 2-16.
[60] Putnam Declaration at 37.
[61] Putnam Declaration at 33.

"technology startup lifecycle" is also baseless and speculative and says nothing about how an injunction against Facebook's *internal use* of certain alleged trade secrets will irreparably harm NMI.

57.     Dr. Putnam's fourth unsupported theory involves Facebook's alleged internal use of NMI's purported trade secrets.   Under this theory, Facebook stands to gain "functionality and speed improvements of its current CPU hardware" that are "likely valued in the tens or hundreds of millions, if not billions" of dollars.[62]   Once again, this theory is baseless and speculative and says nothing about how an injunction against Facebook's *internal use* of certain alleged trade secrets will irreparably harm NMI.   On the contrary, should NMI prevail at trial, and demonstrate that Facebook benefitted from the internal use of NMI's trade secrets, it could be adequately compensated through a reasonable royalty or license fee.   But because that internal use would not result in external competition for NMI's hypothetical future products, none of the categories of harm Dr. Putnam identifies are likely, or even plausible.

f)     Prospect of Lost Venture Funding

58.     Dr. Putnam's opinion that absent an injunction against Facebook's internal use of NMI's purported trade secrets, NMI will have a reduced ability to meet performance milestones[63] and risk losing out on second round financing is baseless and speculative.   The suggestion that NMI's current and potential investors will avoid future investments as a result of Facebook's *internal use* of NMI's purported trade secrets is unsubstantiated and overly simplistic.   All of Dr. Putnam's generic opinions about the threat that potential trade secret misappropriation can have on an early-stage business are predicated on the premise that a potential *competitor* misappropriates trade secrets and enters the market, removing the various advantages that market exclusivity could bring, including the continued ability to raise funding.[64]   There is no economic basis for an opinion that, unless Facebook is enjoined from using these purported trade secrets internally, NMI will lose its ability to hit performance milestones, beat competitors to the market, secure a first mover

---

[62] Putnam Declaration at 33.

[63] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████ (House Declaration at 6.)
However, I am not aware of any information providing support as to why disclosure of the NMI Algorithms would impact the project timeline related to the internal software development of the NMI product or, if it did, the reasons for how it did so and the length of the delay caused by this disclosure.

[64] Putnam Declaration at 16-28, 30-34.

**DECLARATION OF R.C. ANDERSON**                    **HIGHLY CONFIDENTIAL**
**CIVIL ACTION NO: 20-10444**                       **FILED UNDER SEAL**

advantage, or secure another round of investor funding.  Dr. Putnam has not identified any specific information about NMI's investors or its efforts to raise capital that support his opinion, and none of his generic opinions about the harm that could befall a hypothetical startup company from trade secret misappropriation from a competitor apply in the case of Facebook's internal, non-competitive use of NMI's purported trade secrets.

g)      No Feasible Exit Strategy

59.     Along the same lines as his "lost venture funding" theory, Dr. Putnam postulates that NMI and investors "face the longer-term prospect that it possesses no feasible exit strategy."[65]  Again, Dr. Putnam does nothing to explain why Facebook's _internal use_ of NMI's purported trade secrets during the pendency of litigation could have any effect on the longer-term prospect or exit strategy of NMI.  There is no basis to make such a connection, because Facebook does not compete with the market NMI one day hopes to enter.  So when Dr. Putnam opines that "future investors can foresee . . . the same rivalry from Facebook," to the extent he is implying that Facebook would be competitors with NMI and thus harm its ability to enter or succeed in the market, that opinion has no support in fact or economics.

60.     In sum, all of the case-specific opinions Dr. Putnam has about the potential for irreparable harm that NMI faces have no connection whatsoever to the requested injunction against Facebook's _internal use_ of NMI's purported trade secrets until a trial on the merits.  This is because Dr. Putnam's entire report and analysis is predicated on the potential effect on an early-stage company should a <u>competitor</u> misappropriate its trade secrets, and thus erode the benefits of market exclusivity, first mover advantage, and fund-raising capability.  None of those potential pitfalls apply to Facebook's _internal use_ of NMI's trade secrets, as it is not a competitor in the market NMI one day seeks to enter.

ii.     <u>Preliminary Injunction Prohibiting Facebook Display of Additional Trade Secrets</u>

61.     In additional to failing to demonstrate how an injunction against Facebook's internal use of NMI's purported trade secret will result in irreparable harm, Dr. Putnam has not provided sufficient economic basis to support his opinion that NMI is likely to suffer such harm unless

---

[65] Putnam Declaration at 34.

Facebook is enjoined from posting any code that NMI alleges "contains embodiments" of some of NMI's purported trade secrets, for several reasons.  As explained in the preceding sections, all of the potential harms Dr. Putnam opines could occur to a startup like NMI, including loss of customer relationships, loss of market share and first mover advantage, price erosion and threats to future funding, are predicated on two key assumptions:  (i) that NMI derives substantial value from the allegedly misappropriated trade secrets, and (ii) that such trade secrets are misappropriated by a competitor who uses that information to harm the NMI's ability to compete in its desired market.  In order for Dr. Putnam to opine that the latter is likely to come true absent an injunction, at least six different assumptions about the future need to be made, including:  (i) Facebook will publicly re-post the offending code, or some other code that "contains embodiments" of NMI's purported trade secrets; (ii) a potential competitor will discover the code; (iii) that same competitor will be able to uncover the NMI trade secrets that are allegedly embodied in the code and understand their significance; (iv) that same competitor will then be able to use the purported NMI trade secrets to develop and bring a commercial product to market; (v) that NMI is ultimately successful in bringing a commercial product to market based on the same purported trade secrets, and (vi) the competitor's product is successful thereby causing NMI to lose customer relationships, market share, suffer price erosion, and/or lose investment capital.

62.     Each of these things must occur in the future in order for NMI to even be at risk of suffering the types of harm Dr. Putnam opines could occur, yet he does not provide sufficient data, documents, or economic analysis to support that any are likely to occur absent the injunction against Facebook posting the accused code in the future.  Furthermore, while Dr. Putnam does not explicitly state that NMI's potential future customers might gain the benefit of its trade secrets from Facebook's code, such an assumption is equally implausible given the facts available to me.  NMI has been operating for approximately three years and has been unable to create a commercial product from its purported trade secrets.  Just as it is implausible that a prospective competitor will succeed in creating a machine learning product out of purported NMI trade secrets in Facebook's open source code, it is equally, if not more, implausible that a prospective customer would do so.

63.     As an example, one of the future assumptions that must come true for the vast majority of the harm Dr. Putnam identifies to come to pass for NMI is that NMI itself is able to develop a commercial product and create a market for that product.  Yet, NMI has been in existence since

2017 and has not been successful at creating a single commercial product or generating any customers or revenue.  Furthermore, Dr. Putnam misleadingly presents graphs of the lifecycle of a hypothetical startup that suffers from trade secret misappropriation, and then later suggests that such harm is likely to befall NMI without the injunctive relief requested.  These graphs are misleading, in part, because they are highly atypical outcomes for startup companies like NMI, and therefore are not representative of what is likely to occur in the future for a startup company in NMI's position.

64.     On the contrary, the "typical" life cycle of an early-stage startup like NMI has been extensively studied and well documented in the academic literature and is commonly described as the "Valley of Death" curve.  That term is used to "dramatize the particular challenges facing entrepreneurs engaged in the transition from invention to innovation" characterized by the "shortfall of resources" that early-stage startups must overcome.[66]  Although there are several variants of the basic illustration in use, all describe the same broad stages of the lifecycle of an early stage venture.[67]  **Figure 1** below is an example from the Graduate School of Management at the University of California at Davis ("UC Davis").  The UC Davis graphic illustrates that the "valley" is a metaphor for the negative cash flow position of seed-stage companies, and the high risk and likelihood of failure that such companies face for a host of potential reasons[68]:

---

[66] National Institute of Standards and Technology, "Between Invention and Innovation: An Analysis of Funding for Early-Stage Technology Development," November 2002, Branscomb, Lewis M., et al.

[67] National Institute of Standards and Technology, "Between Invention and Innovation: An Analysis of Funding for Early-Stage Technology Development," November 2002, Branscomb, Lewis M., et al.

[68] Investopedia, "Death Valley Curve," Fernando, Jason, October 20, 2019 (https://www.investopedia.com/terms/d/death-valley-curve.asp).  Investopedia gives an alternate definition, "the period in the life of a startup in which it has begun operations but has not yet generated revenue. It is commonly used among venture capitalists (VCs)."

**Figure 1: Lifecycle of a Startup**



65.     Based upon my review of the information concerning NMI in and attached to Dr. Putnam's declaration, as well as publicly-available information, NMI is squarely in the "Valley of Death." The large majority of companies in NMI's position never make it to a position of substantial revenue growth and net positive cash flow and ultimately cease to exist.  Given that most of the harm identified by Dr. Putnam is premised upon NMI reaching a future stage of commercial production of a product and substantial revenue generation, which most companies in its position never reach, his opinion that NMI is likely to suffer such harms absent an injunction is unsupported by the academic literature regarding startups in NMI's position.

66.     In addition, Dr. Putnam does not give any current or past examples of harm that NMI has suffered in the six months since its purported trade secrets were made public.  He has not, for example, identified any supposed customer relationships or market share that NMI has lost since

**DECLARATION OF R.C. ANDERSON**                    **HIGHLY CONFIDENTIAL**
**CIVIL ACTION NO: 20-10444**                       **FILED UNDER SEAL**

the accused code has been exposed to the public, any price erosion it has suffered, or any fundraising opportunities it has lost.

67.     In contrast to Dr. Putnam, the information I have reviewed in this matter to date contradicts his conclusions.  I understand that Facebook first posted the accused code on November 1, 2019, and it remained posted until March 22, 2010, almost five full months.  If Dr. Putnam's hypothesis about the technological importance and market value of NMI's purported trade secrets was correct, I would expect NMI and/or Dr. Putnam to identify at least one player seeking to convert these purported trade secrets into a competitive machine learning product consistent with the threat Dr. Putnam postulates will occur absent an injunction against future posting of the Facebook's code that allegedly contains embodiments of those trade secrets.

68.     Dr. Putnam's opinion that NMI will lose out on future financing absent an injunction is supported only by his own speculation surrounding the opinions, intentions, characteristics and motivations of non-specified seed-stage investors.  Despite the fact that NMI has, including recently, received funding from investors, Dr. Putnam includes no information or analyses to support his position that, but for the injunction against future posting of Facebook's code, NMI will struggle to raise future funding.  His analysis describes the intentions and motivations of investors, generically, only in the abstract.  Dr. Putnam does not, however, attempt to explain the intentions, opinions or motivations of NMI's actual investors or how its investors determined the value of NMI.  In fact, he did not refer to a single business plan, presentation, memorandum of understanding, or other document customarily prepared and shared by start-up companies to solicit capital from investors.[69]  As previously explained, NMI received investment capital from no less than five institutional investors as recently as November 2019, and in my experience, seed-stage investors would have likely required NMI to prepare and present these types of documents as part of their due diligence and decision-making processes.  In fact, it is common for companies seeking investment capital to pitch their technology to several investors before finalizing a deal.[70]

---

[69] Forbes.com, "How Funding Rounds Work for Startups," Cremades, Alejandro (https://www.forbes.com/sites/alejandrocremades/2018/12/26/how-funding-rounds-work-for-startups/#4f03ba3d7386).
[70] Forbes.com, "How Funding Rounds Work for Startups," Cremades, Alejandro (https://www.forbes.com/sites/alejandrocremades/2018/12/26/how-funding-rounds-work-for-startups/#4f03ba3d7386).

69.     Dr. Putnam's failure to rely upon these types of documents to assess the likelihood that NMI will be irreparably harmed is notable.  The premise of Dr. Putnam's irreparable harm analysis is that the code posted by Facebook contains embodiments of NMI's core trade secrets that are the "technological asset" that formed the basis for previous investors to decide to invest in the company.  Based on my training and experience, if that premise is correct, then these core assets (as opposed to projected future sales or cash flow) would have been the centerpiece of NMI's and its investors financing negotiations.  Consequently, the link (i.e., nexus) between the purported loss/diminution of these assets and the irreparable harm claimed by Dr. Putnam should have been straightforward for Dr. Putnam to demonstrate.  I would expect the facts and data demonstrating this link to be plainly outlined in the funding documents and presentations that NMI made to its investors and the purported trade secrets revealed in the accused Facebook code.[71]  That he has not made this link suggests that it does not exist.  As a result, Dr. Putnam has not supported his opinion with sufficient facts or data, nor has he reliably applied the principles and methods underlying his opinions to the facts of the case.

### D.      Dr. Putnam Fails to Consider the Effective of the Existing Competition in NMI's Target Market

70.     Dr. Putnam also fails to analyze the effect of NMI's competition with other companies in the deep learning market if and when NMI does eventually complete and release a commercial product.  As discussed above, the computing market that NMI is attempting to enter is crowded.  There are several software companies in the deep learning market and, in fact, several have already released a commercial product for sale.[72]  Further, based upon NMI's intent to reduce the need for GPUs with software, I understand that computer hardware industry heavyweights – including, "NVIDIA, AMD, Asus and more" – are also in competition with NMI, albeit with hardware-based solutions.[73]

---

[71] Forbes.com, "How Funding Rounds Work for Startups," Cremades, Alejandro (https://www.forbes.com/sites/alejandrocremades/2018/12/26/how-funding-rounds-work-for-startups/#4f03ba3d7386).

[72] See the list of companies in *The Market for NMI Inference* Engine section, including, for example, Skymind, Indico, HyperVerge and Realityengines.AI, among others.

[73] BostInno, "MIT Spinoff Neural Magic Snags $15M to Take on Hardware Industry Heavyweights," Kalyanaraman, Srividya (https://www.americaninno.com/boston/bostinno-bytes/mit-spinoff-neural-magic-snags-15m-to-take-on-hardware-industry-heavyweights/).

71.     Given the crowded market and competition NMI will face if and should it eventually release a commercial product for sale, Dr. Putnam cannot establish that absent an injunction against Facebook's posting of code that allegedly embodies its trade secrets, NMI is likely to suffer the harm he outlines in his report, namely lost customers, lost market share, price erosion, and lost investment capital.  At a minimum, Dr. Putnam's failure to consider the environment and the market NMI seeks to compete in renders his analysis unreliable and speculative.

### E.     Dr. Putnam Fails To Consider Methods Of Quantifying The Purported Harm

72.     Dr. Putnam's analysis of purported irreparable harm is flawed for the additional reason that it does not recognize, or otherwise analyze, the possibility that absent the injunctive relief, should NMI prevail in its claims against Facebook at trial, NMI can be adequately compensated through the award of monetary relief.  Specifically, in connection with its seed-stage round of financing in November 2019— around the time of the alleged wrongful acts—at least one of NMI's investors valued the company at $45 million.  By definition, the enterprise value of a company is an estimate of the future benefit stream (i.e. cash flow) of the company, in perpetuity, discounted to the present.[74]  In other words, it is a present value measure of all benefits that are expected from the company, and the estimate is typically as of a specific date.  Business valuation requires several data points compiled by firm management and the valuator (e.g., venture capitalists), including business plans containing projections of sales, costs, market share, capital investments, target markets and so on.  Investors, like venture capitalists, may also be privy to confidential information like trade secrets as part of the due diligence process.

73.     This $45 million valuation of NMI is important because, among other reasons, it is a third party, contemporaneous estimate of the lifetime value of NMI, including (but not limited to) the value of its trade secrets.  This valuation is also a relevant data point given (i) the specificity of

---

[74] National Association of Valuators and Analysts, <u>Fundamentals, Techniques and Theories,</u> Chapter 6: Commonly Used Methods of Valuation" 2012 v.1.  For example, the Income Approach to valuation derives from a formula called the Gordon Growth Model, which is a mathematical simplification of an infinitely growing/declining benefit stream discounted to the present at a constant rate.

**DECLARATION OF R.C. ANDERSON**                           **HIGHLY CONFIDENTIAL**
**CIVIL ACTION NO: 20-10444**                                    **FILED UNDER SEAL**

this information to the NMI entity, (ii) the date of the valuation, and (iii) the fact that valuations of a company are an acceptable method of calculating damages for a start-up business.[75]

74.     As previously explained, this $45 million valuation effectively serves as a ceiling on the damages, if any, that could be sustained by NMI because it is a measure of the total value of the enterprise contemporaneous with Facebook's alleged wrongful conduct.  However, this value was for the entire company, not solely the trade secrets at issue.  Presumably, the value of the NMI enterprise is comprised of additional assets, including, at least according to Dr. Putnam, additional trade secrets not at issue in this case, as well as its existing workforce, technology, capital assets, etc.

75.     A second quantifiable measurement of harm in this instance would be a reasonable royalty to be paid by Facebook to NMI for the use of its purported trade secrets.  I understand that damages caused by misappropriation of a trade secret may be measured by a reasonable royalty for a misappropriator's unauthorized disclosure or use of that trade secret.  In addition, algorithms are often licensed by large technology companies such as Facebook, among others.  In this situation, should NMI succeed in proving that Facebook has used its trade secrets for internal development of its software, one easily quantifiable indicator of value for such internal use would be the royalties that Facebook would have paid to NMI had it purchased the software from NMI.[76]

### F.     NMI's Failure To Take Actions to Protect Its Purported "Technological Assets" Contradicts Dr. Putnam's Opinions

76.     I understand NMI waited approximately eight (8) weeks before contacting Facebook and demanding the software code it published on the GitHub platform—which allegedly contained embodiments of NMI's purported trade secrets—be removed from that platform.  Additionally, I understand NMI did not contact, and has never contacted, GitHub directly to request this software code be taken down from its platform, although GitHub has a process for removal of sensitive data on its platform.[77]  Presumably, if the NMI trade secrets purportedly embodied in the publicly shared

---

[75] Reference Manual on Scientific Evidence. 3rd Ed. *National Research Council of the National Academies*, 1994 at 469.
[76] I understand there is no single method for determining reasonable royalty damages for trade secret misappropriation.  Such methods include a hypothetical negotiation, analytical method, or discounted cash flow analysis.
[77] https://help.github.com/en/github/site-policy/github-sensitive-data-removal-policy.

**DECLARATION OF R.C. ANDERSON**          **HIGHLY CONFIDENTIAL**
**CIVIL ACTION NO: 20-10444**                **FILED UNDER SEAL**

code are as valuable as Dr. Putnam assumes them to be, NMI would have acted with more urgency in its efforts to protect those assets as a result of the publication of the accused code. Rather, NMI waited almost two months to contact Facebook and never contacted GitHub, the entity hosting the platform that published its purported trade secrets for the world to see.

## X.   BALANCE OF HARDSHIPS

77.   If the Court grants any or all of the requested injunctive relief, it is my opinion that Facebook is likely to suffer greater harm and hardship than NMI would suffer if the Court does not issue a preliminary injunction. I explained at length in the preceding sections why NMI will not be irreparably harmed if the Court denies NMI's injunction, so I incorporate by reference my preceding discussions and analysis on this subject. However, a preliminary injunction against Facebook could result in real and substantial damage to Facebook that could dwarf even the maximum potential harm to NMI.

78.   For instance, I understand from counsel that the reputational harm potentially suffered by a party against whom a preliminary injunction is sought can be considered in weighing the balance of harms. Furthermore, I understand that Facebook presently uses sparse matrix multiplication and neural networks throughout a wide variety of its applications. Accordingly, the grant of a preliminary injunction that has a potential chilling effect on Facebook's continued legitimate use of sparse matrix multiplication and neural networks (including techniques and software that were developed and implemented before Dr. Zlateski arrived at Facebook) across its platform is likely to far outweigh any harm to NMI.

79.   I understand that if Facebook prevails on the merits at trial and the Court does not grant a permanent injunction, the only remedies available to Facebook to repair this harm are attorneys' fees. Even if a remedy was available to Facebook, it is unlikely that NMI will have the wherewithal to adequately compensate Facebook for this harm.

80.   The same conclusion is not true if NMI was to prevail at trial. Based on third party enterprise valuations of NMI, the entire company was valued at $45 million in November 2019, contemporaneous with Facebook's alleged wrongful conduct. Facebook has the wherewithal to compensate NMI for even a total loss in entity value as suggested by Dr. Putnam. Of course, NMI

80.     The same conclusion is not true if NMI was to prevail at trial.  Based on third party enterprise valuations of NMI, the entire company was valued at $45 million in November 2019, contemporaneous with Facebook's alleged wrongful conduct.  Facebook has the wherewithal to compensate NMI for even a total loss in entity value as suggested by Dr. Putnam.  Of course, NMI is not accusing Facebook of misappropriating all of its alleged trade secrets or all of the assets that comprise the entirety of NMI's value, so damages at trial are presumably less than NMI's enterprise value of $45 million as determined at the time of its round of seed funding.

81.     Thus, the granting of a preliminary injunction that later proves to have enjoined Facebook's legitimate use of sparse matrix multiplication and neural networks (including techniques and software that were developed and implemented before Dr. Zlateski arrived at Facebook) has the potential to have a far larger, long-term, and more uncertain impact on Facebook than the alleged harm caused to NMI by failing to grant an injunction where NMI later succeeded on the merits at trial.

## XI.     RESERVATIONS

82.     My work on this matter is ongoing.  This declaration summarizes my current opinions based on the presently available information.[78]  If additional information is produced or made available, I may modify or supplement my analyses and opinions.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on April 23, 2020.                    C. Anderson
                                                 R. Christopher Anderson

---

[78] As used herein, other than references to my education and experience, "I" and "We" shall mean either me personally or those StoneTurn personnel under my supervision.  Also, "My," "Our," and "Us" shall refer to actions taken by me personally or by those StoneTurn personnel under my supervision.

**DECLARATION OF R.C. ANDERSON**          **HIGHLY CONFIDENTIAL**
**CIVIL ACTION NO: 20-10444**              **FILED UNDER SEAL**

# Schedule 1



# Christopher Anderson

## CLP, CVA, CMA, CFM

Partner

T:  +1 512 649 2976
E: canderson@stoneturn.com

**Austin**
823 Congress Avenue
Suite 300
Austin, TX 78701

Christopher Anderson serves as a testifying and consulting financial expert in both complex disputes and licensing negotiations. He has more than 17 years of experience consulting with clients and counsel regarding intellectual property matters in connection with economic damages disputes and licensing.

Chris has been designated as a testifying expert witness in matters involving patent, trademark and copyright infringement, trade secret misappropriation, fraud, and breach of contract, among others.  He has also worked closely with clients engaged in intellectual property licensing negotiations to analyze the economics and communicate the implications to the relevant stakeholders.

Prior to joining StoneTurn, Chris spent eight years in both financial and research positions primarily within the healthcare industry. He helped a top-ranked academic medical center analyze the financial and operational ramifications of offering new medical technologies and served as a clinical monitor and a study coordinator on Phase I and II clinical trials for two contract research organizations.

Chris holds the Certified Licensing Professional designation from the Licensing Executives Society, the Certified Management Accountant and Certified Financial Manager credentials from the Institute of Management Accountants, and the Certified Valuation Analyst credential from the National Association of Certified Valuators and Analysts.

**Education**

MBA, Finance & Accounting, Texas A&M University

B.A., Economics, The University of Texas at Austin

**Practice Areas**

Intellectual Property

Litigation

Expert Testimony

StoneTurn.com



**Christopher Anderson, CLP, CVA, CMA, CFM**                                    **Partner**

---

## REPRESENTATIVE INDUSTRY EXPERIENCE

- Biotechnology / Life Sciences
- Computer Hardware
- Computer Software
- Chemicals
- Consumer Products / Services

- E-Commerce / Internet
- Electronics
- Oil & Gas
- Medical Devices
- Semiconductor / Memory Devices

- Mobile Telephones
- Telecommunications
- Video Games
- Apparel

## PROFESSIONAL AFFILIATIONS / OTHER

- Certified Licensing Professional (CLP)
- Certified Valuation Analyst (CVA)
- Certified Management Accountant (CMA)
- Certified Financial Manager (CFM)
- Member, Licensing Executives Society (USA and Canada)
- Member, National Association of Valuators and Analysts
- Member, Institute of Management Accountants

## PUBLIC SPEECHES & PRESENTATIONS

- Co-presenter, "Valuing Early-Stage and/or Uncommercialized Patents," Haynes & Boone Intellectual Property Group (Richardson, 2019).
- Guest Lecturer — Entrepreneurial Finance, "Valuation of Intellectual Property," Naveen Jindal School of Management (Dallas, 2019).
- Instructor, "IP & Licensing Basics, Session Four: Determining Reasonable License Fees and Royalty Rates," Licensing Executives Society (San Antonio, 2019).
- Instructor, "IP & Licensing Basics, Session Three: Determining Reasonable License Fees and Royalty Rates," Licensing Executives Society (Houston, 2016).
- Co-presenter, "How to Protect Trade Secrets Internally," Licensing Executives Society Webinar (Houston, February 2015).
- Panelist, "Beyond CDAs: Alternatives to Protecting Confidential Information When Doing Deals," Licensing Executives Society Annual Conference (San Francisco, October 2014).
- Co-presenter, "Royalty Considerations in Licensing and Litigation," Dallas ABA Computer Law Section (June 2013).
- Co-presenter, "Economic Damages Overview," University of Houston Clear Lake Chapter of *Beta Alpha Psi* (Clear Lake, April 2011).
- Co-presenter, "Nuts and Bolts of IP Damages," Houston Chapter of the Institute of Management Accountants," (Houston, February 2011).



## Christopher Anderson, CLP, CVA, CMA, CFM                                        Partner

- Co-presenter, "Patent Damages Case Law Update: *Entire Market Value (EMV), Continuing Infringement, and Other Issues Impacting Damages*," Licensing Executives Society, Washington, DC and Northern Virginia Chapter (Washington, DC, August 2010).
- Co-presenter, "Patent Damages Case Law Update: *EMV, Continuing Infringement, and Other Issues Impacting Damages*," Houston ABA IP Roundtable (Houston, July 2010).

# EXPERT DESIGNATIONS AND TESTIMONY

- LET Investors Group, LLC et al. v. <u>Luke Schoenfelder</u> (American Arbitration Association—Case No. 01:19-0002-6256)—Rebuttal of economic damages claim for breach of operating agreement and trade secret misappropriation related to energy management technology company (Expert Declaration, Case adjudicated).

- True Believers Ink 2, Corp. v. <u>Russell Brands, LLC</u> (E.D. Tex.—Case No. 4:18-cv-00432-ALM)— Rebuttal of claim for defendant's profits for trademark infringement related to Christian apparel and sporting goods. (Expert Report, Deposition Testimony, Case adjudicated).

- NCR Corporation v. <u>Pendum LLC and Burroughs, Inc.</u> (N.D. Ga.—Case No. 1:16-cv-04114-SCJ)—Economic damages for copyright and trademark infringement, trade secret misappropriation and tortious interference of a business relationship related to technology for maintaining automated teller machines. Rebuttal of claims for lost profits, defendant's profits and diminution in business value. (Expert Report, Deposition Testimony, Case settled).

- Phenix Longhorn, LLC. v. <u>Texas Instruments, Inc.</u> (E.D. Tex.—Case No. 2:18-cv-00020-RWS)—Economic damages for patent infringement of technology related to analog semiconductors (Expert Report, Case dismissed).

- Miguel Palacios et al. v. <u>Peterson Construction, Inc.</u>, 2019 (Hidalgo County, Tex., 389th Judicial District—Cause No. C-2770-17-H)—Rebuttal of lost earnings capacity claim related to workplace injury (Expert Disclosure, Case pending).

- Ameranth, Inc. v. <u>O-Web Technologies, Ltd.</u> (S.D. Cal.—Case No. 3:11-cv-01810-DMS-WVG)—Economic damages for patent infringement of technology related to food ordering (Expert Report, Case settled).

- <u>Vyacheslav Fish</u> v. Crazy Hammerheads, Inc., et al. (Harris County, Tex 133rd Judicial District—Cause No. 2017-55329)—Economic damages for breach of contract, quantum meruit and promissory estoppel related to incentive compensation agreement (Expert Report, Case settled).

- **In the Matter of the Marriage of Brandy Lyn Egli and Jon-Thomas Paul Egli** (Hays County, Tex 428th Judicial District—Cause No. 18-0525)—Fair market business valuation of privately-owned retail craft brewery (Expert Report, Case settled).



## Christopher Anderson, CLP, CVA, CMA, CFM                                         Partner

---

- **Daewoo International (America) Corp** v. Atlas Tubular, LLC. et al., 2018 (Harris County, Tex., 113th Judicial District—Cause No. 2015-86733)—Economic damages for breach of contract, promissory estoppel and quantum meruit related to purchase of steel pipe (Case removed).

- Eduardo Munoz v. **Bowling Construction, LLC**, 2018 (El Paso County, Tex., 243rd Judicial District—Cause No. 2017DCV2777)—Rebuttal of lost earnings capacity related to workplace injury (Case settled).

- **MacroPoint, LLC** v. Ruiz Food Products, Inc., 2018 (E.D. Tex—Civil Action No. 6:16-cv-01133-RWS-KNM)—Economic damages for patent infringement of technology related to shipment tracking. (Expert Report, Deposition Testimony, Case stayed).

- Raquel Spathos v. **Smart Payment Plan**, 2018 (W.D. Tex—Civil Action No. 1:16-cv-00898-SS)—Economic damages for breach of contract, tortious interference and unjust enrichment related to loan payment service. (Expert Report, Deposition Testimony, Case dismissed).

- Estate of Miguel Angel Alcantara Sanvicente, et al. v. **Crestmark Construction Services LLC, et al.**, 2018 (Harris County, Tex., 129th Judicial District—Cause No. 2016-35372)—Rebuttal of lost earnings capacity related to wrongful death of construction worker (Expert Disclosure, Case settled).

- The Piazza Family Trust II v. **Anthony Ciarrocchi,** 2017 (E.D. Pa.—Civil Action No. 2:17-cv-01704-MAK)—Rebuttal of economic damages for breach of fiduciary duty and tortious interference with a contract related to purchase of an insurance agency. (Expert Report, Case settled).

- **Douglas Schnitzer** v. Milton Carroll, 2016 (Harris County, Tex., 165th Judicial District—Cause No. 2015-29570)—Economic damages for breach of contract related to loan guarantee (Expert Disclosure, Case settled).

- Mechanical Technical Services v. **Airco Mechanical,** 2016 (Travis County, Tex., 201st Judicial District—Cause No. D-1-GN-15-001124)—Economic damages for misappropriation of trade secrets and breach of fiduciary duty. Rebuttal of lost profits damages related to plumbing and HVAC services (Expert Report, Case settled).

- Equipment Performance Management v. **Baker Hughes**, 2015 (Harris County, Tex., 190th Judicial District—Cause No. 2014-40269)—Economic damages for misappropriation of trade secrets and tortious interference with a contract. Rebuttal of lost profits damages related to equipment maintenance for oilfield equipment (Expert Disclosure, Case dismissed).

- **Thomas C. Sheridan** v. Arthur J. Gallagher & Co., 2014 (S.D. Tex.—Civil Action No. 4:13-cv-01969)—Economic damages for violation of Family and Medical Leave Act. (Expert Report, Case dismissed).

- **OLA, Inc.** v. Capital Pacific Holdings, Inc., 2012 (E.D. Tex.—Civil Action No. 2:09-cv-082-JRG)—Economic damages for patent infringement and misappropriation of trade secrets. Reasonable royalty analysis related to customer service method and apparatus in home building industry. (Written Hearing Testimony, Default Judgment).

