HIGHLY CONFIDENTIAL – FILED UNDER SEAL

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEURALMAGIC, INC.<br><br>*Plaintiff*,<br><br>v.<br><br>FACEBOOK, INC. AND ALEKSANDAR ZLATESKI<br><br>*Defendants*. | Civil Action No. 20-CV-10444 |

**NEURAL MAGIC'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION**

**HIGHLY CONFIDENTIAL – FILED UNDER SEAL**

HIGHLY CONFIDENTIAL – FILED UNDER SEAL

# TABLE OF CONTENTS

**Page**

I. ZLATESKI'S STORY SUPPORTS NEURAL MAGIC—AND UNDERMINES DEFENDANTS' CREDIBILITY ........................................................ 2

II. NEURAL MAGIC DEMONSTRATED TRADE SECRET MISAPPROPRIATION .................................................................................................. 4

    A. Neural Magic Specifically Identified The Misappropriated Trade Secrets ............. 4

    B. Neural Magic's Trade Secrets Were Not Generally Known ................................... 5

    C. Neural Magic Demonstrated Misappropriation of its Trade Secrets ...................... 6

    D. Neural Magic Derives Economic Value from its Trade Secrets ............................. 6

    E. Neural Magic Took Reasonable Steps to Protect its Trade Secrets ......................... 7

    F. Defendants' Opposition Further Proves Trade Secret Misappropriation ................ 8

III. NEURAL MAGIC DEMONSTRATED BREACH OF CONTRACT ........................... 8

IV. NEURAL MAGIC MORE THAN MET ITS BURDEN OF SHOWING IRREPARABLE HARM. ................................................................................................ 9

CONCLUSION ............................................................................................................................ 10

# **TABLE OF AUTHORITIES**

**Page**

**Cases**

Cases

*Action Learning Sys., Inc. v. Crowe*, No. 14-CV-5112, 2014 WL 12564011, at *4 (C.D. Cal. Aug. 11, 2014) ................................................................................................ 5

*Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 18 (1st Cir. 2009) ................................. 8

*Bos. Sci. Corp. v. Lee*, 2014 WL 1946687, at *6 (D. Mass. May 14, 2014) .................................. 9

*CardiAQ Valve Techs., Inc. v. Neovasc Inc.*, No. 14-CV-12405-ADB, 2016 WL 6465411, at *13 (D. Mass. Oct. 31, 2016) ........................................................................ 6

*SiOnyx, LLC v. Hamamatsu Photonics K.K.*, 2019 WL 3358599, at *3 (D. Mass. July 25, 2019) ............................................................................................................................... 10

*Thola v. Henschell*, 140 Wash. App. 70, 78 (2007) ....................................................................... 8

HIGHLY CONFIDENTIAL – FILED UNDER SEAL

## NOTE ON CITATIONS

1. References to Plaintiff's Memorandum of Law In Support of their Motion for Preliminary Injunction (Dkt. 32) are indicated by the abbreviation "**Mot**." followed by the page number being cited.  "Mot. at 5" refers to page 5 of Plaintiff's memorandum of law in support of their motion.

2. References to Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction (Dkt. 43) are indicated by the abbreviation "**Opp**." followed by the page number being cited.  "Opp. at 5" therefore refers to page 5 of Defendants' opposition.

3. References to declarations appear as follows:

    a. Declarations submitted April 9, 2020:

        i. Professor Nir Shavit, Ph.D., "Shavit ¶ _" or "Shavit Ex. _"

        ii. Bryan House, "House ¶ _" or "House Ex. _"

        iii. Professor Michael Scott, "Scott ¶ _" or "Scott Ex. _"

        iv. John O'Hara, "O'Hara ¶ _"

        v. Jonathan Putnam, Ph.D., "Putnam ¶ _"

        vi. Patrick Curran, "Curran ¶ _" or "Curran Ex. _"

    b. Declarations submitted April 23, 2020:

        i. Aleksandar Zlateski, Ph.D., "Zlateski ¶ _"

        ii. Jongsoo Park, Ph.D., "Park ¶ _"

        iii. Professor David Kaeli, "Kaeli ¶ _"

        iv. R. Christopher Anderson, "Anderson ¶ _"

    c. Declarations submitted April 30, 2020:

        i. Professor Nir Shavit, Ph.D., "Shavit Reply ¶ _"

        ii. Alex Matveev, Ph.D., "Matveev ¶ _"

        iii. Professor Michael Scott, "Scott Reply ¶ _"

        iv. Jonathan Putnam, Ph.D., "Putnam Reply ¶ _

HIGHLY CONFIDENTIAL – FILED UNDER SEAL

Unlike most defendants accused of trade secret misappropriation, Defendants here do not contest and readily concede most of the core facts at the heart of the pertinent inquiry. For example, Defendants do not contest that Defendant Zlateski was paid by Neural Magic to develop software that would optimize sparse matrix multiplication operations and neural network execution speeds on generic CPUs. Nor do they contest Zlateski then did the *same thing* for Facebook immediately upon arriving there, even though he was subject to a non-competition and non-disclosure agreement. Defendants name no other Facebook employee or team member who supposedly independently developed the code at issue here—code that embodies **Neural Magic's** trade secrets and proprietary algorithms. *See, e.g.*, Shavit ¶¶ 15-20; Matveev ¶ 1. Instead, Facebook' s declarant frankly admits that "[s]hortly after Dr. Zlateski joined Facebook" he discussed "Dr. Zlateski's research" with him and concluded that his "experience" made Zlateski a good choice to write Facebook's sparse GEMM code. Park ¶ 24. That "research" and "experience" however came from and at Neural Magic's expense.

Defendants instead lay out Zlateski's story for the first time. That story, however, contradicts multiple pre-litigation, contemporaneous statements. For example, Zlateski now claims everything he put into Facebook's FBGEMM code was from his postdoctoral research, or from a 2015 paper by Liu, or from his "general education." Zlateski ¶ 24. Yet, previously, Zlateski admitted his GEMM work at Neural Magic would be "different" and "new" compared to his academic research, and even expressed skepticism that a sparse GEMM JIT could work. Matveev ¶¶ 5-9. Zlateski asks the Court to conclude that all the work he did at Neural Magic was *Zlateski's* own *preexisting* thoughts—which only *Zlateski* could own—reflecting *nothing* proprietary to Neural Magic, such that Zlateski, was free to reproduce that work immediately upon arrival at Facebook. This leaves Defendants in the odd and unsupported position of

1

claiming that Zlateski did nothing original and proprietary while at Neural Magic and therefore could legally recreate his Neural Magic work for Facebook—although they also assert, without vigor, that the work he did at Facebook was not the same work as he did at Neural Magic.

Beyond Zlateski's incredulous claims, Defendants flail in search of justifications for the transmission and adoption of Neural Magic proprietary technology. Defendants attempt to oversimplify that misappropriated technology into straw men that they then attack. Defendants also claim there is no evidence of economic value in Neural Magic's trade secrets—a factually inaccurate and legally inconsequential argument. Defendants point to their own misconduct to claim Neural Magic did not adequately protect trade secrets; put forward an offhand, legally unsupported argument that vicarious liability does not apply; and make unfounded and illogical attacks on Dr. Michael Scott to distract from damning test results that confirm misappropriation. Defendants try to undermine an open-and-shut breach of contract claim by saying Zlateski's non-disclosure and non-competition agreement either was invalid or waived: both claims contradict the factual record. And on irreparable harm, Defendants make the incredible claim that Neural Magic cannot possibly have been harmed by Defendants' conduct because it is a small start-up company that has yet to acquire customers, market share, and launch its product.

I.     **Zlateski's Story Supports Neural Magic—and Undermines Defendants' Credibility**

Zlateski's story either supports Neural Magic's position or does not hold water when compared to his previous, contemporaneous statements. Zlateski was guided by Neural Magic to develop a sparse GEMM, despite his skepticism. *See* Matveev ¶¶ 5-9. Even were Zlateski right that he created the "foundation" for Neural Magic (and he is not), that would only prove Neural Magic's point: his employment contract stated anything he would "make, conceive, create, discover, invent or reduce to practice" relating to Neural Magic "*shall immediately become the sole and absolute property of*" Neural Magic, with the exception of a list (provided by Zlateski)

2

of previous work that did *not* include any of the materials Zlateski now claims he drew on for his work at Neural Magic.  Shavit, Ex. 1.  Zlateski also claims Neural Magic "expected me to use my previous work" and that his work "ended up being the foundation for NMI," and claims he "pull[ed]" from his prior work as well as existing literature and "help[ed] NMI develop its software." Zlateski ¶ 12.  **But, again, if true, this proves Neural Magic's point**.  Neural Magic hired Zlateski to use his expertise, and education to *develop* the Neural Magic trade secrets at issue, and those trade secrets belong to Neural Magic.

Zlateski's retelling of his departure from Neural Magic also flies in the face of documentary *evidence*.  On July 5, 2019, Zlateski's last day at Neural Magic, he and Prof. Shavit discussed his work for Neural Magic, plans for future collaboration, and Zlateski's understanding of Neural Magic's need to protect its intellectual property.  Shavit Reply ¶ 13 & Ex. 3.  At the time Prof. Shavit and Zlateski discussed their mutual hopes for a future consulting relationship.  Shavit Reply ¶ 13 & Ex. 3.  Prof. Shavit also explained that he was "not worried" about Zlateski's use of Neural Magic's trade secrets because, Prof. Shavit said, "I trust you understand the ethics involved as you made it clear when negotiating your contract."  Shavit Reply ¶ 14 & Ex. 3.  Zlateski advised, "you might want to consider patenting some complete work I have done," and remarking, "please try to patent bunch of my work that was fully done while there (schedulers, work on AS/*KS*, graph JIT, etc...)."  Shavit Reply ¶ 14, Shavit Reply Ex. 3.  Notably, the work Zlateski calls "KS" is "kernel sparsity," the exact algorithms Neural Magic's code (and now Facebook's) implements.  Shavit Reply ¶ 14.  Facebook released that code with notes praising the **"contributions of @zlateski to sparse kernels"**, and presented "*really interesting results*." (their words) with 2.3x-6.3x speedups **"on some random CPUs"** in the world recognized TVM Conference." Scott ¶ 176 (emphasis added).  These statements from long

3

before this litigation confirm the valuable, proprietary technology at issue, Neural Magic's ownership of that technology, and Defendants' misappropriation.

Zlateski's description of his Facebook work also strains credulity. He asks the Court to find that within days of joining Facebook he *happened* to have a conversation with Jongsoo Park, who did *not* work in Zlateski's Facebook sub-group, and that Park *happened* to ask Zlateski to "write some code for a fast sparse matrix multiplication, which could help speed up convolution and fully-connected layers of a neural network," as one of Zlateski's very first projects—the *precise* code Neural Magic had developed and was preparing to market. Zlateski ¶ 23. Then, despite his time at Neural Magic **working on and solving this exact problem**, Zlateski claims he quickly found a solution using *only* "(i) [his] prior work at MIT and Princeton . . . , (ii) the Liu paper . . . , and (iii) [his] general education in the field . . . ." Zlateski ¶ 24. Incredibly, per Zlateski, "any person" in the field would have been able to write the code. Zlateski ¶ 25. Yet, Facebook, with all of its resources, was not able to add this code to FBGEMM without Zlateski. Facebook asked Zlateski to write the FBGEMM code because of the work he had done in that same field at Neural Magic, *see* Park ¶ 24 ("[I]t occurred to me and Dr. Zlateski that Dr. Zlateski's experience with the optimization of neural networks and GEMM processes might be useful in FBGEMM")—work that caused the company's valuation to rise to more than $45 million, and work that Zlateski and Facebook misappropriated and published to the world. Documentary evidence from 2017-2019, the conclusive facts Neural Magic put forth in its brief, Facebook's admissions, and common sense all compel this conclusion.

## II.     Neural Magic Demonstrated Trade Secret Misappropriation

### A.     Neural Magic Specifically Identified The Misappropriated Trade Secrets

Facebook claims Neural Magic did not specifically identify its trade secrets. Opp. 15-18. It argues—without citation—that "Dr. Scott has no foundation for the basic allegation that NMI

owns any of the alleged trade secrets, and this lack of foundation alone warrants denying NMI's request for a preliminary injunction." *Id*. at 15.  To the contrary, Dr. Scott based his analysis on an extensive review of source code and documentation for Neural Magic's GEMM JIT compiler. *See* Scott ¶¶ 89-94, 96-131.  At each step, Dr. Scott explained how the compiler embodies Neural Magic's trade secret algorithms.  *See id*. ¶¶ 99-105, 106, 110-111, 113-114, 116-124. Facebook complains about "seven … paragraphs" of analysis, "a single memo," and "43 lines of source code," but **never disputes** that the evidence does in fact disclose what Neural Magic identified as its trade secrets.  *Id*.  Indeed, Facebook does not point to a single factual statement from Dr. Zlateski, or a single opinion from Dr. Kaeli, that disputes the presence of the asserted trade secrets in Neural Magic's GEMM JIT compiler.  *Id*.[1]

B.    **Neural Magic's Trade Secrets Were Not Generally Known**

Arguing Neural Magic's trade secrets were known in the industry, Facebook oversimplifies them as high-level concepts and compares each to public materials without any context.  Facebook does not come forward with a single piece of evidence that itself discloses Neural Magic's trade secrets, alone or together, to perform sparse matrix operations.  Scott Reply ¶¶ 11-17, 30, 32-37.  This alone is fatal:  a trade secret defendant cannot claim trade secrets were "public," and therefore not protected, by cobbling together hypothetical combinations of material that had not *actually* been used or disclosed/known in combination publicly.  *See, e.g., CardiAQ*

---

[1] Relying solely on *Action Learning Sys., Inc. v. Crowe*, No. 14-CV-5112, 2014 WL 12564011, at *4 (C.D. Cal. Aug. 11, 2014), Facebook claims that the trade secrets at issue are impermissible "broad categories of concepts" rather than step-by-step algorithms.  Opp. at 17.  Not so.  In *Action Learning Sys*., the supposed trade secrets the court rejected were defined as vague notions including "training," "data driven decision making," and "assessment."  *Action Learning Sys.,* 2014 WL 12564011, at *5.  There is no parallel here.  For each asserted trade secret, Dr. Scott detailed the specific and highly technical steps performed in Neural Magic's GEMM JIT compiler.  *See*, *e.g.*, Scott ¶¶ 99-101, 110, 117-124.

*Valve Techs., Inc. v. Neovasc Inc.*, No. 14-CV-12405-ADB, 2016 WL 6465411, at *13 (D. Mass. Oct. 31, 2016) ("[a] trade secret can exist in a combination of characteristics and components, even if some or all of the characteristics and components are in the public domain, as long as the unified process, design, and operation of the combination constitutes a unique combination.").[2]

### C. Neural Magic Demonstrated Misappropriation of its Trade Secrets

Facebook fails to rebut evidence demonstrating misappropriation of Neural Magic's trade secrets. Opp. 26-28. It offers no legitimate response to inexplicable similarities in the output generated by Neural Magic's compiler and Facebook's compiler, Scott Decl. ¶¶ 143-150; Scott Reply ¶ 6, and so instead attacks the messenger, claiming Dr. Scott, a highly acclaimed and credible expert in this field, manipulated tests to present an erroneous comparison. Opp. 27. Not so. As Dr. Scott explained, Facebook hardcoded to one set of values what is, in the Neural Magic code, a variable, sparsity-based formula, and so, for an apples-to-apples comparison, Dr. Scott restricted the NM GEMM JIT in the same way. Scott Decl. ¶ 143; Scott Reply ¶ 8. Removing this variability shows Facebook traverses its matrices, and orders its computations, ***in exactly the way Neural Magic's trade secrets dictate***—strong evidence of misappropriation. *Id*. ¶¶ 8-10.

### D. Neural Magic Derives Economic Value from its Trade Secrets

Facebook illogically suggests there is no "economic advantage, actual or potential" to

---

[2] *See also Iconics, Inc. v. Massaro*, 266 F. Supp. 3d 449, 454 (D. Mass. 2017) (same); *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.,* 420 F. Supp. 2d 1070, 1089-1090 (N.D. Cal. 2006) ("It does not matter if a portion of the trade secret is generally known . . . so long as the combination of all such information is not generally known."); *Integrated Cash Mgmt. Serv. v. Digital Transactions*, 920 F. 2d 171, 174 (2d Cir. 1990) (plaintiff "retains a protectable trade secret in its product" in unique combination of "generic utility programs" despite "the non-secret nature of the *individual* utility programs," since "trade secret can exist in a *combination* of characteristics and components, each of which, by itself, is in the public domain, but [in combination] . . . affords a competitive advantage and is a protectable secret") (emphasis added).

keeping Neural Magic's trade secrets a secret, and inaccurately states—relying on strained procedural claims—that there is "no competent evidence before the Court for this requisite factor for a trade secret." (Opp. at 19). But Neural Magic has presented *ample* evidence of "economic advantage, actual or potential" from Neural Magic's trade secrets. Those secrets form the foundation of Neural Magic's business, and the performance enhancements they create generate the speedups that form Neural Magic's value-proposition to customers. House ¶ 12-13, 15, 16-29; O'Hara ¶¶ 4-8; Putnam ¶¶ 11-12; 15-22; 55-57.

### E. Neural Magic Took Reasonable Steps to Protect its Trade Secrets

Ignoring the extensive evidence of the measures Neural Magic took to protect its trade secrets, House ¶ 2, O'Hara ¶ 2, Facebook claims that because Zlateski was allowed to retain his company laptop, Neural Magic did not adequately protect its trade secrets. Opp. at 20. But Neural Magic let Zlateski retain his encrypted laptop based on the mutual understanding (or so they thought) that Zlateski would continue to work with them as a consultant, and that he remained subject to his contractual obligations to Neural Magic. Shavit ¶ 24; Zlateski ¶ 19, 51; Shavit Reply ¶¶ 13-14, Shavit Reply Ex. 3-6. Zlateski's decision to breach his legal commitments, and his apparent campaign to dupe Neural Magic into believing he needed his laptop for consulting work, is *evidence* of wrong—not a *defense* to trade secret misappropriation.

Facebook points to its own unlawful posting of code to GitHub, and its refusal to remove that code promptly, as a problem of Neural Magic's making, suggesting Neural Magic took insufficient action to remove the code from GitHub. This is not true: Neural Magic took direct action by ***immediately and repeatedly asking Facebook to take down the code Facebook posted***. *See* Curran Ex. 2 (Jan. 22); Ex. 3 (Feb. 7); Ex. 4 (Feb. 12); Ex. 8 (Marc. 26); Ex. 10 (Mar. 31); Ex. 13 (Apr. 4). Facebook posted the code and was in the best position to remove it from

GitHub; its refusal quickly to do so is no basis to deny a preliminary injunction that would bar further irreparable harm—including re-posting what it only begrudgingly removed.

### F. Defendants' Opposition Further Proves Trade Secret Misappropriation

Facebook weakly claims that it cannot be liable for trade secret misappropriation because Neural Magic supposedly bases its case "on Dr. Zlateski's breach of contract, which is not a tort and cannot support vicarious liability." This two sentence argument—which tellingly ***cites no caselaw***—deliberately misunderstands Neural Magic's point. Facebook is vicariously liable for Zlateski's misappropriation of trade secrets undertaken in the scope of his employment. *See, e.g.*, *Thola v. Henschell*, 140 Wash. App. 70, 78 (2007). Zlateski's violation of his agreement is proof of "improper means" in the process. *See Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 18 (1st Cir. 2009). Facebook is vicariously liable for that conduct. In any event, Facebook does not contest that it knew or should have known it acquired Neural Magic's trade secrets through Zlateski's breach—an additional and independent basis for liability. Opp. 18-19.

### III. Neural Magic Demonstrated Breach of Contract

Zlateski entered into a valid, enforceable, "Non-Disclosure, Non-Competition, and Assignment of Intellectual Property Agreement" with Neural Magic. *See* Mot. at 17; Shavit ¶¶ 11-14. Zlateski breached that agreement in multiple ways. Mot. 17-18. Facebook does not dispute Zlateski signed a non-disclosure agreement with Neural Magic. Yet, it claims Zlateski did not breach his confidentiality obligations when he wrote the code for FBGEMM because he allegedly only relied on general knowledge and prior graduate work—***not on anything he did, learned, or developed while at Neural Magic***. Opp. at p. 23. This asks the Court to believe Zlateski somehow managed to block out the work he did at Neural Magic prior to joining Facebook, and "did not use or reference any NMI code to do that work, and [] did not base any of [his] Facebook code on any NMI algorithms." Zlateski ¶ 24. This is not plausible. Facebook

concedes Zlateski worked on the same topics at Neural Magic and later at Facebook. *See* Zlateski ¶ 13, ¶¶ 23-24. Given the extent of Zlateski's experience at Neural Magic, and the similarity in his work at Neural Magic and for FBGEMM, it is not credible that he set aside all work and information from his immediately preceding time at Neural Magic. *See e.g. Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 130 (D. Mass. 2011).

Having conceded Zlateski worked on the very same technological problem at Facebook as at Neural Magic, Defendants argue that the non-competition provision of Zlateski's Agreement is not valid, and that Neural Magic waived applicability of the non-competition agreement. Neither is correct. The non-competition agreement plainly is valid; it is narrowly tailored and designed to protect a legitimate business interest (in fact, designed to prevent exactly what happened here): transmission of Neural Magic's Confidential Information and trade secrets to a competitor. *See Aspect Software*, 787 F. Supp. 2d at 128 (protection of trade secrets, confidential information, and good will constitute legitimate business interests sufficient to support non-competition agreement). Moreover, Neural Magic never waived Zlateski's non-compete obligations. Neural Magic was never put on notice that Zlateski would be doing work for Park's AI System Software/Hardware co-Design group—the group working on FBGEMM. *See* Zlateski ¶ 13, ¶¶ 23-24. The agreement is valid, breached, and supports an injunction.

**IV.   Neural Magic More Than Met its Burden of Showing Irreparable Harm.**

As previously explained, there is a presumption of irreparable harm in cases of trade secret misappropriation. Mot. 24-25. Defendants do not cite a single case supporting their claim that the presumption applies only if the parties are direct competitors. Opp. 25-26. Nor could they. The presumption applies "in recognition of the fact that once the trade secret is lost, it is gone forever," *Bos. Sci. Corp. v. Lee*, 2014 WL 1946687, at *6 (D. Mass. May 14, 2014). Whether Facebook and Neural Magic directly compete is legally irrelevant. And even if

9

competition mattered legally, Defendants' claim is also wrong factually. Putnam Reply ¶¶ 19-21.

Facebook's suggestion that Neural Magic cannot be harmed because it is a startup that has not yet brought its product to market is a non-starter. Opp. at 25. That is not the law and, tellingly, Defendants cite no case in support of such a specious argument. Indeed, the case law shows the opposite—when a small startup is implicated, the likelihood of irreparable harm is much higher as "it is impossible to quantify the full extent of the harms, including things as loss of market share, lost business opportunity, and harm to reputation." *SiOnyx, LLC v. Hamamatsu Photonics K.K.*, 2019 WL 3358599, at *3 (D. Mass. July 25, 2019). In such a case, the "balance of hardship weighs heavily in favor of an injunction" especially where—as here—the plaintiff is "a tiny company relying on a single type of technology" and the defendant "is a large company with a broad and diversified range of products." *Id.* See also Putnam Reply ¶¶ 35-37.

It comes with ill grace for a one-time Massachusetts start-up and now a commercial titan, to assert that a current local start-up's intellectual property can be freely taken because they still are in the development phase. The law does not support that illogical and inequitable result. Facebook's decision to rely on such strained claims speaks volumes.

## CONCLUSION

Neural Magic hereby requests that the Court grant its motion for a preliminary injunction in order to: 1) memorialize and allow the Court to oversee Facebook's voluntary measures; and 2) require the additional steps Facebook has refused to take, including halting Facebook's internal use of Neural Magic's trade secrets; preventing any further public disclosure of those trade secrets; preventing any further work by Zlateski at Facebook that would implicate Neural Magic's trade secrets and any further breach of Zlateski's contractual obligations to Neural Magic; require additional outreach to GitHub and its users that have accessed Neural Magic's trade secrets; and require the immediate return of Neural Magic's confidential information.

HIGHLY CONFIDENTIAL – FILED UNDER SEAL

Dated: May 5, 2020

/s/ *Steven Cherny*
Steven Cherny (BBO# 706132) (*pro hac vice*)
Patrick D. Curran (BBO# 568701)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, MA 02199
Tel: (617) 712-7100
stevencherny@quinnemanuel.com
patrickcurran@quinnemanuel.com

HIGHLY CONFIDENTIAL – FILED UNDER SEAL

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 5th day of May, 2020.

/s/ *Patrick D. Curran*
Patrick D. Curran