# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| **NEURAL MAGIC, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 20-10444-DJC** |
| | ) | |
| **FACEBOOK, INC. and ALEKSANDAR** | ) | |
| **ZLATESKI,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                **May 29, 2020**

## I.     Introduction

Plaintiff Neural Magic, Inc. ("Neural Magic") has sued Defendants Facebook, Inc. ("Facebook") and Dr. Aleksandar Zlateski ("Zlateski"), a former Neural Magic employee, for Zlateski's alleged disclosure of trade secrets to Facebook and Facebook's internal use and posting of same on an open source forum.  D. 1.  Specifically, Neural Magic alleges that Facebook and Zlateski have misappropriated trade secrets under the Massachusetts Uniform Trade Secrets Act, Mass. Gen. L. c. 93, §§ 42 _et seq._ (Count I) and the Defend Trade Secrets Act, 18 U.S.C. § 1836 (Count II), engaged in unfair and deceptive business practices in violation of  Mass. Gen. L. c. 93A § 11 (Count III) and were unjustly enriched by using Neural Magic's trade secrets (Count VI).  Neural Magic also alleges that Zlateski breached his non-disclosure and non-competition agreement (Count IV) and that Facebook tortiously interfered with its advantageous contractual relations with Zlateski. (Count V). Id.  Neural Magic has now moved for a preliminary injunction

to require Defendants to refrain from using or disclosing Neural Magic's proprietary information, bar any further work by Zlateski involving Facebook's business related to machine learning in any fashion or any other of its businesses that would implicate Neural Magic's proprietary information and to prevent any further breaches of Zlateski's contractual obligations to Neural Magic.  D. 25.  As explained further below, given the contested record about whether the matters at issue are trade secrets and whether Defendants used improper means to obtain these alleged trade secrets, the Court DENIES Neural Magic's motion, D. 25.

## II.     Standard of Review

Injunctive relief "is an 'extraordinary and drastic remedy.'"  <u>Voice of the Arab World, Inc.</u> <u>v. MDTV Med. News Now, Inc.</u>, 645 F.3d 26, 32 (1st Cir. 2011) (quoting <u>Munaf v. Geren</u>, 553 U.S. 674, 689-90 (2008)).  To obtain such relief, the Court must consider:  (1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest.  <u>Corp.</u> <u>Techs., Inc. v. Harnett</u>, 731 F.3d 6, 9 (1st Cir. 2013).  A movant "bears the burden of establishing that these four factors weigh in [their] favor."  <u>Esso Standard Oil Co. (P.R.) v. Monroig-Zayas</u>, 445 F.3d 13, 18 (1st Cir. 2006).

## III.     Factual Background

### A.     <u>Founding of Neural Magic</u>

Neural Magic is a start-up company co-founded by Dr. Nir Shavit ("Shavit"), a professor at the Massachusetts Institute of Technology ("MIT") and MIT research scientist Dr. Alex Matveev ("Matveev") in 2017.  D. 1 ¶ 1.  Zlateski and Shavit met in 2014 while Zlateski was pursuing his Ph.D. in computer science at MIT.  D. 34 (Shavit Aff.) ¶ 9.  Shavit served on Zlateski's Ph.D. thesis committee.  D. 34 ¶ 9; D. 47 (Zlateski Aff.) ¶ 9.

In 2017, Shavit and Matveev were in the process of beginning their company, Neural Magic.  D. 47 ¶ 10.  Their goal in doing so was to create technology that can "perform sparse matrix multiplication on a conventional CPU [computer processing unit] at an unprecedented rate." D. 37 (Scott Aff.) ¶ 95.  Such technology would allow a CPU to run at the speed of more costly and specialized graphic processing units ("GPUs") with the advantages of a CPU's memory and data.  D. 34 ¶ 5.  It would allow for the analysis of larger data sets, D. 32 at 12, and would be of interest to researchers, universities, direct-to-customer services and even "Facebook and Google which use hundreds of thousands of CPUs and GPUs to operate their business and research."  D. 34 ¶ 7.  As alleged, Neural Magic is developing technology that is "a set of computer algorithms encompassed within a machine compiler" that have "the potential to revolutionize the field of artificial intelligence ('AI')."  D. 1 ¶ 1.

### B.   Neural Magic's Founders Hire Zlateski

In building Neural Magic, Shavit and Matveev hired Zlateski, who was then completing his postdoctoral work, as the company's first employee, in the role of the Technology Director on March 16, 2018.  D. 47 ¶ 11; D. 34 ¶ 10.  As part of his employment, Zlateski signed a non-disclosure and non-competition agreement ("the Agreement").  D. 34 ¶ 12; D. 34-1 (the Agreement) at 8-10.  In relevant part, the Agreement states that Zlateski:

> not at any time, whether during or after the termination of [his] engagement by [Neural Magic], reveal to any person or entity any of the trade secrets or confidential, proprietary or other non-public information concerning the organization . . . including but not limited to information related to [Neural Magic] inventions, research, testing, manufacturing, production, marketing, supplies, suppliers, consultants, strategic partners, products, designs, methods, know-how, technique, systems, processes, software programs and/or code, works of authorship, customer and collaborate lists, projects, plans, proposals, any Developments . . . , and the notes, memoranda, reports, lists, records, drawings, sketches, specifications, data, documentation or other materials of any nature containing such trade secret or confidential information."

D. 34-1 at 8.  The Agreement further provides that any invention Zlateski created, either alone or with others, during his engagement with Neural Magic "that relates to the business of [Neural Magic] . . . become the sole and absolute property of [Neural Magic]."  D. 34-1 at 9.  The Agreement also includes a non-competition provision that provides that he could not "directly or indirectly . . . engage in any business activity which is in competition with the service or products being rendered, delivered, marketed, commercialized, produced or sold or under development or active consideration" by Neural Magic during his engagement with Neural Magic and for one year thereafter.  D. 34-1 at 10.

C.      **Zlateski's Work at Neural Magic**

According to Neural Magic's co-founder, Shavit, Matveev and Zlateski worked together to create programming and algorithms for their software product.  D. 34 ¶ 15.

Zlateski disputes much of this account.

Still, by fall 2018, Zlateski claims that

Neural Magic still did not have product to sell yet.  Id.   At any rate, by November 2019, Neural Magic had received $15 million in seed-round funding and has grown its team from ten employees to, after this funding, more than twenty people.  D. 34 ¶ 21.  According to its founders, Neural Magic had planned to launch its product in April 2020, D. 35 (House Aff.)  ¶ 14, but this timeline was "called into question" because of the Defendants' actions.  D. 34 ¶ 22.

### D.  Zlateski Leaves Neural Magic for Facebook

In March 2019, Zlateski received an offer to join Facebook.  D. 47 ¶ 16.  Although he received this offer in March and he informed Neural Magic of same, D. 47 ¶¶ 17, 18, he remained at Neural Magic until July 2019.  D. 47 ¶ 19.  Zlateski told Shavit and Matveev that he was joining Facebook's Artificial Intelligence Research ("FAIR") group in their Systems in Machine Learning ("SysML") sub-group.  D. 47 ¶ 17.  Neural Magic did not object to Zlateski joining Facebook because Shavit alleges that Zlateski assured him that his role at Facebook would not relate to his work at Neural Magic. D. 34 ¶ 24.  Neural Magic also allowed Zlateski to keep his Neural Magic laptop in part to allow Zlateski to help engineers at Neural Magic with questions about his prior work, D. 47 ¶ 19, and as the parties do not appear to dispute, Shavit and Matveev were hopeful that they could collaborate with Zlateski even after he was at Facebook.  D. 34 ¶ 24; D. 47 ¶ 18.

### E.  Zlateski's Work at Facebook

Zlateski began working at Facebook on July 8, 2019.  D. 47 ¶ 20.  Shortly after Zlateski began working in Facebook's FAIR group, Dr. Jongsoo Park ("Park"), the Technical Lead and Manager in Facebook's AI Systems group, asked Zlateski to write some optimization for Facebook General Matrix Multiplication ("FBGEMM"), a code library that the Park's group develops and uses to optimize performance across numerous machine learning ("ML") and AI applications.  D. 46 (Park Aff.) ¶¶ 17, 24; D. 47 ¶ 23.  Development on FBGEMM began in 2017.  D. 46 ¶ 17.

"FBGEMM is not a product that is sold." D. 46 ¶ 18. Instead, Facebook makes FBGEMM's code publicly available on GitHub, a third-party online source code repository. D. 46 ¶ 18. Zlateski's optimization code for FBGEMM was for a fast sparse matrix multiplication and he attests that he "wrote this code for Dr. Park and the FBGEMM team from scratch" and "did not use or reference any [Neural Magic] code to do that work" and "did not base any of my Facebook code on any [Neural Magic] algorithms." D. 47 ¶ 24.

On November 1, 2019, Facebook posted the FBGEMM that Zlateski had optimized on GitHub, an open source software development platform. D. 34 ¶ 25. On January 18, 2020, approximately two months later, Matveev saw a LinkedIn post from Park crediting Zlateski for his contribution and referencing "sparse kernels," which is key component of the algorithms that Neural Magic claims that Zlateski developed while in their employ. D. 34 ¶ 26; D. 37 ¶ 13.

### F. The Leadup to the Initiation of this Lawsuit by Neural Magic

Soon after Matveev's viewing of the public post about the FBGEMM on January 18, 2020, D. 34 ¶ 26, counsel for Neural Magic sent letters to both Facebook and Zlateski asking that they remove the publication from GitHub, cease use of the proprietary information and that Zlateski assure that he would not engage in further breaches of his obligation to Neural Magic. D. 33-2 at 2, 7. Over the course of the following two months, counsel for the parties exchanged several letters and otherwise conferred. Although they did not resolve all of their disputes, Facebook eventually agreed to remove the FBGEMM from GitHub repository and asked GitHub to remove any vestiges of this code from its platform, D. 46 ¶¶ 35-39, instructed Zlateski and other engineers not to re-post or use the code or any derivative work and agreed that it would not write any new code based on the allegedly proprietary algorithms. D. 46 ¶ 40. Since Defendants do not agree that such algorithms are trade secrets and did not agree to all of the relief that Neural Magic was seeking for

them to undertake voluntarily, Neural Magic filed this suit on March 4, 2020, D. 1, and thereafter

moved for preliminary injunction, D. 25.  D. 32 at 12.

### G.      Trade Secrets Claimed by Neural Magic



## IV.      Procedural History

On March 4, 2020, Neural Magic instituted this lawsuit.  D. 1.  On April 9, 2020, Neural

Magic moved for a preliminary injunction.  D. 25.  After full briefing, the Court heard the parties

on the pending motion and took the matter under advisement.  D. 73.

## V.       Discussion

### A.      Likelihood of Success on the Merits

Although the Court considers all factors of the preliminary injunction analysis, "[t]he sine

qua non of this four-part inquiry is likelihood of success on the merits:  if the moving party cannot

demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002); see Boathouse Grp., Inc. v. TigerLogic Corp., 777 F. Supp. 2d 243, 248 (D. Mass. 2011) (explaining that "[l]ikelihood of success on the merits is the critical factor in the analysis and, accordingly, a strong likelihood of success may overcome a 'somewhat less' showing of another element").

Where the factual record is highly contested, particularly as to the key consideration of likelihood of success on the merits, a preliminary injunction may not be warranted. See Spencer Co. v. Armonk Indus., Inc., 489 F.2d 704, 707 (1st Cir. 1973) (affirming the refusal to grant a preliminary injunction as an appropriate exercise of discretion considering a "major factual dispute" and there was "uncertainty whether [plaintiff] would ever prevail on the merits"); Guevara-Salgado v. Hayes-Meninno, LLC., No. 15-12294-PBS, 2016 WL 3774195, at *1 (D. Mass. 2016) (denying preliminary injunction where facts pertaining to substantial likelihood of success were "hotly dispute[d]").

Although it asserts several claims against Defendants, in connection with this motion, Neural Magic contends that it is likely to succeed on the merits of its misappropriation of trade secret claims arising under state and federal law against Facebook and Zlateski and its breach of contract claim against Zlateski, D. 32 at 19; D. 32 at 27, and so the Court confines its analysis to these claims.

### 1.    *Misappropriation of Trade Secrets Claim*

To prevail on a misappropriation of trade secrets claim under Massachusetts law, Neural Magic must demonstrate:  (1) the existence of a trade secret; (2) that Neural Magic took reasonable steps to preserve the secrecy of the trade secret; and (3) that Zlateski "used improper means, in

breach of a confidential relationship, to acquire the trade secret." Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1165 (1st Cir. 1994) (citing J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 357 Mass. 728, 729-31 (1970), abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154 (2010)).

The Defend Trade Secret Act ("DTSA") confers a federal cause of action on an owner of a trade secret that has been misappropriated and is "nearly equivalent" to the Massachusetts trade secret law. Allscripts Healthcare, LLC v. DR/Decision Resources, LLC, 386 F. Supp. 3d 89, 94 (D. Mass. 2019). It requires plaintiff to show that it (1) took reasonable measures to keep such information secret and (2) the information derives independent economic value. Id at 94-95 (citing 18 U.S.C. §§1836(b)(1) and 1839(3)). The DTSA defines misappropriation as "the disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." Id. at 95 (citing 18 U.S.C. § 1839(5)(B)). !

a)   Whether the Claimed Algorithms are Trade Secrets

"The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret." Healy, 357 Mass. at 736 (quoting Restatement; Torts § 757 comment (b)). Whether a given set of business information is secret "depends on the conduct of the parties and the nature of the information," Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840 (1972), but there are six factors of relevant inquiry:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer

9

and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Id.

Defendants argue that the approaches and concepts that Neural Magic purport to be trade secrets are matters that are widely known by people of skill in the industry, that they were known and used by Zlateski prior to joining Neural Magic and that Neural Magic does not derive any economic value from them.  D. 47 ¶ 123.











██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████  Defendants,

however, have provided substantial evidence to suggest that these concepts were widely known by

those of skill in the field and that any one of them or the combination of them, were not the

proprietary trade secrets of Neural Magic's.  Whether Neural Magic has at least plausibly stated

these claims is a matter for another day.  Given the higher standard that applies to the present

motion and on this highly disputed record, the Court cannot conclude that Neural Magic is

reasonably likely to succeed on its claim that the matters at issue are trade secrets.

The same is true as to whether Neural Magic has demonstrated that it derived economic

value from any of its alleged trade secrets.  Although it has noted the performance enhancements

that the combination of these concepts can generate and provided evidence of the potential benefits

to potential customers, see e.g., D. 35 (House Aff.) ¶¶ 12-13, 15, 16-29 (noting that venture

investment firms have committed to Neural Magic), it does not yet have a product on the market

or customers and has not earned any revenue from the sales of any product.  D. 48 (Anderson Aff.)

¶ 63.  Accordingly, even considering this aspect of the showing that Neural Magic would have to

make as to its federal trade secret claim, the Court does not conclude that it has shown a reasonable

likelihood of success that ██████████████████████████████████████████████

████████████████████  are trade secrets.

    b) <u>It is a Close Call Whether Neural Magic Took Reasonable Steps to Preserve the Secrecy of Its Purported Trade Secrets</u>

Even if Neural Magic had succeeded in showing that there were trade secrets at issue here, they have still failed to show a reasonable likelihood of success on all of the elements of their trade secret claims. As to the second element regarding whether Neural Magic has made sufficient showing of the reasonable steps it took to preserve the secrecy of the claimed trade secrets, the Court considers several relevant factors:

> (1) the existence or absence of an express agreement restricting disclosure, (2) the nature and extent of security precautions taken by the possessor to prevent acquisition of the information by unauthorized third parties, (3) the circumstances under which the information was disclosed . . . to (any) employee to the extent that they give rise to a reasonable inference that further disclosure, without the consent of the possessor, is prohibited, and (4) the degree to which the information has been placed in the public domain or rendered "readily ascertainable" by the third parties.

USM Corp. v. Marson Fastener Corp., 379 Mass. 90, 98 (1979) (quoting Kubik, Inc. v. Hull, 224 N.W.2d 80, 91 (Mich. App. 1974)).

Much of Neural Magic's argument rises and falls on the first factor, the Agreement with Zlateski requiring his non-disclosure of trade secrets. Neural Magic requires all employees to enter into confidentiality agreements and it did so with Zlateski. Such measures are in line with the security of its computer networks and office space, D. 35 ¶¶ 23-26; D. 36 ¶¶ 4-8, and are some reasonable measures of security which would be prudent in most circumstances. D. 32 at 22; see TouchPoint Solutions, Inc. v. Eastman Kodak Co., 345 F. Supp. 2d 23, 31 (D. Mass. 2004) (finding that existence of confidential agreement and password protected server were reasonable security measures). Here, Neural Magic subjects not only its employees to non-disclosure agreements, but potential employees and "alpha customers and beta testers" as well. D. 35 ¶¶ 18-22. Moreover, Neural Magic is designing its product as a "closed-source software product" so that no customer will receive the underlying source code and any algorithms are hidden from the user. D. 35 ¶ 27.

These are all steps to designed to protect the secrecy of what Neural Magic maintains are its trade secrets.

What is debatable here, however, is whether Neural Magic took other reasonable steps to secrecy of its alleged trade secrets in light of the particular circumstances presented here, namely the departure of their Chief Technology Officer to Facebook, an entity that undisputedly is a major user of AI and uses many CPUs and GPUs.  D. 38 ¶ 25.  Neural Magic is correct that that they should be able to rely upon Zlateski's compliance with the Agreement and no lack of additional, protective measures serves to undermine the terms of same that, among other things, prohibits him, even after his termination from revealing "to any person or entity any of the trade secrets, or other non-public information concerning the organization."  D. 34-1 at 7.  Although the Agreement was some measure of protection against disclosure of trade secrets to any third party, Defendants have a reasonable argument that Zlateski's departure warranted more to prevent disclosure to third parties.  Neural Magic allowed Zlateski to remain in its employ for a number of months after his announced departure to Facebook, a company "widely recognized as pioneer of machine learning and artificial intelligence," D. 48 ¶ 28, did not deny him access to its systems, demand return of his laptop or seek to have that computer scrubbed of any alleged proprietary material before his departure from the company in July 2019.  D. 47 ¶ 18.

When Neural Magic learned of the publication of its alleged trade secret on GitHub, it took the immediate action of contacting Facebook to remove it.  As a first step, such measure was reasonable to address the public posting of the allegedly proprietary information with the entity, Facebook, that posted it.  When, however, remnants of same remained on GitHub, D. 48 ¶ 32 (citing D. 25 at 1), reasonable measures may have also included demands for removal from

GitHub, D. 43 at 20, particularly where there was some suggestion in the record that GitHub has a process for removal of sensitive data from its platform. D. 48 ¶ 76 & n.77.

c)     <u>Neural Magic Has Not Shown that Defendants Obtained the Alleged Trade Secrets by Improper Means</u>

Even as the Court assumes that Neural Magic showed that it took reasonable measures to protect its alleged trade secrets, it has not made the requisite showing as to the third requisite element of its trade secret claims:  namely, that the Defendants used improper means to obtain the trade secret.  <u>Optos, Inc.</u>, 777 F. Supp. 2d at 238.  First, Neural Magic alleges that Facebook shifted its direction as to FBGEMM upon Zlateski's arrival. D. 37 ¶¶ 142-159.  As evidence of said shift, Neural Magic notes that as late as June 2019 Facebook was still pursuing specialized hardware to speed up inference, and in terms of FBGEMM, Facebook in 2018 used compressed sparse column for its sparse GEMM and did not use JIT complier technology nor full-tile loop unrolling.  D. 37 ¶ 137.  Neural Magic alleges that it was not until July 2019, after Zlateski's arrival, that Facebook announced improvements it made in FBGEMM using loop unrolling.  D. 37 ¶ 138.  Defendants point out, however, that Facebook has used sparse matrix multiplication since at least 2015, D. 46 ¶ 13, and has used loop unrolling in the context of sparse matrix multiplication and JIT compilers prior to Zlateski's arrival at Facebook.  D. 46 ¶ 14.  Neural Magic does not appear to dispute that Facebook did use loop unrolling prior to Zlateski's arrival.  Instead it argues that the loop unrolling that Facebook discusses is distinguishable than ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████,

it is not apparent from the record that Neural Magic has shown sufficient evidence of a shift.

20

Second, Neural Magic argues that evidence of misappropriation can be seen in FBGEMM's assembly code. Neural Magic alleges that Facebook is using its trade secret algorithms because Neural Magic ran a random set of 1,000 matrices through both compliers and got outputs that are identical.  D. 32 at 23.  ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████     As Defendants note however, the hardcoding removes the algorithm ██████████

████████████████████████████████████████████████

Neural Magic, moreover, acknowledges that there are differences between its assembly code and the FBGEMM code.  D. 37 ¶ 146 (████████████████████████████████████

███████████████████████████████████████).  Moreover, Zlateski attests that he wrote the optimization code for use in the FBGEMM from scratch and not based upon Neural Magic trade secrets.  D. 47 ¶ 24.

Third, Neural Magic asserts that improper use is established given that Facebook's code uses identical variable names to Neural Magic's code, and not the variable names typically used in Facebook's code.  D. 32 at 24.  ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████

Given that Neural Magic acknowledges that prior to Zlateski's arrival, Facebook did in fact use full-tile loop unrolling in some instances and also acknowledges that there are differences between its code and FBGEMM, the Court cannot conclude that Neural Magic has shown a substantial likelihood on the merits of the improper means element.

2.      *Breach of Contract Claim Against Zlateski*

To prove a breach of contract claim, a plaintiff must show there was a valid contract, the defendant breached the contract and that the plaintiff sustained damages as a result of the defendant's breach.  Linton v. N.Y. Life Ins. Corp., 392 F. Supp. 2d 39, 41 (D. Mass. 2005).  The parties do not dispute that there is a valid contract.  Neural Magic alleges that Zlateski breached his contract "by disclosing Neural Magic's confidential information, including trade secrets to Facebook" and "by working with a directly competing business unit at Facebook."  D. 32 at 28-29.  The Agreement states that he may not "reveal to any person or entity any of the trade secrets or confidential, proprietary or other non-public information concerning the organization." D. 34-1 at 8. Neural Magic argues that Zlateski disclosed the alleged trade secretes discussed above, and therefore breached his contract.  Neural Magic, however, for the reasons discussed above, has failed to demonstrate a reasonable likelihood of success on the merits that Zlateski revealed trade secrets or used said trade secrets in the FBGEMM code.

As to the non-compete provision of the Agreement, it states that Zlateski cannot "directly or indirectly . . .  engage in any business activity which is in competition with the service or products being rendered, delivered, marketed, commercialized, produced or sold or under development or active consideration."  D. 34-1 at 10.  Under this definition, the Court does not conclude that Facebook is a competitor's of Neural Magic.   In its present startup stage, Neural Magic has not provided any goods, products or services that it has that are in competition with Facebook.  Moreover, even when it launches its product, its intended customers are researchers, universities, direct to consumer services and even Facebook itself.  D. 34 ¶ 7.  Moreover, Facebook

does not offer a GEMM JIT product for sale that competes with the customer base that Neural

Magic intends to develop.  D. 43 at 30.[1]

For all of these reasons, Neural Magic has not shown a reasonable likelihood of success on

the merits of either its trade secret claims against both Defendants or its breach of contract claim

against Zlateski.

### B.     Irreparable Harm

Given the Court's conclusion that Neural Magic has not shown a reasonable likelihood of

success on the merits, the Court need not reach the other elements for injunctive relief, but does

so here in the interest of completeness.  To obtain preliminary injunctive relief, a plaintiff must

also show a "significant risk of irreparable harm if the injunction is withheld." EEOC v. Astra

USA, 94 F.3d 738, 742 (1st Cir. 1996).  Threatened or continued use of another party's trade

secrets creates a presumption of irreparable harm.  See Optos, 777 F. Supp. 2d at 241; Aspect

Software, Inc. v. Barnett, 787 F. Supp. 2d 118, 130 (D. Mass. 2010); TouchPoint Solutions Inc.,

345 F. Supp. 2d at 32.  Since Neural Magic "has failed to demonstrate a reasonable likelihood of

success on its claim[s] for misappropriation of trade secrets, it is not entitled to that presumption

of irreparable harm," Viken Detection Corp. v. Videray Tech. Inc., 384 F. Supp. 3d 168, 179 (D.

Mass. 2019), assuming that such presumption would otherwise apply here.

Even with no presumption of irreparable harm, Neural Magic alleges that it may suffer

loss of potential customers, loss of market share, loss of goodwill, price erosion, and the loss of

head-start or first move advantage.  D. 38 (Putnam Aff.) ¶¶ 55-60.  Defendants argue that it cannot

cause such a harm because it does not offer a competing product that can lure away customers and

market share.  D. 43 at 31; D. 48 ¶ 49.  Facebook's public posting however could result in potential

---

[1] Since the Court concludes that, at this juncture, Neural Magic has not shown that it is reasonably likely to show a breach of contract, the Court need not address the final element of any injury from the alleged breach.

customers, who might otherwise have purchased from Neural Magic, instead deciding to use the free code published on GitHub.  Defendants note that Facebook has already addressed this risk of irreparable harm by removing the accused code from GitHub, pressing GitHub to remove any remaining vestiges of the code and instructed its employees not to use the code or analyze any algorithms in the code.  D. 46 ¶¶ 35-40.  While Defendants have taken these remedial steps, as Neural Magic notes the FBGEMM has been copied more than 120 times, and thus it remains publicly available.  D. 38 ¶ 57(d).  Neural Magic claims that such fact undermines any market exclusivity that it could have and, therefore, Facebook's actions in this regard "threaten[ ] Neural Magic's very existence."  D. 38 ¶ 56.  This contention, however ignores that although Facebook's posting on GitHub was publicly available for a number of months, November 2019 to January 2020 when Shavit saw it and then until Facebook agreed to remove it, D. 48 ¶ 67, Neural Magic has "failed to demonstrate that [it] has suffered any of the potential harms that [its expert, Dr. Putnam] identifies to date:"  i.e., loss of customer relationships, lost market share, price erosion and loss of investment capital.  D. 48 (Anderson Aff.) ¶¶ 39-40.  Even as the irreparable harm that a movant seeks to prevent is not just actual harm, but threatened harm, D. 69 (Putnam Reply Aff.) ¶ 3, the inability to point to actual harm to date undermines the reasonable likelihood that the same alleged wrongful acts will lead to future harm to Neural Magic.

Neural Magic's allegation of irreparable harm from Facebook's internal use of its trade secrets fares no better than the alleged risk of harm that arises from the public disclosure on GitHub.  Neural Magic argues that it is irreparably harmed by Facebook's internal use because Facebook will gain an unfair edge in the market of artificial intelligence technology, D. 38 ¶ 12(e), and will be able to use Neural Magic's work for its own benefit internally before Neural Magic can get its own product to market.  Neural Magic, however, does not explain persuasively how

such internal use would harm Neural Magic's first-mover advantage.  Dr. Putnam, one of Neural Magic's experts, posits that "[b]y using the code internally, Facebook also gains an unfair head start in using these algorithms that they would have otherwise had to pay Neural Magic to use." D. 38 ¶ 129(e).  To say that such use amounts to irreparable harm, requires the Court to assume that the algorithms are proprietary to Neural Magic (which it has not), that the company had produced them in a product for purchase (which it has not yet) and that Facebook would choose to purchase it from them (which it has not even as Neural Magic envisioned Facebook as a potential, future customer).  Given all of the leaps of logic that this argument requires, the Court is not persuaded by it.  Accordingly, Neural Magic has not demonstrated that it will be irreparably harmed by Facebook's internal use.

Regarding Zlateski specifically, Neural Magic provides little argument as to why Zlateski's continued involvement in any work related to machine learning in any fashion would cause it irreparable harm.  Neural Magic alleges that Zlateski possesses other trade secrets that he "has disclosed or may disclose to Facebook in violation of his contractual commitments." D. 38 ¶ 57(d). Neural Magic provides no other details as to what trade secrets Zlateski has disclosed or may disclose, Zlateski attests that he has not done any further work on the FBGEMM code at issue and has no plans to do so in the future, D. 47 ¶ 25, and even absent an injunction, Zlateski is still obligated to refrain from disclosing any actual trade secrets pursuant to his Agreement. Accordingly, Neural Magic has not demonstrated that Zlateski's continued work at Facebook in machine learning in any fashion will irreparably harm it.

Lastly, the Court notes that part of the showing of the need for injunctive relief is that the movant will suffer irreparable harm where there is no adequate remedy at law for same. Charlesbank Equity Fund II, LP v. Blinds to Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004) (noting

that "[i]rreparable harm most often exists when a party has no adequate remedy at law"); see D. 48 ¶ 72.  Neural Magic has not shown that there is no adequate remedy at law where, even if the harms above had been shown here, a monetary measure of same could be made.  That is, if Neural Magic prevails at trial, it could rely upon its business valuation during its seed-stage round as $45 million, D. 48 ¶ 72, if not as a cap on damages as Defendants' expert suggests, D. 48 ¶ 74, but as a reasonable marker for the value of a startup company has not sold a product, developed a product, or captured any part of the relevant market, but has the potential to do so as, presumably, its investors have recognized.

### C.        The Balance of Harms and the Public Interest

The final considerations in weighing the grant of a preliminary injunction are "a balance of equities in the plaintiff's favor, and [] service of the public interest." Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, 794 F. 3d 168, 171 (1st Cir. 2015).  Neural Magic argues that the balance of hardships weighs in its favor because it faces market share loss and deterioration of its customer base, D. 38 ¶¶ 12 (a)-(c); 57(a)-(c), while Facebook and Zlateski would face no hardship. D. 32 at 33.  As discussed above, Neural Magic has not shown a risk of irreparable harm. Moreover, as to Zlateski, injunctive relief is not warranted where whether Zlateski has violated the Agreement presently remains unclear and allegations of misappropriation may have adverse consequences for a scientist in his field.  See Maine Pointe, LLC v. Collins, No. 18-12072-DJC, 2018 WL 5303038, at * 6 (D. Mass. Oct. 25, 2018) (finding defendant would suffer reputational harm within the industry, "if only in suggesting wrongdoing on [Defendants'] part").

As to the public interest, in the absence of a reasonable likelihood of success of the merits of Neural Magic's primary claims, the public interest is served by holding the parties to their Agreement (which still governs Zlateski's post-employment status as to confidential information) and allowing relief, if any is warranted, to follow the litigation of Neural Magic's claims on the

merits.  Accordingly, the balance of harms and the public interest do not favor Neural Magic in considering the issuance of preliminary injunctive relief.

**VI.     Conclusion**

For the reasons discussed above, the Court DENIES Neural Magic's motion for preliminary injunction, D. 25.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge