UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEURAL MAGIC, INC.,                )<br>                                                        )<br>            Plaintiff,                       )<br>                                                        )<br>v.                                                   )<br>                                                        )<br>FACEBOOK, INC. AND                 )<br>ALEKSANDAR ZLATESKI            )<br>                                                        )<br>            Defendants.                   )<br>                                                        )<br>                                                        ) | **Civil Action No. 20-10444** |

**JOINT STATEMENT OF THE PARTIES PURSUANT TO**
**FED. R. CIV. P. 16(b) & 26(f) AND LOCAL RULE 16.1**

Pursuant to Fed. R. Civ. P. 16(b) and 26(f), Local Rule 16.1, and the Court's Notice of Scheduling Conference dated October 29, 2020 (Dkt. No. 89), counsel for the parties hereby submit this Joint Statement in advance of the Scheduling Conference set for November 16, 2020 at 3:15 PM.

**I.      SUMMARY OF THE PARTIES' POSITIONS**

A.      *Background of Litigation*

Plaintiff Neural Magic, Inc. ("Neural Magic," "NMI," or the "Company") filed its complaint in the above-captioned action on March 4, 2020 (Dkt. No. 1). On April 9, 2020, Neural Magic filed a Motion to Expedite Discovery and a Motion for Preliminary Injunction (Dkt. Nos. 23-25). Neural Magic's Motion to Expedite was denied without prejudice on April 15, 2020 (Dkt. No. 30). On April 27, 2020, the Court entered a Protective Order governing the handling of confidential information and documents in this case (Dkt. No. 52). The Court denied Neural Magic's Motion for Preliminary Injunction on May 29, 2020 (Dkt. No. 80).

Defendants moved to dismiss certain claims on May 11, 2020 (Dkt. No. 74) ("Defendants' Partial Motion to Dismiss"). The Court granted in part and denied in part Defendants' Partial Motion to Dismiss. (Dkt. No. 88).

The following claims remain against the Defendants:

a) Facebook, Inc.: alleged misappropriation of trade secrets in violation of M.G.L. c. 93 § 42; alleged violation of the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836); alleged violation of M.G.L. c. 93A § 11; alleged tortious interference with advantageous contractual relations.

b) Aleksandar Zlateski: alleged misappropriation of trade secrets in violation of M.G.L. c. 93 § 42; alleged violation of the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836); alleged violation of M.G.L. c. 93A § 11; alleged breach of contract (non-disclosure and non-competition agreement).

B.   *Plaintiff's Position*

MIT professor Nir Shavit and MIT research scientist Alex Matveev co-founded Neural Magic in 2017. The core of Neural Magic's value is in its novel algorithms, techniques, design patterns, optimization strategies, and formulas (collectively, the "Neural Magic Algorithms"). The Neural Magic Algorithms are a breakthrough in the field of artificial intelligence ("AI"). These algorithms support large data sets and allow complicated mathematical functions to run in a highly-efficient manner on commodity-based computers. The investment community recognized the significance of this innovation, and Neural Magic soon raised $20 million in funding.

Defendant Aleksandar Zlateski was a MIT post-doctoral researcher when Professor Shavit and Matveev founded Neural Magic. Excited by the idea of commercializing CPU-based neural network computation, Zlateski joined Neural Magic on March 19, 2018 as its Technology Director

and first employee. As part of the onboarding procedures, Neural Magic emphasized the need for confidentiality and Zlateski signed a non-disclosure agreement. Zlateski agreed that he would not reveal Neural Magic's trade secrets or confidential, proprietary or other non-public information, and that any inventions he created—either alone or with others—during his engagement by the company, relating to the business of the company, would be the sole and absolute property of Neural Magic.

Zlateski was a trusted member of the small Neural Magic team. In his unique role as Technology Director, Zlateski had unfettered access to Neural Magic's trade secrets, research and development. As part of his work in this role, Zlateski co-authored software code that encapsulates Neural Magic's algorithms. This information was not public and was only made available to Zlateski through his role as Technology Director of Neural Magic.

After almost a year and a half with Neural Magic, Zlateski accepted a new position at Facebook. Zlateski assured Neural Magic that his position at Facebook was not related to the work he performed at Neural Magic. Although the Facebook position was supposedly substantively unrelated to his work at Neural Magic, Zlateski was reminded that he was required to keep all Neural Magic proprietary information and trade secrets strictly confidential.

In November 2019, Facebook published Neural Magic Algorithms on GitHub—an open-source software development platform that users can access for free. One month later, Facebook announced at an AI Developers Conference that it made an algorithm that would enable neural networks to run efficiently on commodity Central Processing Units (CPUs). Later investigation by Neural Magic would reveal that Facebook's open source implements the very same algorithms as the Neural Magic Algorithms.

C.   *Defendants' Position*

NMI accuses Facebook and Dr. Aleksandar Zlateski—a computer scientist of impeccable credentials and a stellar reputation—of theft.  NMI's claims are based on its allegations that Facebook and Dr. Zlateski worked in concert to steal a series of purported "trade secrets" and confidential information from NMI, a company that had no products, no customers, and no industry presence when this suit was filed.  The purported proprietary information, NMI contends, was lifted from its unfinished software and used in Facebook's compiler, FBGEMM—software Facebook has open-sourced to the public for years.

The truth is that, while Dr. Zlateski was earning three degrees from MIT and conducting postdoctoral research there and at Princeton, he developed a considerable toolkit of software development techniques, and he employed those techniques throughout his career as a student, at NMI, and at Facebook.  Far from valuable proprietary information that belongs only to NMI, the amorphous categories of information NMI accuses Dr. Zlateski and Facebook of stealing are, in reality, well-known approaches commonly used by computer scientists in the field.

When Dr. Zlateski left NMI, NMI knew he was leaving to join Facebook's AI Research (FAIR) group.  NMI wished to continue to benefit from Dr. Zlateski's expertise after his departure, so it freely let him go, gave him his company laptop as a going away present, encouraged him to stay in NMI's offices for months after resigning, and gave him ongoing access to its systems and information even after he was at Facebook.  Later, after learning that Facebook had posted the accused code on GitHub (a code sharing site), NMI wrote letters to Facebook and Dr. Zlateski, but, inexplicably, never once asked GitHub to take down the code.

The lack of merit in NMI's case was already revealed in the latticework of falsehoods, exaggerations, and mistakes that NMI relied on as it strained to contort the facts of this case into

a fictitious narrative of misappropriation for its preliminary injunction motion. For example, NMI told the Court that Dr. Zlateski's illicit copying was established by the "telltale signs" that FBGEMM and NMI's compiler share several variables; by the insinuation that a typo in FBGEMM shows the wholesale copying of NMI's code, mistakes and all; and in tests its expert performed on 1,000 inputs that, NMI trumpeted, achieved identical outputs in both NMI's compiler and FBGEMM. But the evidence presented at the preliminary injunction stage already debunked NMI's sensational claims. The variables NMI touted were the same ones Dr. Zlateski used as a student and were never secret nor proprietary to NMI. The typo was never actually in NMI's code and in no way showed the copying of even a single line of NMI code. And the tests NMI so heavily relied on were manipulated by NMI's expert to coerce the results he wanted.

For these and other reasons, the Court denied NMI's motion for a preliminary injunction. The Court correctly ruled that Facebook and Dr. Zlateski provided "substantial evidence" that the "concepts" NMI claims are proprietary "were widely known by those of skill in the field and that any one of them or the combination of them, were not the proprietary trade secrets of [NMI]." D.I. 80 at 17. Indeed, as the Court recognized and NMI conceded, Facebook was using the information NMI claims is proprietary before it hired Dr. Zlateski. *See id.* at 20 ("Facebook has used sparse matrix multiplication since at least 2015, … and has used loop unrolling in the context of sparse matrix multiplication and JIT compilers prior to Zlateski's arrival at Facebook."), 22 ("[NMI] acknowledges that prior to [Dr.] Zlateski's arrival, Facebook did in fact use full-tile loop unrolling … and also acknowledges that there are differences between its code and FBGEMM").

## II.  RULE 26 (A) DISCLOSURES AND DISCOVERY LIMITATIONS

The parties have agreed to defer the exchange of initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1) until December 2, 2020, subject to approval by this Court.

## III.  TRADE SECRETS IDENTIFICATION

### A. *Defendants' Position*

By December 2, 2020, in accordance with M.G.L. c. 93 §42D(b), Plaintiff will serve on Defendants a statement identifying "with reasonable particularity the circumstances" of any alleged trade secret misappropriation, "including the nature of the trade secrets and the basis for their protection."  That statement "shall identify [any allegedly misappropriated] trade secret with sufficient particularity under the circumstances of the case to allow the court to determine the appropriate parameters of discovery and to enable reasonably [Defendants] to prepare their defense." M.G.L. c. 93 § 42D.  Plaintiff is not permitted to commence discovery until its trade secret identification is served, and that statement may be amended only with the Court's leave and upon a showing of good cause.

The above requirements will allow the Court to control discovery and the Defendants to prepare their defenses, as M.G.L. c. 93 § 42D contemplates, without fear of NMI adopting a shifting sands approach to discovery and its claims while "rummaging through [Defendants'] scientific files." *Alnylam Pharm., Inc. v. Dicerna Pharm., Inc.*, No. MICV20154126, 2016 WL 4063565, at *2 (Mass. Super. Apr. 6, 2016) (ordering service of a revised, more detailed trade secret disclosure).  "Both for the defendants to respond to the charges against them, and for the Court to make appropriate findings and rulings on the case, there must be a clear designation that distinguishes unique or proprietary material from the vast body of" information alluded to in NMI's complaint.  *L-3 Commc'ns Corp. v. Reveal Imaging Techs., Inc.*, No. 035810BLS, 2004

WL 2915743, at *13 (Mass. Super. Dec. 2, 2004) (citing, among other cases, *Xerox Corp. v. Int'l Bus. Machines Corp.*, 64 F.R.D. 367 (S.D.N.Y. 1974)). Until NMI "identif[ies] in detail the trade secrets and confidential information alleged to have been misappropriated by" Defendants, "neither the court nor the parties can know, with any degree of certainty, whether discovery is relevant or not; and it is doubtful whether [Defendants] can undertake a meaningful discovery program"—which is likely to include the "attempt to trace the flow of [alleged] trade secrets and confidential information through" Facebook—"without [NMI] first identifying which trade secrets and what confidential information [Defendants allegedly] misappropriated." *Xerox Corp.*, 64 F.R.D. at 371-72; *see also Digital Assurance Certification, LLC v. Pendolino*, No. 6:17-CV-72-ORL-41TBS, 2018 WL 9669762, at *1, 4 (M.D. Fla. Sept. 9, 2018) (motion to stay discovery pending a sufficient trade secret identification resolved where the court questioned plaintiff's counsel to "create a workable list" and ruled that "[i]f Plaintiff is claiming … information is a Trade Secret that was misappropriated by a Defendant, then it must furnish a written description to Defendants") (citing *Xerox Corp.*, 64 F.R.D. at 371); *A&P Tech., Inc. v. Lariviere*, No. 1:17-CV-534, 2017 WL 6606961, at *9 (S.D. Ohio Dec. 27, 2017) (ruling that a plaintiff had to "specifically identify those trade secrets that ha[d] allegedly been misappropriated" before a defendant was required to "divulge its own trade secrets through discovery," particularly where, as in this case, the court "already found no strong case for requiring preliminary injunctive relief").

NMI complains that Defendants seek to delay discovery by an additional month with their proposed December 2, 2020 deadline. That is not true. Defendants would welcome an earlier, specific identification of the trade secrets and proprietary information that NMI alleges Defendants have misappropriated. NMI also argues that it already disclosed multiple trade secrets with more than reasonable particularity in earlier proceedings. Defendants do not agree that any actual trade

secrets were previously disclosed, but if NMI wants to state in a trade secret disclosure document, as it does below, that "the trade secrets it intends to pursue in discovery" are limited to those it already identified, that too is welcome. Indeed, NMI should be able to make that disclosure immediately, e.g., by incorporating its earlier briefing and expert reports by reference. Last, with respect to requiring NMI to show good cause to amend its trade secret disclosure, that it is an eminently reasonable approach for the Court to take, to control and bring clarity to NMI's allegations. This standard applies to all of the Court's scheduling orders, *see* L.R. 16.1(g), and the Court would be well within its discretion to apply it to NMI's trade secret disclosure. *See, e.g.*, *United Servs. Auto. Ass'n v. Mitek Sys., Inc.*, 289 F.R.D. 244, 248 (W.D. Tex. 2013), *aff'd*, 2013 WL 1867417 (W.D. Tex. Apr. 24, 2013) (granting a motion for "Pre-Discovery Identification of Trade Secrets"; collecting cases requiring such disclosures, including *L-3 Commc'ns Corp.*; and noting that Fed. R. Civ. P. 16(c)(2)(L) provides the district court with "broad discretion" to adopt procedures for managing "'potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems.'") (quoting Fed. R. Civ. P. 16(c)(2)(L)).

    B.    *Plaintiff's Position*

Neural Magic proposes that discovery should begin now, as to all non-trade secret issues and as to all trade secrets that have already been identified. M.G.L. c. 93 §42D(b) requires parties alleging trade secrets misappropriation to "state with reasonable particularity the circumstances thereof, including the nature of the trade secrets and the basis for their protection." The statute further states that "[b]efore commencing <u>discovery relating to an alleged trade secret</u>, the party alleging misappropriation shall identify the trade secret with sufficient particularity under the circumstances of the case to allow the court to determine the appropriate parameters of discovery

and to enable reasonably other parties to prepare their defense." *Id*. (emphasis added). The statute does not stay all discovery until a particular trade secret has been identified: only discovery related to the alleged trade secret is stayed, and that discovery is only stayed until the trade secret is disclosed with reasonable particularity.

Neural Magic has already disclosed multiple trade secrets with more than reasonable particularity in its complaint, in its preliminary injunction papers, and in its expert reports. Courts in this Commonwealth have commenced discovery under M.G.L. c. 93 § 42D based on far less detail than what Neural Magic has already provided. *See, e.g., Moog, Inc. v. ClearMotion, Inc.*, Case No. 1:19-CV-12066-IT, Dkt. 40 at *7 (D. Mass. Oct. 21, 2020) (in M.G.L. c. 93 §42D case, holding plaintiff's complaint "adequately distinguish[ed] that which is public knowledge from the trade secrets") & *id*. Dkt. 31 at 1-2 (entering scheduling order without any separate deadline for trade secret identification). Facebook's proposal to stay all discovery for at least an additional month is inconsistent with the statute and unreasonable under the circumstances of this case, which has been pending for eight months already without discovery.

Facebook also proposes that trade secret identifications "may be amended only with the court's leave and upon a showing of good cause." M.G.L. c. 93 § 42D contains no such requirement. The statute only requires that trade secrets be disclosed before discovery on those trade secrets commences. It does not prohibit disclosing additional trade secrets, or amending trade secrets, as a case progresses; it merely restricts pursuing discovery on undisclosed trade secrets. Neural Magic has already disclosed the trade secrets it intends to pursue in discovery, based on public evidence of trade secret misappropriation Neural Magic has already obtained. If, as discovery progresses, it appears that other trade secrets may be relevant to the case and discovery on those other trade secrets is necessary, Neural Magic will disclose additional trade

secrets at that time as required by the statute, and will then pursue discovery on those trade secrets. Neural Magic does not believe the Court should be bothered with motion practice and adjudicating disputes over what does and does not constitute "good cause" for amendment (even clerical typographical corrections) as the case progresses; instead, Neural Magic proposes the parties work cooperatively on any future disclosure of trade secrets, if any such disclosure is ultimately required.

## IV.     ELECTRONICALLY STORED INFORMATION

The parties will jointly submit a proposed order regarding electronically stored information on or before November 13, 2020.

## V.     PROPOSED PRETRIAL SCHEDULE

The parties have agreed to the following discovery and motions practice schedule, subject to Court approval:

| Event | Deadline |
| --- | --- |
| Deadline for Defendants to answer the complaint | November 12, 2020 (14 days after October 29, 2020) |
| Deadline for service of initial disclosures | December 2, 2020 |
| Deadline for amendments to pleadings | December 16, 2020 |
| Deadline for completion of all discovery, other than expert discovery | August 27, 2021 |
| Deadline for opening expert reports | October 15, 2021 |
| Deadline for rebuttal expert reports | November 5, 2021 |
| Deadline for conclusion of expert discovery, including expert depositions | November 24, 2021 |
| Deadline for filing of any summary judgment motions | December 10, 2021 |

## VI.     TRANSFER TO A UNITED STATES MAGISTRATE JUDGE

At this time, the parties do not consent to the transfer of this matter to, or to trial before, a United States Magistrate Judge.

## VII. SETTLEMENT OFFER

Plaintiff submitted a written settlement demand to Defendants on November 5, 2020. Defendants are considering Plaintiff's demand and will respond to it before the November 16, 2020 scheduling conference.

## VIII. LOCAL RULE 16.1(D)(3) CERTIFICATIONS

The required certifications signed by counsel and by an authorized representative of each party will be filed under separate cover. Each party affirms that they and their counsel have conferred: (a) with a view to establishing a budget for the costs of conducting the full course and various alternative courses of the litigation, and (b) to consider the resolution of the litigation through the use of alternative dispute resolution programs such as those outlined in Local Rule 16.4.

## IX. ALTERNATIVE DISPUTE RESOLUTION

At present, the parties are not prepared to consent to alternative dispute resolution.

| | |
|---|---|
| Respectfully submitted, | Dated: November 9, 2020 |
| /s/ *Steven Cherny* | /s/ *William J. Trach* |
| Steven Cherny (BBO# 706132)<br>Patrick D. Curran (BBO# 568701)<br>Kait O'Connor (BBO# 687527)<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>111 Huntington Avenue, Suite 520<br>Boston, MA 02199<br>Tel: (617) 712-7100<br>stevencherny@quinnemanuel.com<br>patrickcurran@quinnemanuel.com<br>kaitoconnor@quinnemanuel.com<br><br>*Counsel for Plaintiffs* | William J. Trach (BBO No. 661401)<br>Christopher W. Henry (BBO No. 676033)<br>Nathanial McPherson (BBO No. 697666)<br>LATHAM & WATKINS LLP<br>John Hancock Tower<br>200 Clarendon Street, 27th Floor<br>Boston, MA 02116<br>(617) 948-6000 / (617) 948-6001 Fax<br>william.trach@lw.com<br>christopher.henry@lw.com<br>nathanial.mcpherson@lw.com<br><br>Douglas E. Lumish (*pro hac vice*)<br>LATHAM & WATKINS LLP<br>140 Scott Drive<br>Menlo Park, CA 94025<br>(650) 328-4600 / (650) 463-2600 Fax<br>douglas.lumish@lw.com<br><br>Jennifer L. Barry (*pro hac vice*)<br>LATHAM & WATKINS LLP<br>12670 High Bluff Drive<br>San Diego, CA 92130<br>(858) 523-5400 / (858) 523-5450 Fax<br>jennifer.barry@lw.com<br><br>*Attorneys for Defendant*<br>*Facebook, Inc.*<br><br>/s/ *Stephen D. Riden*<br>Stephen D. Riden (BBO No. 644451)<br>Russell Beck (BBO No. 561031)<br>Hannah Tso Joseph (BBO No. 688132)<br>BECK REED RIDEN LLP<br>155 Federal Street, Suite 1302<br>Boston, MA 02110<br>(617) 500-8670 / (617) 500-8665 Fax<br>rbeck@beckreed.com<br>sriden@beckreed.com<br>hjoseph@beckreed.com<br><br>*Attorneys for Defendant*<br>*Aleksandar Zlateski* |

**CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 9th day of November, 2020.

                                                    /s/ *Patrick D. Curran*
                                                    Patrick D. Curran