**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NEURALMAGIC, INC. | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | )    **Civil Action No. 20-CV-10444** |
| | ) |
| FACEBOOK, INC. AND ALEKSANDAR | ) |
| ZLATESKI | ) |
| | ) |
| *Defendants.* | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**NEURAL MAGIC'S MEMORANDUM IN OPPOSITION TO DEFENDANTS'**
**MOTION TO COMPEL AND FOR A PROTECTIVE ORDER**
**AND IN SUPPORT OF CROSS-MOTION TO COMPEL**

███████████████████████

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

    A.    Factual Background ....................................................................................... 4

        1.    Facebook Refuses to Address Neural Magic's Early Concerns About Internal Use. .......................................................................... 4

        2.    Defendants Resist Early Discovery and Make Untested Representations to the Court. ................................................... 4

        3.    This Court Orders an Identification of Trade Secrets; Neural Magic Complies. ......................................................................... 5

        4.    Facebook Categorically Refuses to Engage in Discovery. ......................... 7

        5.    Hours After The First Meet And Confer, Defendants Move For A Protective Order. ................................................................... 7

        6.    █████████████████████████████████████████████████████████████████████████

LEGAL STANDARDS ........................................................................................................ 9

    A.    Trade Secret Identification ........................................................................... 9

    B.    Damages Disclosures .................................................................................. 11

ARGUMENT .................................................................................................................... 11

    A.    Neural Magic Identified Trade Secrets More Than Sufficiently To Begin Discovery. .......................................................................................... 11

    B.    Defendants Should Not be Permitted to Withhold Relevant Documents and Information Regarding Neural Magic's Damages. ..................................... 16

    C.    Discovery on Non-Trade Secret Claims Should Not be Stayed. ........................ 18

    D.    This Court Should Not Reward Defendants' Rush To Court. ............................. 19

CONCLUSION ................................................................................................................. 20

## **TABLE OF AUTHORITIES**

### **Cases**

*Advanced Modular Sputtering, Inc. v. Superior Court,*
  33 Cal. Rptr. 3d 901 (Cal. Ct. App. 2005)......................................................................13, 15

*Alnylam Pharm., Inc. v. Dicerna Pharm., Inc.*,
  No. MICV20154126, 2016 WL 4063565 (Mass. Super. Apr. 6, 2016)..................... 10, 13, 14

*Aquila, LLC v. City of Bangor*,
  No. CV-08-64-B-W, 2009 WL 3326765 (D. Me. Oct. 9, 2009) ...........................................18

*Brescia v. Angelin*,
  90 Cal. Rptr. 3d 842 (Cal. Ct. App. 2009).........................................................................10

*Chrimar Sys. Inc v. Cisco Sys. Inc*,
  No. C 13-01300 JSW(MEJ), 2013 WL 4647392 (N.D. Cal. Aug. 29, 2013) ........................17

*Clark v. Berkshire Med. Ctr., Inc.*,
  No. CV 17-30186-MGM, 2019 WL 78994 (D. Mass. Jan. 2, 2019) .....................................17

*Corning Optical Commc'ns Wireless Ltd. v. Solid, Inc.*,
  306 F.R.D. 276 (N.D. Cal. 2015) .......................................................................................18

*Cruz v. Bos. Litig. Sols. LLC*,
  No. CV 13-11127(LTS), 2015 WL 12964732 (D. Mass. Jan. 9, 2015).................................17

*Cruz v. Bos. Litig. Sols. LLC*,
  No. CV 13-11127(LTS), 2015 WL 12964336 (D. Mass. Apr. 17, 2015) .............................. 19

*DeRubeis v. Witten Techs., Inc.*,
  244 F.R.D. 676 (N.D. Ga. 2007).................................................................................10, 16

*Katz v. Liberty Power Corp., LLC*,
  No. 18 CV 10506(ADB), 2020 WL 3492469 (D. Mass. June 26, 2020)...............................20

*Pine Ridge Recycling, Inc. v. Butts Cty., Ga.*,
  889 F. Supp. 1526 (M.D. Ga. 1995).....................................................................................17

*Proofpoint, Inc. v. Vade Secure, Inc.*,
  No. 19 CV 04238 (RMI), 2020 WL 1911195 (N.D. Cal. Apr. 20, 2020)............. 10, 13, 14, 15

*Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*,
  280 F.R.D. 147 (S.D.N.Y. 2012) .........................................................................................18

*Silvagni v. Wal-Mart Stores, Inc.*,
  320 F.R.D. 237 (D. Nev. 2017)............................................................................................11

*Soc. Apps, LLC v. Zynga, Inc.*,
No. 11 CV 04910(YGR), 2012 WL 2203063 (N.D. Cal. June 14, 2012) ..............................11

*Song v. Drenberg*,
No. 18 CV 06283 LHK VKD, 2019 WL 1949785 (N.D. Cal. May 2, 2019) .........................18

*Stone Brewing Co., LLC v. MillerCoors LLC*,
No. 3:18 CV 00331 (LL), 2020 WL 907060 (S.D. Cal. Feb. 25, 2020) ................................17

*StoneEagle Servs., Inc. v. Valentine*,
No. 3:12 CV 1687 (P), 2013 WL 9554563 (N.D. Tex. June 5, 2013) ....................................15

*Structural Pres. Sys., LLC v. Andrews*,
No. CV 12-1850-MJG, 2013 WL 12244886 (D. Md. Dec. 17, 2013) ....................................10

*WeRide Corp. v. Kun Huang*,
379 F. Supp. 3d 834, 846 (N.D. Cal. 2019), *modified in part*, No. 5:18-CV-07233-EJD, 2019
WL 5722620 (N.D. Cal. Nov. 5, 2019) ...................................................................................15

## Statutory Authorities

Mass. G. L. c. 93 § 42D(b) .....................................................................................................passim

## Rules and Regulations

Fed. R. Civ. P. 26(a)(1)(A)(iii) ..................................................................................... 11, 16, 17

Fed. R. Civ. P. 26(b)(1) ...................................................................................................... 19, 20

Rule 37(a)(5)(B) ...........................................................................................................................20

iii

## PRELIMINARY STATEMENT

Facebook takes the extraordinary position that discovery of its technical documents cannot *begin* until Neural Magic provides detailed contentions distinguishing all documents Facebook intends to rely on for its "public availability" defense.  This is backwards.  Massachusetts law requires Neural Magic to identify trade secrets with sufficient detail so that Defendants can *prepare* a defense.  *It does not stay discovery until those defenses are resolved*.  Defendants clearly are able to prepare their "public availability" defense, and cite multiple documents they contend disclose the trade secrets at issue.  This defeats, not supports, their request.  Under Defendants' view, a plaintiff cannot get discovery unless it can win a motion to dismiss or summary judgment based on the record at the pleadings stage.  That is not the law.

Defendants likewise say financial discovery cannot *begin* until Neural Magic's calculation of damages is complete.  But this turns Rule 26 on its head.  The Rule does not authorize withholding discovery based on objections to initial disclosures—and the Rules Committee specifically states damages calculations may occur *after* discovery in disputes like this.  Defendants are certainly entitled to move to compel any preliminary disclosure or discovery response it contends is deficient but it is not entitled to use any such alleged deficiency unilaterally to halt discovery.

Just weeks ago Defendants told the Court a trade secrets identification at the outset of the case would make these proceedings more efficient and would not lead to delay or fights between the parties.[1]  In fact, Defendants said Neural Magic could simply incorporate its preliminary

---

[1]  *See* Nov. 16 Hr'g Tr. at 10:9-16 ("we're actually proposing an earlier deadline to try to make this more efficient on the front end for the Court and for the parties going forward" by trying to avoid "exchanges of discovery requests, and then, as you'll see in the cases we cited, competing motions to compel and motion for protective order practice").

injunction briefing by reference to make a sufficient trade secrets disclosure.[2]  Neural Magic did exactly that, serving a trade secret identification that mirrored the same four categories of trade secrets at issue in the preliminary injunction phase, drawing detail from the very briefing and expert reports Defendants conceded were sufficient for trade secret identification. ███ █ ███
██████████████████████████████████████████████████████████████████

Defendants' own motion *concedes* Neural Magic still is relying on the same four categories of technology at issue in preliminary injunction phase.  Dkt. 115 at 10, 12, 13 █████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
████████████████████████████████████ Yet Defendants now say *every* trade secret Neural Magic identified, even those drawn word-for-word from the preliminary injunction papers, is inadequately identified – a stunning retreat from prior statements to the Court.  *See* Dkt. 92 at 8; Nov. 16 Hr'g Tr. 8:11-16.

The dozen or so internal documents Defendants did produce on January 4 reveal why Defendants seek to stall any further discovery: ███████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████

---

[2]  *See* Dkt. 92 at 8 ("NMI should be able to make [a trade secret] disclosure immediately, e.g., by incorporating its earlier briefing and expert reports by reference."); *see also* Nov. 16 Hr'g Tr. at 8:11–16 ("[If] it is the case that plaintiffs intend to proceed on just the trade secrets, the alleged trade secrets that were identified in the preliminary injunction phase, then that should take almost no time to identify").

[3]  Exhibit citations in this motion refer to Exhibits to the Curran Declaration.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████

Defendants claimed in their preliminary injunction opposition papers that the algorithms at issue were not being analyzed by Facebook engineers, were not being recreated in or added to new code, and that Zlateski's work for Facebook in this area was done by October 2019. ██

█████████████████████████   ████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████   Neural Magic has waited ten months for discovery to begin.   The fact that early discovery has undermined Defendants' contentions is a basis for discovery to continue, not to shut it down prematurely.

This Court made clear that § 42D(b)'s identification requirement *only applies* to discovery on the trade secret claims.   Dkt. 105.   Defendants cannot use § 42D(b) as a shield to withhold discovery on other claims, and they give *no explanation* why a protective order on *all*  Facebook proprietary technical information is justified – especially where that information is clearly relevant

to the claims for breach of contract, tortious interference, and violations of Chapter 93A.

Neural Magic respectfully requests that the Court order Defendants to begin discovery on all of Neural Magic's claims.  And to avoid future efforts by Facebook to file motions and increase litigation costs for a much smaller adversary, Neural Magic asks the Court to order Defendants to pay Neural Magic's costs in connection with this unnecessary motion practice.  With the Court's guidance, Neural Magic hopes Defendants will adopt a more appropriate approach to future meet and confer efforts and avoid future efforts to drag out the schedule and increase litigation costs.

## BACKGROUND

A.    Factual Background

1.    *Facebook Refuses to Address Neural Magic's Early Concerns About Internal Use.*

Since February 2020, Facebook has only been willing to commit that it would not use the specific open-source code uploaded to Github in October 2019 – refusing to commit to cease using *other* internal code that used algorithms Zlateski took from Neural Magic.  *See*  Ex. C (Feb. 13 letter from Facebook rejecting Neural Magic's requests for this information);  Ex. D & E (March correspondence committing only that Facebook would not "re-post, re-publish, or use (in production or internally) *the [open-source Github] code* or any derivative work *[of the open-source Github code]*," but refusing to stop using other code); Ex. F & G (same); Ex. H & I (refusing to commit that "'algorithms' from the accused code" were not being used in other Facebook code).

2.    *Defendants Resist Early Discovery and Make Untested Representations to the Court.*

Given Facebook's repeated refusals to cease use of Neural Magic's trade secrets, Neural Magic moved to expedite discovery and requested a preliminary injunction.  Dkt. 24, 25.  The Court denied without prejudice the request for expedited discovery.  Dkt. 30.  The Court also concluded that contested issues of fact, including a "battle of the parties' conflicting experts" on

trade secret issues, precluded granting Neural Magic's request for a preliminary injunction. Dkt. 79 at 13; *see also* Dkt. 37 ("Scott Decl."); Dkt. 60 ("Kaeli Decl."); Dkt. 68 ("Scott Reply").

Defendants represented that a preliminary injunction was not warranted because "the *algorithms* in the accused code [were] not being analyzed by Facebook engineers and recreated in new code." Dkt. 58 at 8–9 (emphasis in original). Defendants further stated that the motion would only apply to "algorithms that were developed before NMI's alleged trade secrets or independently of Dr. Zlateski's work." *Id.* at 9. And Defendants claimed that, since Zlateski's work on a single "early project," *id.* at 7, he "[had] not worked further on FBGEMM . . . and [had] no plans to do so." Dkt. 62. at ¶ 25. These representations to the Court were clear: Zlateski's work at Facebook on the algorithms at issue was supposedly a narrow, one-off project. The limited discovery to date belies those representations and Plaintiffs should be allowed to obtain the discovery needed to show the full extent of how Facebook has misused the algorithms Zlateski brought to Facebook.

3. *This Court Orders an Identification of Trade Secrets; Neural Magic Complies.*

On November 17, 2020, the Court adopted Defendants' proposal for an identification of Neural Magic's trade secrets on Dec. 2. Dkt. 105. The Court noted the trade secret disclosure would not create "any real delay in discovery" as initial disclosures would not occur until this same Dec. 2 date. *Id.* Moreover, the Court explained that the "the Section 42D(b) identification only applies to trade secret claims and not to other claims" at issue. *Id.*

Defendants had argued that this identification would not delay the discovery process or add cost or burden because it could be accomplished by simply incorporating Neural Magic's previous briefing and expert reports. *See* Dkt. 92 at 8 ("Indeed, NMI should be able to make that disclosure immediately, e.g., by incorporating its earlier briefing and expert reports by reference."); *see also* Nov. 16 Hr'g Tr. at 8:11–16 ("[If] it is the case that plaintiffs intend to proceed on just the trade

secrets, the alleged trade secrets that were identified in the preliminary injunction phase, then that should take almost no time to identify[.]").[4]  On Dec. 2, Neural Magic did exactly that, and served a Trade Secrets Statement (Ex. J) that laid out the same four trade secrets from the preliminary injunction phase in four categories. ████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████ *Id.; see also* Dkt. 32 at 11–12 ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████  The Statement is often a word-for-word incorporation of the preliminary injunction papers.  *See* Ex. A.  ████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████ *See* Dkt. 32 at 11.  ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████.  *See* Ex. J at 2–5; *see also* Ex. A. Much of the wording came ***directly*** from Dr. Scott's declarations – an approach Defendants expressly stated would be sufficient.  *See* Dkt. 92 at 8; Nov. 16 Hr'g Tr. at 8:11–16.

On December 2, Neural Magic also served Defendants' with its Rule 26(a) initial disclosures, categorizing the types of damages sought and noting that specific damage amounts were not susceptible to calculation prior to discovery.  Ex. K at 4–5.  That same day, Neural Magic served Defendants with its first sets of requests for production, Ex. L, and interrogatories, Ex. M.

---

[4] In response to concerns that this step would needlessly waste time and money, Facebook replied that early identification would allegedly *avoid* the very motion practice Facebook is now engaged in: "competing motions to compel and motion for protective order practice."  *Id.* at 10:1–16.

4.      *Facebook Categorically Refuses to Engage in Discovery.*

On December 2, only *hours* after being served with these initial disclosures and discovery requests, Defendants emailed Neural Magic to claim that an exact computation of damages was required by Rule 26.  Ex. N.  Neural Magic responded on December 4, explaining that Defendants were incorrect; the Rules expressly contemplate the same approach Neural Magic took for disputes involving technology valuation.  Ex. O.  Neural Magic explained that precise computation of damages would follow discovery, and offered to accelerate a supplement on this issue if Facebook would provide early discovery related to damages.  *Id*.  Defendants declined this offer, even though this approach was the fastest path to the calculations Facebook supposedly desired.  Ex. P.

On December 11, Defendants sent Neural Magic a letter alleging deficiencies in *some* of Neural Magic's trade secrets – specifically, Nos. 3, 4, 6-8, 10, 17-19, 25-26, 28-32, 35, and 36. Ex. Q at 2.  Neural Magic promptly responded, explaining that its disclosure complied with Mass. G. L. c. 93 § 42D(b), with the Court's order, and *with Defendants' own description* of what that disclosure should contain.  Ex. R at 1. Neural Magic encouraged Facebook to move forward with discovery collaboratively, rather than continue to advance baseless objections and delay discovery. *Id*. at 2-3.  On January 4, Defendants nonetheless served discovery responses that categorically refused to provide information in response to requests regarding Defendants' misappropriation or the financial benefit Facebook derived from Neural Magic's technology. Ex. S & T.

5.      *Hours After The First Meet And Confer, Defendants Move For A Protective Order.*

On January 7, counsel for all parties met and conferred.  Neural Magic tried to clarify what information it could provide to address Defendants' objections.  For the first time, Facebook said it would not proceed with any discovery on technical topics until Neural Magic served detailed contentions on how the trade secrets identified differed from public information Facebook would

rely on for its defenses.  Facebook stated it would not engage in discovery regarding *any* Facebook technology without this information—even though this discovery is also relevant to Neural Magic's 93A and breach of contract claims.  Defendants stated that, absent a written commitment to provide this information in less than 24 hours, Defendants would file the present motion.



**LEGAL STANDARDS**

A.      Trade Secret Identification

Massachusetts law requires an identification of trade secrets with "sufficient particularity

under the circumstances of the case to allow the court to determine the appropriate parameters of discovery and to enable reasonably other parties to prepare their defense."   Mass. G. L. c. 93 § 42D(b).[5]   This requirement is not meant to be a tool for defendants to improperly prevent discovery nor "intended to resolve the issue of whether the claimed trade secrets are, in fact, protectable trade secrets."   *Alnylam Pharm., Inc. v. Dicerna Pharm., Inc.*, No. MICV20154126, 2016 WL 4063565, at *3 (Mass. Super. Apr. 6, 2016).; *cf. Brescia v. Angelin*, 90 Cal. Rptr. 3d 842, 855 (Cal. Ct. App. 2009) ("The [trade secret] identification is to be liberally construed, and reasonable doubts concerning its sufficiency are to be resolved in favor of allowing discovery to commence.").   Defendants' own cases acknowledge that identification is a "balancing act." *Structural Pres. Sys., LLC v. Andrews*, No. CV 12-1850-MJG, 2013 WL 12244886, at *4 (D. Md. Dec. 17, 2013).   Importantly, requiring identifications that are "too specific" may "miss what [the defendant] is doing" with a plaintiff's trade secrets.   *DeRubeis v. Witten Techs., Inc.*, 244 F.R.D. 676, 681 (N.D. Ga. 2007) (internal citations and quotations omitted).

The particularity requirement "***does not require*** the designation itself to ***detail how the trade secret differs from matters of general knowledge in the trade***." *Proofpoint, Inc. v. Vade Secure, Inc.*, No. 19 CV 04238 (MMC) (RMI), 2020 WL 1911195, at *7 (N.D. Cal. Apr. 20, 2020) (emphases added).   A plaintiff need only identify the trade secrets with "adequate detail to ***allow the defendant to investigate*** how [they] ***might*** differ from matters already known, and to allow the court to craft discovery."   *Id.* (emphases added).   A plaintiff is not required to "define its trade

---

[5]   Tellingly, Defendants rest much of their argument not on the text of the Massachusetts statute enacted in 2018, but on cases that *predate* that statute—authority that no longer applies in this Commonwealth.   Dkt. 115 (citing cases from 1986, 2004, 2016).   The standards cited do not reflect the language the Massachusetts legislature chose to enact, and do not inform the post-2018 standards that the Court ordered Neural Magic to comply with.   Nor did Defendants previously argue for such an exacting identification.   Dkt. 92.

secret[s] down to the finest detail," nor should the initial identification "require a mini-trial on misappropriation before discovery may commence." *Soc. Apps, LLC v. Zynga, Inc.*, No. 11 CV 04910 (YGR), 2012 WL 2203063, at *3 (N.D. Cal. June 14, 2012).

> ### B.   Damages Disclosures

Federal Rule of Civil Procedure 26(a)(1)(A)(iii) generally requires a plaintiff to disclose "a computation of each category of damages claimed," but does not require a precise computation of damages where the information necessary to do so is in Defendants' possession. The Rule's Advisory Committee expressly noted this is often the case in technology disputes. *See* Rule 26(a), Advisory Committee Notes, 1993 Amendments ("[A] party would not be expected to provide a calculation of damages which, as in many patent infringement actions, depends on information in the possession of another party or person."). Rule 26(a)(1)(A)(iii)'s requirements should be applied using "common sense": a plaintiff should provide information "reasonably available" at the time, but "a precise method of calculation need not be disclosed initially to the extent it is properly the subject of expert testimony that will be provided through future expert reports." *Silvagni v. Wal-Mart Stores, Inc.*, 320 F.R.D. 237, 241 (D. Nev. 2017).

## **ARGUMENT**

### A.   Neural Magic Identified Trade Secrets More Than Sufficiently To Begin Discovery.

Massachusetts law requires identifying trade secrets with sufficient particularity "to allow the court to determine the appropriate parameters of discovery and to enable reasonably other parties to prepare their defense." M. G. L. c. 93 § 42D(b). Neural Magic satisfied this standard; it identified in great detail (with annotated figures and source code references) algorithms Neural Magic currently believes Defendants misappropriated. Section 42D(b) only requires a party to "identify the trade secret with sufficient particularity *under the circumstances of the case*" to fulfill

the statute's purposes.  M. G. L. c. 93 § 42D(b) (emphasis added).  This case has benefited from extensive briefing at the preliminary injunction phase, including expert reports from both sides. Defendants know this, and ***represented to this Court*** that simply incorporating those materials would satisfy § 42D(b)'s requirements.  *See* Dkt. 92 at 8 ("Indeed, NMI should be able to make that disclosure immediately, e.g., by incorporating its earlier briefing and expert reports by reference."); *see also* Nov. 16 Hr'g Tr. at 8:11–16 ("[If] it is the case that plaintiffs intend to proceed on just the trade secrets, the alleged trade secrets that were identified in the preliminary injunction phase, then that should take almost no time to identify[.]").  Neural Magic did exactly this, in more detail than simply incorporating prior expert reports: it used the preliminary injunction briefing and expert reports to lay out additional details on each of the four areas of technology at issue from the preliminary injunction phase, including figures, graphics, and specific code.[6]  *See* Ex. J at 5, 6, 8; *see also* Ex. A.  This is more than sufficient to provide notice of the trade secrets at issue.  Indeed, Defendants' own brief shows Defendants can "prepare" a public availability defense; Defendants recognize the same four areas of technology are still at issue, Dkt. 115, and have already identified the public materials they will apparently rely on for that defense.

Defendants nonetheless argue that the details, figures, and code citations in the trade secret disclosure are not enough to allow discovery to begin, because Defendants are not convinced the trade secrets differ from "matters of general knowledge."  *See id.* at 7.  But Neural Magic already provided expert testimony explaining precisely why Neural Magic's trade secrets – individually and in combination – were not generally known.  *See* Scott Decl. ¶¶ 160–70.  Indeed, as the Court

---

[6] Neural Magic agreed to make its source code available for inspection.  *See* Ex. S (Resp. to Def. Rog. 8).  Defendants argue that Neural Magic's Trade Secret Statement is deficient in its entirety, even as to trade secrets that *do* reference specific code – claiming that these trade secrets are too vague to understand, despite the fact that Facebook *has not yet inspected Neural Magic's code*.

observed, there is already a "battle of the parties' conflicting experts" on these issues.  Dkt. 79 at 13.  "Sufficient particularity" does not require resolving that battle before discovery exists.  *Cf. Advanced Modular Sputtering, Inc. v. Superior Court*, Cal. Rptr. 3d 901, 908 (Cal. Ct. App. 2005) (allowing discovery to proceed where experts disagreed on whether valid trade secrets existed; "[T]he experts will continue to disagree on [whether the alleged secrets are generally known or were described in a vague or overbroad manner]. . . . at this pre-discovery stage of the proceedings, it is appropriate to recognize the existence of this credible dispute, but not necessarily to resolve it."); *Proofpoint*, 2020 WL 1911195 at *7 (denying protective order request; "compliance with this particularity requirement does not require the [trade secret] designation itself to detail how the trade secret differs from matters of general knowledge in the trade," but instead "require[s] the trade secret claimant to identify the alleged trade secret with sufficiently adequate detail to allow the defendant to *investigate* how it might differ from matters already known and to allow the court to craft relevant discovery," since "at this very preliminary stage of the litigation, the proponent of the alleged trade secret is not required … to reach such an exacting level of specificity that even its opponents are forced to agree the designation is adequate") (emphasis added; citations omitted).

Moreover, much of the pre-2018 authority Defendants cite supports Neural Magic, not Defendants.  *Alnylam Pharm., Inc. v. Dicerna Pharm., Inc.*, No. MICV20154126, 2016 WL 4063565 (Mass. Super. Apr. 6, 2016), which Defendants cite heavily, involved a trade secret identification that "appear[ed] to contend that the *entire field* of RNAi belongs to it, alone," rather than a case involving particular techniques or algorithms – and their novel combination – in a larger field of computer science or machine learning.  *Id.* at *2.  Moreover, that case did not involve a "battle of the experts" over whether specific trade secrets were disclosed in specific public materials – indeed, defendant's expert was the only expert of record.  *Id.*  And that expert did not

opine that specific public materials (like the materials Defendants cite) disclosed the trade secrets at issue and must be distinguished; instead, defendant's expert testified that he could not "understand the nature of Alnylam's claims [or] advise Dicerna with respect to the relevancy of discovery sought by Alnylam." *Id.* at *2. The *Alnylam* Court emphasized that any remedy would be "for the purpose of [the defendant] understanding what trade secrets [were] claimed by [the plaintiff] to have been misapprehended." *Id.* at *3 (identification "is not intended to resolve the issue of whether the claimed trade secrets are, in fact, protectable trade secrets."). Here, Defendants' expert, Dr. Kaeli, was able to "understand[] what trade secrets" were at issue and provide "a detailed response" to Dr. Scott's explanation for why the Neural Magic Algorithms are in fact trade secrets, even *before* Neural Magic provided a Trade Secrets Statement with *additional* detail. Kaeli Decl. ¶¶ 122–170. Dr. Scott provided a detailed response distinguishing Neural Magic's trade secrets from public materials Dr. Kaeli relied on. Scott Reply ¶¶ 11–45. This went far beyond an initial identification of trade secrets: it created, as this Court recognized, a "battle of the parties' conflicting experts" on the trade secrets at issue. Dkt. 79 at 13. "Under the circumstances of this case," Neural Magic's trade secrets disclosure provides more than sufficient information to investigate how its trade secrets might differ from matters already known, *cf. Proofpoint*, 2020 WL 1911195 at *7,[7] especially where Neural Magic's Trade Secrets Statement

---

[7] Defendants argue Neural Magic must distinguish certain patent applications. *See*, Dkt. 115 at 11 n.10. This argument was not in Facebook's Dec. 11 letter and is a higher standard than Defendants argued for when asking the Court to adopt an initial trade secret disclosure. Dkt. 92. It also is an approach unsupported by the law. *Cf. Proofpoint*, 2020 WL 1911195 at *7. Defendants cite only high-level references to concepts in these applications without explaining *why* they are unable to prepare a defense at this stage of litigation. *And*, Defendants ignore the timeline. These patent applications were published **long after** the misappropriation at issue; Zlateski disclosed the algorithms at issue to Facebook in summer 2019; the patent applications Defendants point to did not publish **until May 2020**, as Defendants acknowledge. Dkt 115 at 2 n.2. Even if the misappropriated trade secrets were disclosed in these applications (and they are

and its prior expert briefing specifically explain how its **combination** of techniques and algorithms are novel and unique, *cf. StoneEagle Servs., Inc. v. Valentine*, No. 3:12 CV 1687 (P), 2013 WL 9554563, at *4 (N.D. Tex. June 5, 2013) (suggesting a plaintiff who "describe[s] what *particular combination* of components renders each of its designs novel or unique, how the components are combined, and how they operate in unique combination" satisfies the standard) (emphasis added).

Defendants complain that some trade secrets reference "source code" or "assembly code" without providing granular details, like file names and line numbers. *See, e.g.*, Dkt. 115 at 12. But identification of source code is not required at this stage. *See WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 846 (N.D. Cal. 2019), *modified in part*, No. 5:18-CV-07233-EJD, 2019 WL 5722620 (N.D. Cal. Nov. 5, 2019) (claim plaintiff must identify specific code is "wrong on the law"). ██████████████████████████████████████████████

██████████████   ███████████████████████████████

████████████████████████████████████████████████

██████. *Cf. Proofpoint*, 2020 WL 1911195 at *7 (requiring "adequate detail to allow the defendant to investigate how [the trade secrets] might differ from matters already known"). Neural Magic's Trade Secrets Statement does not exist in a vacuum where each item can be parsed away from the broader context of this case. Defendants know what code gave rise to this litigation. They have seen multiple expert declarations explaining why techniques and algorithms used in that code differ from matters that are generally known. Defendant may dispute the merits of these contentions, but that is immaterial. *Cf. Advanced Modular*, 33 Cal. Rptr. 3d at 908 ("We have no doubt the experts will continue to disagree . . . it is appropriate to recognize the existence of this

---

not), this would only impact the *duration* of liability – not whether these concepts were trade secrets *when misappropriated*. That should not delay discovery, especially where the full scope of how Zlateski and Facebook used the misappropriated secrets remains unclear. Ex. B.

credible dispute, but not necessarily to resolve it.").

Defendants have enough information to prepare their defense.  Escalating demands for narrower identifications are an attempt to block Neural Magic from uncovering how its trade secrets have likely ***already been adapted*** into other Facebook projects.  Ex. B.  Defendants should not be permitted to define "reasonable particularity" to a point where Neural Magic may "miss what [Facebook] is doing" – and has already done – with its trade secrets.  *DeRubeis*, 244 F.R.D. at 681.  Discovery relevant to the full scope of this work at Facebook should now proceed.

B.   <u>Defendants Should Not be Permitted to Withhold Relevant Documents and Information Regarding Neural Magic's Damages.</u>

Defendants should not be permitted to rely on objections to Neural Magic's initial Rule 26(a)(1)(A)(iii) disclosures to withhold relevant and discoverable information related to damages.  ***Nothing*** in the Federal Rules allows Defendants to withhold discovery on such a basis.  Indeed, responses to Neural Magic's damages-related discovery requests would allow Neural Magic to provide ***more*** information to Facebook about its computation of damages.  Yet when Neural Magic proposed early disclosures on necessary financial information by Facebook, and early supplementation by Neural Magic on how that information supports a damages quantification, Facebook refused to engage—preferring instead to file this motion.

Federal Rule of Civil Procedure 26(a)(1)(A)(iii) does not require a plaintiff to provide a precise computation of damages at the outset of the case where the information necessary to do so is in Defendants' possession.  *See* Rule 26(a), Advisory Committee Notes, 1993 Amendments ("[A] party would not be expected to provide a calculation of damages which, as in many patent infringement actions, depends on information in the possession of another party or person.").  Defendants make no attempt to reconcile their demands for early supplementation with the clear statements of the Advisory Committee Notes regarding intellectual property disputes.

Furthermore, calculating the full harm Defendants caused Neural Magic—particularly the competitive harm flowing from Defendants' continued internal use of Neural Magic's trade secrets without paying for such use—will likely necessitate expert testimony.  *Cf. Stone Brewing Co., LLC v. MillerCoors LLC*, No. 3:18 CV 00331 (BEN) (LL), 2020 WL 907060, at *8 n.14 (S.D. Cal. Feb. 25, 2020) (rejecting claims of inadequate disclosure under Rule 26(a)(1)(A)(iii) where plaintiff stated it would outline theories and calculations in expert report, agreeing that "[i]t is usually not possible to disclose sophisticated intellectual property damages calculations at the Rule 26(a) deadline"); *Pine Ridge Recycling, Inc. v. Butts Cty., Ga.*, 889 F. Supp. 1526, 1527 (M.D. Ga. 1995) (finding plaintiff's categorization of damages sufficient in light of evidence initially developed at preliminary injunction hearing, and arguments over computation of damages were premature where that necessitated expert testimony).  Requiring an exact assessment of damages, including "the math" (as Defendants demanded[8]), before Neural Magic receives relevant discovery "will not save the parties' time or money"—particularly where the plaintiff "will be forced to amend its contentions after receiving further discovery from Defendants."  *Chrimar Sys. Inc v. Cisco Sys. Inc*, No. C 13-01300 JSW (MEJ), 2013 WL 4647392, at *2 (N.D. Cal. Aug. 29, 2013).

Defendants' cited cases did not involve relevant information that resided exclusively with the Defendants at the time of the initial disclosure.  *See Clark v. Berkshire Med. Ctr., Inc.*, No. CV 17-30186-MGM, 2019 WL 78994, at *3 (D. Mass. Jan. 2, 2019) (suit for unpaid wages where defendant employer had already produced copies of plaintiff employees' compensation records); *Cruz v. Bos. Litig. Sols. LLC*, No. CV 13-11127 (LTS), 2015 WL 12964732, at *1 (D. Mass. Jan. 9, 2015) (counterclaim based on lost, preexisting business where the party failed to provide an

---

[8] During the January 7 meet and confer, Defendants repeatedly claimed Neural Magic is required to provide "the math" of its damages calculations in its initial disclosures at the outset of discovery.

apparently existing contract regarding that business).  Others involved wildly different procedural postures.  *See Corning Optical Commc'ns Wireless Ltd. v. Solid, Inc.*, 306 F.R.D. 276, 277 (N.D. Cal. 2015) (motion to compel "just a few weeks from the close of fact discovery").  Defendants' citations to disputes *after* discovery, where plaintiffs later claimed to be entitled to damages that had never been disclosed, are particularly inapposite.  *See Aquila, LLC v. City of Bangor*, No. CV-08-64-B-W, 2009 WL 3326765, at *4 (D. Me. Oct. 9, 2009) (initial disclosures inadequate to preserve a claim for "lost rental income" which was not even in the complaint); *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 155 (S.D.N.Y. 2012) (plaintiff had failed to identify whole category of bankruptcy fees throughout discovery and had argued that documents related to the bankruptcy were irrelevant).  Here,  Neural Magic identified the specific categories of damages that it seeks.  Ex. K at 4   (seeking "actual damages" for Defendants' respective violations);  Ex. U (Resp. to Def. Rog. 13)  (identifying "lost profits, or in the alternative, reasonable royalty" as a theory of recovery).  Especially given the nature of the case and the early stage of discovery, this is sufficient, as Defendants' cited authority makes clear. *Song v. Drenberg*, No. 18 CV 06283 LHK VKD, 2019 WL 1949785, at *2 (N.D. Cal. May 2, 2019) (providing "actual damages" as an adequate disclosure that "describe[s] on a claim-by-claim basis the nature of the damages").

Even if Neural Magic's Rule 26 disclosures were deficient, that would not be a basis to withhold discovery.  Defendants cite *no* authority to the contrary.  Thus, even if the Court were to order Neural Magic to supplement its disclosures, that should not delay discovery on Neural Magic's damages and the related scope of Facebook's use of Neural Magic's trade secrets.

C.      Discovery on Non-Trade Secret Claims Should Not Be Stayed.

When this Court ordered the initial trade secret disclosure (Dkt. 105), the Court expressly noted that "the Section 42D(b) identification only applies to trade secret claims and not to other

claims." Dkt. 105. Thus, Defendants have no basis to rely on a § 42D(b) trade secret disclosure complaint to withhold discovery relevant to other claims – including discovery on Neural Magic's unfair competition claim under Chapter 93A, or discovery relevant to Neural Magic's breach of contract or tortious interference claims. Defendants' seek a protective order barring discovery on all proprietary and commercial Facebook information despite the fact that such information is also relevant—and key—to these non-trade secrets claims. Defendants offer no explanation for why a protective order effectively barring discovery on *non-trade secret claims* is justified by trade secret complaints. Nor could they; there is no basis to continue delay on these other causes of action.

Notably, Defendants already tried once to eliminate other causes of action by advancing a misguided preemption defense. Dkt. 74. This Court rightly rejected that preemption claim and ordered that these other independent causes of action would proceed. Dkt. 88. Defendants are now advancing preemption by another name: they are claiming that their trade secret objections effectively preempt discovery on other, independent, well-pled causes of action that are not subject to § 42D(b)'s identification requirement. This is legally baseless and contrary to multiple prior orders by this Court. *See* Dkt. 88; Dkt. 105 (noting § 42D(b) "only applies to trade secret claims").

D.   This Court Should Not Reward Defendants' Rush To Court.

Defendants used their objections to Neural Magic's disclosures to block document discovery and interrogatories on misappropriation and damages issues—all relevant discovery targets concerning the scope of Facebook's current and planned use of Neural Magic's information, and all issues with clear relevance to liability and damages.[9] *See* Fed. R. Civ. P.

---

[9]   At the January 7 meet and confer, Facebook made clear the discovery they would allow: documents concerning Zlateski's *hiring* (not what he did once hired) and code he *authored, commented on, or reviewed* (not code others made with what he taught them). *See* Ex. B. These hiring documents were among the barely two dozen confidential documents produced.

26(b)(1); *Cruz v. Bos. Litig. Sols.*, No. CV 13-11127-LTS, 2015 WL 12964336, at *3 (D. Mass. Apr. 17, 2015) ("Rule 26(b)(1) generally permits liberal discovery[.]"); *cf. Katz v. Liberty Power Corp., LLC*, No. 18 CV 10506 (ADB), 2020 WL 3492469, at *5 (D. Mass. June 26, 2020) (party resisting discovery "must show specifically how each [request] is not relevant"). The Court should not reward Defendants' efforts to block discovery, including discovery on unfair competition and breach of contract claims *not* subject to *any* trade secret disclosure requirement. Dkt. 105.

This case has been pending for more than ten months without discovery. █████████ ████████████████████████████████████████████████████████████ █████████████████████████████████ Discovery is urgently needed to ascertain the path Zlateski's misappropriation took in Facebook's internal projects. Neural Magic requests that the Court order Defendants to produce documents and respond to interrogatories.

Defendants' early rush to motion practice, and the associated effort to increase litigation costs for a much smaller adversary, is troubling.[10] The best path forward for all parties is to meaningfully cooperate on discovery and move this case towards resolution by the trier of fact. A jury will resolve the parties' substantive disputes. They will not be resolved before discovery begins. Defendants should begin to produce evidence relevant to the claims at issue, so that a jury can determine what consequences are appropriate for Defendants' actions.

## CONCLUSION

For the foregoing reasons, Neural Magic hereby requests that this Court deny Defendants' motion to compel and for a protective order and grant Neural Magic's cross-motion to compel Defendants to meaningfully and cooperatively engage in discovery.

---

[10]   Neural Magic also asks that the Court order Defendants to pay Neural Magic's reasonable fees and costs incurred in opposing this motion, pursuant to Rule 37(a)(5)(B).

Respectfully submitted,

Dated: January 22, 2021

*/s/ Patrick D. Curran*
Steven Cherny (BBO# 706132) (*pro hac vice*)
Patrick D. Curran (BBO# 568701)
Stacylyn M. Doore (BBO# 678449)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, MA 02199
Tel: (617) 712-7100
stevencherny@quinnemanuel.com
patrickcurran@quinnemanuel.com
stacylyndoore@quinnemanuel.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above document was served upon attorneys of record by email on this the 22nd day of January, 2021.

<u>/s/ Stacylyn M. Doore</u>

Stacylyn M. Doore
