```
 1                   UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3   _____

 4   NEURAL MAGIC, INC.,

 5                    Plaintiff,        Civil Action
                                        No. 20-10444-DJC
 6   v.
                                        September 29, 2022
 7   FACEBOOK, INC., and
     ALEKSANDAR ZLATESKI,               9:26 a.m.
 8
                     Defendants.
 9   _____

10

11

12          REDACTED TRANSCRIPT OF MOTION HEARING

13         BEFORE THE HONORABLE DENISE J. CASPER

14            UNITED STATES DISTRICT COURT

15          JOHN J. MOAKLEY U.S. COURTHOUSE

16                 1 COURTHOUSE WAY

17               BOSTON, MA  02210

18

19

20

21                DEBRA M. JOYCE, RMR, CRR, FCRR
                       Official Court Reporter
22                 John J. Moakley U.S. Courthouse
                    1 Courthouse Way, Room 5204
23                      Boston, MA  02210
                       joycedebra@gmail.com
24

25
```

```
 1    APPEARANCES:
      FOR THE PLAINTIFF:
 2
      STEVEN CHERNY, ESQ.
 3    Quinn Emanuel Urquhart & Sullivan, LLP
      111 Huntington Avenue, Suite 520
 4    Boston, MA 02199
      617-712-7100
 5    stevencherny@quinnemanuel.com

 6    PATRICK D. CURRAN, ESQ.
      Quinn Emanuel Urquhart & Sullivan LLP
 7    51 Madison Ave.
      22nd Floor
 8    New York, NY 10010
      212-849-7216
 9    patrickcurran@quinnemanuel.com

10    FOR THE DEFENDANTS:

11    DOUGLAS E. LUMISH, ESQ.
      Latham & Watkins LLP
12    140 Scott Drive
      Menlo Park, CA 94025
13    650-328-4600
      doug.lumish@lw.com
14
      WILLIAM J. TRACH, ESQ.
15    Latham & Watkins LLP
      John Hancock Tower, 27th Floor
16    200 Clarendon Street
      Boston, MA 02116
17    617-880-4514
      william.trach@lw.com
18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

1

2          (The following proceedings were held in open

3   court before the Honorable Denise J. Casper, United States

4   District Judge, United States District Court, District of

5   Massachusetts, at the John J. Moakley United States Courthouse,

6   1 Courthouse Way, Boston, Massachusetts, on September 30,

7   2022.)

8               THE CLERK:  All rise.

9               (The Court entered the courtroom.)

09:26 10               THE CLERK:  Court is in session.  Please be seated.

11               Civil action 20-10444, <u>Neural Magic v. Meta Platforms</u>.

12               Would counsel please state your name for the record.

13               THE COURT:  Counsel, I think we're going to not do

14   that.

15               THE CLERK:  Okay.

16               THE COURT:  I don't want to spend the first part of

17   your time introducing yourselves, so perhaps as you rise to

18   speak, you can identify yourselves for the first time.

19               Counsel, I know we're all here on the motion for

09:26 20   summary judgment.  I also know that there are pending motions

21   in regards to strike certain of the experts on either side.

22   I've read the papers on either side.

23               I think Ms. Hourihan has told you that I wanted to

24   focus primarily on the motion for summary judgment.  I'll give

25   you equal time on either side, 45 minutes.

```
 1              Counsel, on the defense side, since it's your motion.
 2    Did you want to reserve time for rebuttal out of the 45
 3    minutes?
 4              MR. LUMISH:  We do, your Honor.  We hope to reserve
 5    roughly 10 minutes.  We're going to be rushing to get through
 6    our materials, so it's possible by the time we get to the end
 7    of the first part, we won't really have ten left, but we
 8    understand your Honor's instructions.
 9              THE COURT:  Okay.
10              Counsel, anything else before we begin?
11              MR. CHERNY:  Your Honor, Steven Cherny for the
12    plaintiff.
13              THE COURT:  Good morning.
14              MR. CHERNY:  I've discussed this with opposing
15    counsel.  We've asked that the courtroom be closed due to the
16    nature of the trade secret issue.  We've taken a poll of who's
17    here, and nobody here is an issue, so it will only become an
18    issue if we see someone come in, and we'll just, with the
19    Court's permission, just ask why they're here and if so --
20              THE COURT:  So, counsel, I will keep track of that,
21    but if either side think there's an issue, just rise and we'll
22    address it.
23              MR. CHERNY:  Thank you, your Honor.
24              Counsel, we can begin.
25              MR. LUMISH:  Your Honor, would you like us to argue
```

```
 1   from the table or --
 2           THE COURT:  Either way, counsel.
 3           MR. LUMISH:  Happy to save the time and stay here
 4   then, if it's all right with your Honor.
 5           THE COURT:  Thank you.
 6           MR. LUMISH:  Can I have my slides up, please.
 7           Your Honor, I'm Douglas Lumish from Latham & Watkins
 8   representing Meta.  I did want to introduce a couple of our
 9   client representatives to you, if I might.  Nikki Vo is here
10   today, and Michele Woodhouse from Meta Platforms.
11           So, your Honor, as you know from our papers, our
12   summary judgment motion raised a number of grounds.  We
13   obviously won't go into all of those today.  We're going to
14   focus on four issues that are on the screen right now.
15           We believe the others have merit.  And in particular,
16   by not arguing one of the Dauberts, I want to make sure your
17   Honor, or impress upon the Court that we still have very grave
18   concerns about the testing that was done by Dr. Scott in this
19   case.  As you'll remember from the preliminary injunction
20   hearing, he had acknowledged that he had changed code on Neural
21   Magic's side --
22           THE COURT:  And now you're saying it's on Meta's
23   side as well.
24           MR. LUMISH:  He also changed code on our side and
25   didn't tell us, and we had to discover that at the end of the
```

1    case.

2          I'm not going to get further into that because it

3    doesn't go to summary judgment specifically as your Honor has

4    asked, but I didn't want that to go unstated and the silence to

5    suggest any ebbing of our concern there.

6          Okay.  So four issues -- and we also, by the way,

7    think it's emblematic of the approach here.  If I had a theme

8    for our arguments today, it would be that they're trying to

9    force round pegs into square holes and trying to find evidence

09:29 10    that will support their case when there really isn't any.

11          And so it's that lack of evidence I wanted to focus

12    on.  And I'll start with the possession issue.  And you'll see

13    in our papers, possession and identity of the trade secrets are

14    kind of wrapped up together.  Possession is a fundamental

15    pillar of every trade secret case.  For them to show

16    misappropriation, they first have to show that they actually

17    owned the trade secret, that this was something that was

18    theirs, that existed, that they possessed and then was

19    misappropriated.  So it's really this two-step or two sides of

09:30 20    that coin.  We'll submit to your Honor that there is no

21    evidence of possession of any of the alleged trade secrets in

22    this case.

23          There was a suggestion made in the papers that you

24    would be the first court to grant summary judgment for lack of

25    possession, and we just wanted to start by saying that's

1    incorrect.

2             On the screen, slide 4, which we need to hand up to

3    your Honor, if you'd like hard copies --

4             THE COURT:  Sure.

5             MR. LUMISH:  Why don't we take a second to do that.

6             THE COURT:  I'm sure all slides have been shared with

7    either side.

8             MR. LUMISH:  We have not.  I think we're exchanging

9    live as we go here.

09:30 10             (Discussion off the record.)

11             MR. LUMISH:  So I'm on slide 4, your Honor.

12             And what we have here are just excerpts from the

13    Synopsys case and the Calendar Rsch. case, both of which are in

14    our papers, and both of which stand for the principle that if

15    the trade secret -- plaintiff cannot establish that they have,

16    in fact, in their possession these trade secrets that preexist

17    before the alleged misappropriation, they're out on summary

18    judgment.  Both cases, Synopsys and Calendar Rsch., found

19    summary judgment for the defendant.

09:31 20             You can see in the highlighted sections here on the

21    Synopsys case it was where plaintiff couldn't identify where in

22    its own products the alleged trade secret material had

23    originated.  And in Calendar Rsch., they called it a failure to

24    carry the burden of proof that the trade secrets even existed.

25             And this wasn't a secret, this wasn't some new

```
 1    requirement that we made up.  What we have on the screen here,
 2    slide 5, is Exhibit D to the Henry declaration, it's
 3    Dr. Scott's report.  Dr. Scott is Neural Magic's expert on the
 4    technical issues.
 5            In paragraph 15 of his report is what you're looking
 6    at where he says to everybody that the law requires Neural
 7    Magic to prove that they possessed a protectable trade secret.
 8            Now, he's a first-time expert, he's never done it
 9    before.  He didn't write this; the lawyers did.  The company
10    knows it has this burden and this fundamental obligation, and
11    it doesn't meet it.
12            I'll show you trade secret by trade secret -- I don't
13    have a ton of time, as your Honor knows, so I'm going to try to
14    do this quickly.  If you have questions or if I go too fast,
15    please, of course, let me know, but I did want to just touch on
16    each of the buckets of trade secrets.
17            The first one, Trade Secret 1, is on the screen.  This
18    is from Henry declaration A, the identification of trade
19    secrets in the case.  And what you'll see is they're trying to
20    claim this broad notion of just a discovery.  ████████
21    ██████████████████████████████████████████████████████
22    ████████████████████████████████████████
23    ██████████████████████████████████████████████████████
24    ████████████████████████████████████  That's Trade
25    Secret 1 in a nutshell.
```

```
 1              First problem they have is they've actually disclaimed

 2    that -- any technical part of that description.  What I have on

 3    the screen now, your Honor, slide 7, is from the preliminary

 4    injunction proceedings.  So this is what Dr. Scott said to the

 5    Court two years ago during the PI proceedings.  And he, when

 6    ████████████████████████████████████████████████████████████

 7    ████████████████████████████████████████████████████████████

 8    ████████████████████████████████████████████████████████████████

 9    ████████████████████████████████████████████████████████████████

 10             So this notion that Trade Secret 1 adds some

 11   technology to it is belied by this disclaimer of that

 12   technology.

 13             But going back to the trade secret articulation

 14   itself, so back to Exhibit A here, the second sentence of Trade

 15   Secret 1 is maybe the most troubling where what they say is the

 16   ██████████████████████████████████████████████████████

 17   ████████████████████████████████████████  What they're saying is

 18   we did something fast and so anybody else who does the same

 19   thing fast is using our trade secrets.

 20             And I came up with a metaphor -- I don't know if this

 21   is helpful -- but no human being has ever broken a three-minute

 22   mile.  People have been trying to run a three-minute mile

 23   forever, nobody's ever done it.  If your Honor came up with a

 24   new type of racing shoe, for whatever reason, the rubber was

 25   better, and people were 25 percent faster and suddenly could
```

1    break the three-minute mile, you might own the trade secret on

2    the shoe, but you wouldn't own the trade secret on the

3    breaking the mile, on the goal, the result, the concept of

4    speed.

5          Maybe I'd do the same thing, but I've come up with a

6    performance enhancing cream that causes people to be 25 percent

7    faster.  Your runner now can break the three-minute mile, my

8    runner can break the three-minute mile, but neither one of us

9    is using the other trade secrets just because we're getting to

09:35 10    the same outcome.

11          This trade secret, as they've written it down, would

12    let them own that, at least they're going to try to stand up in

13    front of a jury and say they own it to the tune of 800-plus

14    million dollars.  We think that's fundamentally improper.

15          On the possession side, they have shown no evidence

16    from anybody that they made some new discovery of this

17    throughput that nobody had ever seen before.

18          And today's the day to show it, your Honor.  We've

19    challenged them from the beginning on identity of their trade

09:35 20    secrets and possession.  We flagged it with their expert in

21    deposition.  They've now briefed it.  If they had evidence to

22    show you trade secret by trade secret where in their materials

23    they can show that they possessed these things before the

24    lawsuit, they would have done it by now.  And you won't find

25    anything that shows this discovery, this aha moment of ███████

1　███████████████████████████████████████████

2　██████████████████████████

3　　　　So that's 1.

4　　　　I'm going to skip the law for the sake of time, I know

5　your Honor has it all briefed.

6　　　　Trade Secret 2 is -- or really 2 through 5 are

7　combination trade secrets.  They bundle up the ones from 6

8　through 12 into combinations.

9　　　　So what you see on the screen again is Henry

09:36 10　declaration Exhibit A.  I'm just showing 2 as an example,

11　illustrating 2 through 5.

12　　　　What they say here is any one or more of the

13　techniques in the alleged Trade Secrets 6 through 10, either on

14　their own or augmented by other trade secrets, what they call

15　████████████████████████████ 11, and/or ████████

16　████████ what they call alleged Trade Secret 12.  When do you

17　the math, it's simple, you get to 124 combinations.  And your

18　Honor instructed Neural Magic they could only have 12.  This is

19　an end around to try to get to 124.

09:37 20　　　　When you do this, when you try and leave yourself

21　flexible and have all these options in your case, it imposes a

22　burden on you as the plaintiff.  They now need to show you,

23　your Honor, that they have conceived of these things and that

24　they have evidence to establish possession or ownership or

25　preexistence, depending on the case you read, of each one of

these combinations as a trade secret that they owned, they kept

secret, that had independent value, that met all those

requirements of the law to be a trade secret.  And they'll show

you nothing.  They have no evidence of that.  There's no expert

who says it; there's no witness who can say it legitimately.

So that's Trade Secret 2.  Again, I'll skip the law

here to keep moving forward.

When you get into the three buckets, the first one

they call ████████████████████ that starts at alleged

Trade Secret 6, and it covers 6 through 10.  I won't go through

all the details, your Honor, but what I've done here is color

code to try to illustrate to your Honor that there are lots of

different subcomponents now.  They've taken this notion of what

they call ████████████████████ and they've layered

into it a series of other details or requirements that are

recited.

So just to use 6 as an example.  ████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████████████████████████
████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

1

2

3

4

5

6          So these are a series of obligations that have to be

7    met.  And you will look in vain for any evidence that they can

8    show you that shows that they had possession of the notion of

9

09:39 10

11

12

13

14          There's no evidence even remotely close to say here's

15   where we did that, here's where we came up with it, here's

16   evidence to show that we conceived of this.

17          Instead, they're backing into it.  They go read

18   FBGEMM.  They pull out -- that's our product, your Honor,

19   FBGEMM was our code.  They go read it and say, Okay, these are

09:40 20   our trade secrets over here without showing the first part,

21   here's where we actually had those trade secrets in our

22   possession prior to this lawsuit.

23          7 illustrates the same thing, so I'll go through it

24   more quickly.

25          THE COURT:  So, counsel, I guess my question about

1  this, and I suppose this applies to all the trade secrets, do I

2  understand your point that the plaintiff is not pointing to

3  anything in their possession that, what, is code or is evidence

4  of a code that does these things?  Like, what is it that you

5  would expect Neural Magic to present that would meet this

6  burden?

7          MR. LUMISH:  So each of the trade secrets is about a

8  programming technique, and so we think it should be code.  But

9  even if it's not code, if they could provide you with a flow

09:40 10  chart that preexisted the case, they could provide you with --

11          THE COURT:  Meaning a flow chart that indicated that

12  they were -- that they had gone down the road of creating this

13  code.

14          MR. LUMISH:  Right.  If you look at 6 -- I'm sorry, I

15  just skipped forward.  Go back to where I was.

16          If you look at alleged Trade Secret 6, it's written as

17  if it were a flow chart.  You have a technique, █████████████

18  ███████████████████████████████████████████████████████████████

19  ███████████████████████████████████

09:41 20          Now, we think they should have to have proven to you

21  with code that they actually own this, that they possessed it,

22  that they programmed it.  But if they were able to pull out of

23  their archives a spreadsheet, a flow chart, a software

24  specification, even a notebook page where somebody from their

25  company conceived of this as an idea, not their lawyers trying

1    to win a lawsuit, but some engineer back at Neural Magic where

2    it's supposed to be their trade secret to show that this was

3    ever their idea in the first place.  And there's just no

4    evidence of that of any kind.  It's not in their code, it's not

5    in their technical documents.

6           Does that answer your Honor's question?

7           THE COURT:  Thank you.

8           MR. LUMISH:  So I'll skip through 7, it's more of the

9    same.  And they get more and more complex as you go through 6

09:42 10   through 10.  They add mathematics, they add more and more

11   details, recitations of subcomponents to the trade secrets.

12          The second bucket here is ████████████████████████

13   and it's really only alleged Trade Secret 11, that's on the

14   screen here on slide 14.

15          ███████████████████████████████████████████████

16   ████████████████████████████████████████████████████

17   █████████████████████████████████████████████████████

18   ██████████████████████████████████████████████████

19   ████████████████████████████████████████████████

09:42 20  ██████████████████████

21         ████████████████████████████████████████

22   ████████████████████████████████████████████████

23   █████████████████████████████████████████████████████

24   ███████████████████

25          So, again, there's no evidence that they ever did

```
 1    this, thought of this, conceived of this as a trade secret,
 2    possessed it, as we put it in our papers, your Honor.
 3           I'll go back to the PI just as a slight diversion
 4    here, this is slide 15, and this is what they told your Honor
 5    during the preliminary injunction proceedings.  Of course just
 6    having ████████████████████████████████████████████████████
 7    ████████████████████████████████████████████████████████████
 8    ████████████████████████████████████████████████████████████
 9    ██████████████████████████████████████████████████████
10    █████████████████████████████████████████████████████
11    ████████████████████████████████████████████████████████████
12    ████████████████████████████████████████████████████████████
13    ████████████████████████████████████████████████████████████
14    ████████████████████████████████████████████████████████████
15        ████████████████████████████████████████████████████████
16    █████████████████████████████████████████████████████████
17    █████████████████████████████████████████████████████████
18    █████████████████████████████████████████████████████████
19    ██████████████████████████████████████████████████████████
20    █████████████████████████████████████████████████████████ and
21    they need to show that to your Honor.
22           12, more of the same, your Honor.  This is the last
23    alleged trade secret, No. 12, ██████████████████████████
24    ████████████████████████████████████████████████████████████
25    ██████████████████████████████████████████████████████████
```



09:45  10                                                        That's

11   a lot.  Those are a lot of little pieces and parts, and there's

12   been no effort to show you conception of those, possession of

13   those, ownership of those in their files from their materials

14   to establish that they ever owned that as a trade secret in the

15   first place.  They can't just say we can't do it, your Honor;

16   they have to show that they had it first.

17          Okay.  So what do they argue for possession?

18          On the screen, slide 17 from your brief -- from their

19   brief I mean to say, excuse me, their opposition at page 4 is

09:45  20   their argument for possession.

21          And what they say is there was a meeting in May of

22   2018.  Dr. Zlateski, one of the two defendants here, met with

23   Drs. Matveev and Shavit, the two founders of Neural Magic.  And

24   after that meeting, Dr. Zlateski, quote, wrote code that

25   contained nearly all optimizations they had discussed.

1          They put a lot of weight that on that quote, there's a

2    number of places they cite it.  But when you look at the

3    e-mail, it just says what they typed here.  It doesn't say

4    those optimizations equal their trade secrets, ███████████

5    ███████████████████████████████████████████████████████

6    ███████████████████████████████████████████████████████

7    All he says is he did something in their optimizations.

8          Every time you address sparsity, it's an optimization.

9    So this doesn't mean he did something even new.  It just means

09:46 10   he optimized the data.  And so we don't know from this

11   statement what that is.  And more importantly, though, your

12   Honor, he says Zlateski wrote code.  Neural Magic says Zlateski

13   wrote code.  So this is their evidence they say ███████████

14   ███████████████████████████████████████████████████

15   ██████ that's the middle highlighting there.  I'll submit, your

16   Honor, there that's exactly the thing I showed you in the

17   beginning of my comments they disclaimed during the preliminary

18   injunction proceedings.  But, in any event, at the end they say

19   now we know this is when we're in possession of trade secrets,

09:46 20   when Zlateski writes code in May of 2018.  And they cite you to

21   four of their statements of fact to prove it up, SF 28 through

22   31.  And I just want to go through those, because when you look

23   at them, you'll see the absence of evidence that I mentioned

24   when I began.

25          So on the screen, slide 18, are plaintiff's facts 28

1    and 29.  And what you'll see is it references a single code

2    file.  28 says, On May 28, 2018, Dr. Zlateski shared a code

3    file that he had written.

4         Fact No. 29 says, Dr. Zlateski shared a code file, and

5    now they give it a name.

6         And I won't read the long path name into the record,

7    your Honor, but the last part after that last slash, that's the

8    file name, it's avx512.hpp.  That's the name of the source code

9    file that Dr. Zlateski wrote, and that's where they said

09:47 10   possession is proven.  So if we're going to find evidence of

11   possession, it's going to be in that code file.

12        30, same thing.  So this is plaintiff's fact No. 30,

13   I'm on slide 19.  It says, The code that Dr. Zlateski wrote for

14   NMI and shared on May 28, 2018, same code; same with 31.  The

15   code that Dr. Zlateski wrote for NMI and shared on May 28,

16   2018.

17        Now they cite to Dr. Scott.  I've highlighted that and

18   put a red line under it, because if somebody's going to prove

19   up that this code file proves possession, it's going to be

09:48 20   Dr. Scott, their technical expert.  And they cite to paragraphs

21   44 through 51.  And this -- by the way, this is the ultimate

22   conclusion.  They say that code that he wrote implemented each

23   of Neural Magic's trade secrets.  So we're looking to see where

24   Dr. Scott is going to show us that, and he just never does,

25   your Honor.

1          You can look at paragraphs 44 through 51, which is

2     what they cited you to, but you could also go corner to corner

3     in Dr. Scott's expert report and you will find not one place

4     where he shows you and maps the elements of these alleged trade

5     secrets to the avx512 file or to any other code at all.  He

6     doesn't show you a single line of code, nor -- back to your

7     Honor's question -- nor does he show you a flow chart or a

8     spreadsheet or a notebook page or anything else that says here

9     is where I know Neural Magic had possession of these trade

09:49 10    secrets first.

11          What you have is examples on the screen.  I just put

12     two on to keep my slide not too busy.  There's no citations at

13     all in paragraphs 44 through 51, not one.

14          There's -- it's just his recitation of what they say

15     the trade secrets are, and he says it's based on his

16     discussions with Dr. Shavit and Matveev, his review of Neural

17     Magic documents, and his review of Neural Magic source code and

18     generated assembly code.  If he reviewed all that stuff and he

19     found evidence of possession, he would have shown it to us.

09:49 20    And this section isn't even about possession.  This is just a

21     background section where he tells us what the trade secrets are

22     in his mind, Dr. Scott's.

23          So he has paragraph 15 where he says I've got to show

24     you possession.  There's no section in the report that says

25     here is possession, nor is there anywhere where you can find

1 it.

2        They're going to tell you, and they've said in their

3 papers, Oh, it's interwoven throughout the report; it's not.

4 There would be some line of code, there would be some technical

5 document.  There would be someplace where he says here is where

6 ███████████████████████████████████████████ was found

7 in their early work, you know, limitation by limitation each of

8 those color coded pieces.  It never happens.  He just addresses

9 the broad categories and calls it a day.

09:50 10        That should be enough, your Honor.

11        THE COURT:  Meaning, if you look at the code file

12 that's referenced here alongside the listing of the Trade

13 Secrets 1 through 12, you wouldn't find the elements reflected

14 there.

15        MR. LUMISH:  You would not.

16        First of all, he did not.  He's their expert; he

17 didn't do the exercise.  He never showed us where if he thought

18 it was avx512 had any of the elements of the trade secrets, not

19 one.  He doesn't talk about this file.

09:51 20        The one thing they've told you shows possession, their

21 expert doesn't ever map it.  And that's enough for summary

22 judgment.

23        I have on the screen the Trident case, your Honor, as

24 one example, where this is beyond the pale for a common

25 knowledge of a juror.  And when you're addressing issues that

1    are beyond the common knowledge of a juror, you need expert

2    testimony.  This is certainly one of those.  This is one of the

3    more complicated cases I've ever had subject matter wise.

4    Trying to assume that a jury --

5            THE COURT:  Well, thanks for saying that for my

6    benefit.

7            MR. LUMISH:  I don't know if you feel that way, your

8    Honor, but I struggle with the mathematics here.

9            To the notion that a juror is going to be able to look

09:51 10   at avx512 for itself because it's admitted into evidence at a

11   jury trial and determine that that shows possession of each of

12   those little pieces and parts that I walked you through the

13   trade secrets I think is not credible.

14           And so they needed an expert, they didn't have one,

15   they have none, and so they should be out.

16           Now, we went a step further, to further answer your

17   question.  Even though we think they're done there, we took

18   their 30(b)(6) witness, Dr. Matveev.  He is the CTO, I believe,

19   of the company.  He's one of the co-founders.  He's an M.I.T.

09:52 20   professor.  He knows the subject matter, at least he purports

21   to, and we handed him the code.  We gave him 512.hpp and said

22   show us where your trade secrets are.

23           And this is one example, you Honor, on the screen.

24   This is slide 23, I have pages 423 through 424 of his depo.

25   But this went on for a series of questions, and we got the same

1    kind of evasive answer back each time, which is, show me where

2    in this file, which is what they've said is their evidence of

3    possession, the trade secrets are.  And he came back and he

4    actually completely reversed field and effectively says it's

5    not the file at all.

6          So what he says is -- so the question was, "I want you

7    to go to the code in front of you" -- which you'll see in the

8    context of the deposition is the avx512 file -- "and I want you

9    to identify all of the functions, all of the lines, all of the

09:53 10   contents that you believe correspond to any of Neural Magic's

11   alleged trade secrets."

12         And he comes back and he says, "So, again, as I said

13   before, this file implements a class, which implements all of

14   our trade secrets"...

15         So now it's not the file at all.  The file doesn't

16   have the trade secrets.  The only thing they point to in all of

17   those statements of fact and all of their evidence, it's not

18   the file at all, it's something they're now calling a class.

19   Suffice it to say they never showed us anywhere in the class

09:53 20   either where any of the alleged trade secrets are or even where

21   a single one of them is or really where any of the specific

22   parts and pieces are, all those color components parts are,

23   which was their obligation.

24         THE COURT:  Was there further testimony on what was

25   meant by class?

1          MR. LUMISH:  There was some, your Honor.  He

2     identified a class name, I think he gave us the name of the

3     file, or the name of the class, I should say.  It's hundreds of

4     lines, if not thousands of lines, of code.  And there's been no

5     effort, despite all of our flagging of this as an important

6     issue for them, there's been no effort by them to show us where

7     in that class they argue that the alleged trade secrets can be

8     shown.

9          And it's too late, your Honor.  The time has come.

09:54 10    We've raised it.  They had an expert; he didn't do it.

11    Dr. Matveev, they didn't issue a report from him, which if he

12    was going to do that, he should have issued a report as well.

13         There's been no notice to us.  We can't find it.  We

14    don't think these trade secrets are in their code.  Leave that

15    aside, it's their burden.  We don't have to disprove that they

16    exist.  They had to show that they own these, and they made no

17    effort to.  And they ran away from the file and said, Oh, it's

18    a class, it's even something bigger and more amorphous, but we

19    won't tell you where.  That should be summary judgment.

09:54 20         I'm going to skip this part here.

21         I'm almost out of time, your Honor.

22         I wanted to touch quickly on two other points, if I

23    might, unless you had further questions on possession.

24         So quickly on reasonable measures.  The facts are not

25    disputed.  Dr. Zlateski was allowed to keep his laptop.  It had

1   all of his materials on it.  He was allowed to retain access to

2   Neural Magic's systems, what they call their slack channels,

3   and their code.

4        So he leaves the company to go work for Meta, they

5   know that.  He's going to work with the company with one of the

6   most formidable artificial intelligence and machine learning in

7   the world, and they know it, and they let him keep his laptop,

8   they let him keep all of the code that's on it and all the

9   access he has to the slack channels and their code otherwise.

09:55 10        There's no exit interview.  Dr. Shavit acknowledges,

11   this is slide 31 from his deposition, page 285.

12        THE COURT:  I'm sorry, slack channel is just, what,

13   like an internal log in which engineers within the company

14   share information.

15        MR. LUMISH:  Exactly.  Blog is probably not exactly

16   right.  Think of it more like a chat function.  It's a way to

17   share documents and communications with each other without

18   email, sort of a more streamlined version.

19        THE COURT:  And what do you say to Neural Magic's

09:56 20   argument that I should reject this particular argument because

21   he made certain representations about the limits of the work

22   that he was going to do at Meta?

23        MR. LUMISH:  I think you should reject that argument,

24   and here's why:  This isn't a question of whether we should

25   say, Well, it's a self-inflicted wound.  That would be the

1      response if that were our argument, it's a self-inflicted
2      wound, you get what you deserve.  That is not what we're saying
3      today.  What we're saying is what the CMBB case on the screen
4      says and what lots and lots of other cases say.  When you're
5      assessing whether the information is, in fact, a trade
6      secret -- because it's easy to just call it a trade secret, put
7      the words down, you can stamp a piece of paper with
8      "confidential trade secret" -- but actions often speak louder
9      than words in the law on trade secrets.
09:57 10           And so what you're looking at is the conduct and
11      saying if this really were the trade secret, if it really were
12      the Coke recipe, you'd lock it in a vault, you'd isolate it
13      from people who didn't have a need to know, and you sure as
14      anything wouldn't let anybody walk out of our building with it,
15      ever.
16           So when people do that, like in our case and in the
17      CMBB case, when you say go ahead and keep your laptop and I
18      don't care if you delete anything on it, it tells you a lot
19      about the truth whether that material is actually something
09:57 20      they think is a trade secret.  And not only they call it a
21      trade secret, they're now telling the world and they want to
22      tell a jury it's a billion-dollar secret, or a set of them, and
23      that it's company wrecking, that it will ruin their company,
24      and yet, they did nothing to keep it from walking out of the
25      door.

1          So that's my response to that, your Honor.  The

2     conduct actually goes to the definition of trade secrets and

3     whether they really were.  Because if they were, people would

4     treat them much more differently than they have.

5          And it's worst and just the laptop.  Dr. Matveev, when

6     he learns of FBGEMM being published, takes a copy of it and

7     publishes it himself.  He puts it on the web, on GitHub, and it

8     sits there for a year and a half, this company wrecking,

9     billion dollar file worth of trade secrets, he publishes it --

09:58 10          THE COURT:  I was assuming this, but I was assuming

11     the GitHub page is publicly available.

12          MR. LUMISH:  Some are, some are not; Dr. Matveev's

13     was.

14          He acknowledges here on the screen that it was

15     publicly available on his GitHub page from January 19, 2020

16     until September 13, 2021.  That is not conduct that can be

17     squared or made consistent with the argument that these are

18     trade secrets, your Honor.  That alone should be enough.

19          And of course, as you know from the preliminary

09:58 20     injunction hearings, they didn't even go to GitHub and say,

21     Hey, can you take this Facebook stuff down?  They asked us to

22     do it, in fairness.  They came to us, wrote aggressive letters

23     saying you need to take this down, and we did.  We took it

24     down; they didn't.  They put it on up on GitHub and left it

25     there for a year and a half.  Didn't go to GitHub themselves

1    and say, Hey, please take down any copies that Facebook put up.

2          And then, last, your Honor, I'll touch -- this is in

3    our papers -- but they have access logs that show you who's

4    accessed their code.  They might show that Dr. Zlateski never

5    did after a certain date.  They might have shown that all sorts

6    of third parties did access their trade secret code that they

7    claim is trade secret.

8          They didn't preserve those logs; they destroyed them

9    in the middle of the case.  We'll take up that as spoliation on

09:59 10   some other date perhaps.  But it does show, again, a lack of

11   consistent conduct.  If these were trade secrets and you were

12   so concerned that somebody might see them, the last thing you

13   would do is get rid of the logs that you've kept to make sure

14   you know who's come in and out, who's accessed your code and

15   who's changed it.

16         Their main argument is the bell was rung, none of this

17   matters because after January 19, 2020, when all this conduct

18   occurred, it's too late, doesn't matter because Facebook had

19   already put FBGEMM out on the web.

10:00 20         Two problems with that, your Honor.  First is the law.

21   That's just completely wrong in the law.  We cite the J.T.

22   Healey case, we site the HiRel case.  These are slides 37 and

23   38, which just debunk that notion.  The HiRel case, in

24   particular, has a similar fact pattern where the government

25   posted on the web a requirement on how to attach missiles to

1  airplanes that the company thought was a trade secret of

2  theirs, and they didn't do anything about it.  They let it sit

3  up on the web, and that was enough to grant summary judgment

4  against them, after the fact, after it was published.

5          So just to finish, your Honor, it also cannot possibly

6  be squared with what they told you in preliminary injunction.

7  So they're telling you today:  January 19th, everything that

8  happens after that doesn't matter, cat is out of the bag, and

9  so of course we shouldn't be held to conduct that would

10 establish these trade secrets.

11          They came to your Honor three-and-a-half months later,

12 in April of 2020, and told you there was ongoing harm.  They

13 asked for sweeping injunctive relief against Meta to, quote,

14 preserve or restore the status quo.  They said if you didn't

15 act now, Neural Magic would be harmed beyond any ability to

16 repair.

17          The notion that all the harm had already been done and

18 so there was no reason for them to try and take these things

19 down, that it was okay to post their alleged trade secrets on

20 the web, that it was okay to ignore the laptop in

21 Dr. Zlateski's possession, that it was okay to just, you know,

22 let GitHub keep up whatever they had up, none of that can be

23 squared with the fact that they came here months later and

24 asked the Court to issue this injunctive relief.

25          I'm sure I'm out of time.

```
 1              I did want to just make the last point, your Honor,
 2    switching to my third point --
 3              THE COURT:  I think you have two minutes, three
 4    minutes -- Ms. Hourihan is shaking her head so we'll take that.
 5              (Discussion off the record.)
 6              MR. LUMISH:  Last point, your Honor, is the
 7    Massachusetts General Law Chapter 93A point, and your Honor's
 8    very familiar with the law here.  The statute itself requires
 9    that the conduct occur primarily and substantially within the
10:02 10    Commonwealth.  My highlighting got a little bit messed up
11    there, but it's the last two lines of the quote.  And that just
12    didn't happen.
13              Dr. Zlateski is working in the New York office at
14    Meta.  FBGEMM was written in Menlo Park -- Menlo Park,
15    California --
16              THE COURT:  Although I think Neural Magic says he
17    works in Massachusetts at some point.
18              MR. LUMISH:  Here's what they said, and I want to show
19    that to you.
10:02 20              I want to show this to you, your Honor.  First what
21    they argue is, well, we're in Massachusetts; that's not good
22    enough.  That would mean anybody could sue -- anybody in a
23    Massachusetts company could sue anybody under 93A if all it
24    required was the plaintiff be in Massachusetts.  That's not the
25    law.
```

1          So here's what they said to answer your Honor's

2    question directly.  This is slide 43, and this comes from NMI's

3    statement of facts in evidence.

4          They said, okay, well, here's a spreadsheet, and what

5    this shows is Dr. Zlateski accessing FBGEMM code on July 13,

6    2019, and he was in Massachusetts that day.  That's the

7    argument they make to you.

8          Both of those fail.  First of all, we don't know what

9    the access is.  It could be a read, it could be a write, maybe

10:03 10   he's writing code, maybe he's just reading code.  More

11   importantly, we have no idea what part of FBGEMM this is.

12         Just like they don't show you in their files that the

13   trade secrets map up to anything they did before, they don't

14   make any effort to show you that what Dr. Zlateski accessed on

15   July 13 had anything to do with the alleged trade secrets.  Did

16   it go to anything of these things that they're accusing, all

17   the many pieces and parts, the subcomponents.  They don't make

18   any effort to show that.

19         So all you have is that he accessed some code of

10:03 20   FBGEMM's, which is a huge program that has many things that are

21   not accused of being their trade secrets in it.  All we know is

22   he accessed something in that code in some way on July 13th,

23   and we're not disputing that for this motion.

24         But here's the thing:  They say he was in Boston that

25   day and so that whatever access he did on that day should be

1    attributed as an act within the Commonwealth.  Their evidence

2    for that is Dr. Gelashvili.  They don't have a train ticket.

3    They don't have an admission from Dr. Zlateski saying he was

4    there that day; it's another guy.  It's a friend of

5    Dr. Zlateski's, Dr. Gelashvili.  And I'm going to do this very

6    quickly, your Honor, because I want to make sure Mr. Trach

7    doesn't kill me when we're done.  But on slides 45 and forward,

8    if you look at Dr. Gelashvili's testimony on the pages they

9    cite --

10:04 10          THE COURT:  And I should say you're at time.

11          MR. LUMISH:  Okay, thank you, your Honor.

12          What he really says is, I don't recall.  I don't know

13    if he had drinks with Dr. Zlateski on those weekends.

14          He says he doesn't even know -- he cannot confirm, he

15    doesn't remember if Dr. Zlateski even came back to Boston at

16    all after he left Neural Magic.  That's slide 46, page 82 and

17    83 of the deposition.

18          He says it's an old conversation, he can't confirm.

19          And here's the best it gets for them, your Honor, the

10:04 20    last two slides are 48 and 49.  And the best it gets is these

21    two where he says, I suppose what I meant was that he was

22    coming to see me on July 19th.  I put a big red line under

23    that, because the accesses of the code they relied on were July

24    13th.  Six days later they're saying, Well, here's our best

25    evidence that he came to Boston.  Okay, maybe he came to

1    Boston, I'm not saying he didn't.  But what their evidence is

2    is he came on July 19th.  Look at slide 49.  Same thing.  You

3    and Dr. Zlateski went out in the Boston area that night on July

4    19th?

5              I suppose that is likely, yes.

6              That's the strongest evidence they have, and it's six

7    days off the date of the access.  It just doesn't get them

8    there, your Honor.

9              Unless your Honor has questions, I'm going to pass the

10:05 10   lectern.

11             THE COURT:  Okay.  I think, counsel, you were at

12   your -- Ms. Hourihan 35.

13             (Discussion off the record.)

14             THE COURT:  So you have about eight minutes left for

15   rebuttal.

16             MR. CHERNY:  Your Honor, I'm Steven Cherny from Quinn

17   Emanuel on behalf of Neural Magic.

18             THE COURT:  Good morning, again.

19             MR. CHERNY:  I ask the Court to switch over.

10:06 20       I also will say I'm going to deal with some of the

21   record, and then Mr. Curran is going to respond specifically to

22   some of what Mr. Lumish said specifically about possession and

23   some of the other issues.

24             THE COURT:  Sure, thank you.

25             MR. CHERNY:  May I approach the Court?

```
 1              THE COURT:  You may.
 2              MR. CHERNY:  Here's two copies of the slides.
 3              Obviously when we prepared the slides, we didn't know
 4     what they were going to focus on, so there are more there than
 5     we're addressing.
 6              THE COURT:  Sure.
 7              MR. CHERNY:  I am going to go to the lectern --
 8              THE COURT:  Counsel, I see you're handing these to
 9     your opposing counsel?
10     MR. CHERNY:  We have.
11              THE COURT:  Okay.
12              MR. CHERNY:  One moment, your Honor, just make sure
13     the screen is on.
14              Okay.  So, your Honor, Mr. Lumish, my esteemed
15     colleague, my friend for a number of years, stayed very high
16     above the record and genericized a number of places he made
17     arguments, where he said, Well, that's not an invention, and
18     then he would leave out, for example, that some of the
19     generalizations were actually talked about later in the quotes
20     being applied to sparsity or other specifics.
21              I'm going to go through the record, actually, that has
22     been developed since the PI hearing.  And in this brief part of
23     the record -- it's not the entire record -- I think the Court
24     will see that the jury will have adequate basis for it to
25     address any number of these issues, including where Mr. Lumish
```

1    ended on Rule 93A.

2           So with that I'm going to go through the record, and

3    you're going to see how in a very brief time it becomes clear

4    that Neural Magic had an invention, it has trade secrets.

5    Mr. Curran is going to go through the specifics of the

6    possession issue, about how Dr. Zlateski assured Dr. Shavit he

7    was going to Facebook and working in a totally different area,

8    that he then went immediately to Facebook and immediately was

9    meeting with the people involved in the area that he said he

10:08 10   wasn't working in; how he immediately wrote the code that has

11   been pointed chapter and verse as containing our trade secrets;

12   and how he did that in Massachusetts.  And with that, your

13   Honor, I'm going to go through the record and not just focus on

14   excerpts from the brief and highlights.

15          So the first thing here is March 2018.  Aleks Zlateski

16   is hired at Neural Magic, and he's hired by Dr. Shavit,

17   Professor Shavit, who was his professor at M.I.T.  He signs a

18   confidentiality agreement.  No one has challenged that's a good

19   confidentiality agreement.  He signs it, and he understands

10:08 20   what his duties are in terms of the information that he's going

21   to be working on at Neural Magic.

22          I will say we've heard in this case any number of

23   things from there's nothing there to everything was done by

24   Dr. Zlateski before he was at Neural Magic.  So it's either

25   zero or it was done, but nothing apparently happened in those

1    18 months he worked at Neural Magic, a startup founded by one

2    of the foremost computer scientists in the world.

3          And so Mr. Lumish talked about, oh, there's never any

4    aha moment.  Luckily, I have documents that show -- actual

5    documents about the aha moment.

6          Here is where Zlateski is informing Matveev and Nir

7    Shavit that SDGEMM, which is sparse density GEMM, with nearly

8    all the optimizations we had discussed were getting 4x speedup

9    for sparsity.  They have all this, and they have the code.

10:09 10          THE COURT:  And, counsel, here we're talking about the

11   same file, the avx512.

12          MR. CHERNY:  Correct.

13          If you look at the next slide, you have the reaction

14   from Dr. Shavit.

15          By the way, nobody is taking anything away from

16   Dr. Zlateski.  He's a very fine programmer who was hired there

17   because of his skills.  But the idea that he did this before he

18   was at Neural Magic is undercut by the very documents where he

19   is reporting back that they had worked cooperatively together,

10:10 20   then he implemented -- and Dr. Shavit goes -- remember, I just

21   showed you on the last slide -- he sends this on May 28, 2018

22   at 3:04:02.  And then Dr. Shavit responds, Amazing.  This is

23   speedup of your code versus your code.  "Your code" is his past

24   work.

25          So when they suggest to you that Dr. Zlateski had all

1    this in the past, which is now he had nothing, apparently, he's

2    telling Dr. Shavit that the work they had done together is

3    amazing, it is so much better than the stuff that he had

4    before.  This is his own words.

5          Remember, the jury -- not only is the Court supposed

6    to on summary judgment give us every benefit of the doubt, the

7    jury is certainly entitled to credit that this is an indication

8    of that very aha moment that Mr. Lumish says that doesn't

9    exist.

10:11 10          Zlateski says, "Yes, that is speedup over my own

11   code."

12          Shavit:  "Ah great.  This is amazing."

13          Zlateski says, "Yep, better than what I was hoping

14   for..."

15          This is the code that he wrote.  This is the code, as

16   you will see from the record I will go through, that he took

17   and gave to Facebook.

18          He's leaving Neural Magic on July 5, 2019.  This is

19   important, because the amount of things that happen from July

10:11 20   5th through about July 18th are astounding.

21          So he leaves, and he's having a talk with Dr. Shavit

22   about things he -- he's positing, well, maybe this is something

23   I'm doing by myself or impartially myself.  And they talk about

24   patenting things.

25          And Shavit says, I want to make sure it's clear to

1    you, Aleks, everything you did while you're here belongs to us

2    and I understand that you understand that because of the

3    ethical issues and the contract.

4            And then he says, Good luck at Facebook.

5            So we have on the calendar July 5th.

6            Now, we know from Zlateski's affidavit from the PI, he

7    joined Facebook on July 8, 2019, that's three days later.  And

8    he was assigned to the SysML subgroup of FAIR.  That group has

9    nothing to do with what this code and what Neural Magic does.

10:12 10        He told -- Dr. Zlateski told Professor Shavit he was

11   going to Facebook to join a team that worked on systems and

12   compiling.

13           So, yes, he went to a gigantic company that is at the

14   forefront of AI, but he told Dr. Shavit he was going to do

15   nothing to do with neural networks, that he was going to be

16   based in New York, and that's what Dr. Shavit said.  And nobody

17   gainsays that.  It doesn't make a difference, the jury is

18   entitled to credit that.

19           And in fact, Zlateski confirmed that in his

10:12 20   declaration.  "I am not and never was a member of Facebook's AI

21   System Software/Hardware co-design group."

22           So he told Dr. Shavit he was working in a different

23   group, and he was working in a different group.

24           So you would think when he shows up at Facebook on the

25   8th that he's going to be working on something else.

1          And in fact, one of the reasons -- the only reason

2     that he kept his laptop was because he told Professor Shavit

3     that I didn't know he was going to be working on compilers and

4     because he was going to be doing things that were not related

5     to Neural Magic, we talked about how he would remain as a

6     consultant.

7          So the whole point was he represented to Dr. Shavit

8     that they were going to be consulting on some other area, this

9     area, their area, and that he was going to be working in a

10:13 10   totally unrelated area, and that's the only reason Dr. Shavit

11    let him keep the laptop.  But, remember, the laptop is a little

12    bit of a red herring because this is not like somebody breaking

13    into the Coca Cola vault and taking -- he wrote the code.  He

14    knows everything.  I mean, it's not like -- and there's never

15    been any assertion by anyone that Aleksandar Zlateski needed to

16    look at his laptop to say, aha, now I remember what I just did.

17         So now let's go to July 8th to 12th --

18         THE COURT:  But doesn't it at least suggest -- I mean,

19    it's not just that, it's also the slack channel, that there's

10:14 20   this open communication about information that Neural Magic is

21    now saying are trade secrets.

22         MR. CHERNY:  I think you mean GitHub.  The slack

23    channel was internal at Neural Magic, that was an internal

24    chat, so that wouldn't be an issue.

25         THE COURT:  No, actually, I mean the slack channel in

1  the sense that he continues to have access, right?

2          MR. CHERNY:  He has access to the slack channel, and

3  Mr. Curran will deal with the specifics of the slack channel

4  because it's beyond my knowledge of what he was accessing.  I'm

5  talking about in terms of the laptop there which is what they

6  were focusing on --

7          THE COURT:  I guess in addition to the laptop.

8          MR. CHERNY:  If I may defer to Mr. Curran.

9          THE COURT:  Okay.

10:14 10         MR. CHERNY:  And so he goes to Facebook the 8th to the

11  12th.  And who does he immediately have dinner with?

12  Dr. Jongsoo Park and Andrew Tulloch, who are in the very group

13  that does what he does at Neural Magic, and who are not in the

14  group that he told the Court and that he told Nir Shavit he was

15  going to be working for, the unrelated group.

16         Okay.  Now, this goes to the knew or should have known

17  thing.  It's not like Park didn't know Aleksandar Zlateski or

18  the people at Neural Magic.  In fact, there is a chat from

19  December 2017 where Zlateski says, "I actually talked to

10:15 20 Jongsoo a few weeks ago, about the group they are starting in

21  Facebook," the group to do this very work.

22         And Matveev says, Yeah, "he reached out to me and

23  offered me to join Facebook."

24         And Zlateski says, "haha... same thing."

25         So this is not where Jongsoo Park happens to meet him

1    and doesn't know who he's meeting with.  He knows who he's

2    meeting with, and Park knows about his work because he says, "I

3    first learned of Dr. Aleksandar Zlateski through his

4    publications, including his papers relating to optimizing

5    convolutions in neural networks."

6              So he knows who's he's meeting with.

7              Remember, he is not in the group that Zlateski is

8    supposed to be working for.  And, yet, he's immediately with

9    Zlateski, along with Tulloch.

10:16 10         And so what happens?  During the time he's at Menlo

11   Park, he has dinner with Jongsoo Park.  And Jongsoo Park wrote

12   a note, because what Zlateski said was so notable to other

13   people about what they talked about.

14              "I talked with Aleks Zi (had dinner together with

15   Andrew)" -- that's Andrew Tulloch.  "He was playing with sparse

16   matrix dense matrix multiplication, ████████████████████████

17   ████████████████████████████████████████

18              Now, that is SDGEMM, the very thing I talked about

19   before.  That is Neural Magic's work that encompasses the trade

10:16 20   secret.

21              Now, they may disagree, but the jury is certainly

22   entitled to take from that -- and when Mr. Lumish says, Well,

23   that's just all old.  Well, we disagree.

24              And when Zlateski is telling this to Jongsoo Park, a

25   guy he's not even working for, he's telling him all about --

about what he was playing with, the sparse matrix dense matrix
multiplication.

They can say he was talking about before when he was
at Neural Magic, but I believe the jury is entitled to believe
the argument that what he was really talking about was the work
he had just done at Neural Magic.

He writes this to his boss, Smelyanskiy, this is
Jongsoo Park's boss, Smelyanskiy.  I did write something
similar for SpMVM back in 2010.  It resulted in huge code
explosion.

So he's like, wow, I tried that, it didn't work.  And
Jongsoo Park said he's actually trying to reproduce this number
in FB codes.

So now we know literally it is 12 days after he left
Neural Magic, it is nine days after -- actually four or five
days because the dinner is between the 8th and 12th, that he's
agreed to writing FBGEMM code relating to the sparse matrix
dense matrix multiplication, which he's not even supposed to be
doing there.

And so when Dr. Park gave his declaration for the PI,
he put a more sanitized view.  He says, Shortly after
Dr. Zlateski joined in July 2019 -- that would be right away --
and after conversation about, among other things,
Dr. Zlateski's research -- now, I would suppose that the jury
is entitled to believe that Dr. Zlateski's research included

1   the work he did at Neural Magic.  He doesn't say his research

2   before.  It occurred to me -- it just occurred to him -- and

3   Dr. Zlateski that Dr. Zlateski's experience with optimization

4   of neural networks and GEMM processes might be useful to

5   FBGEMM.

6          Now, at that point, his experience included the last

7   18 months where all he's working on is this.

8          Now, again, remember, this is -- now, our view is, and

9   we think the facts support is, he just came from Neural Magic;

10:19 10  he immediately has dinner with Jongsoo Park and Andrew Tulloch;

11  he's immediately talking about the same type of exact work he

12  was doing at Neural Magic.  They want to argue it was what he

13  was doing before, we disagree, and we think the jury is

14  entitled to disbelieve that somehow he allocated in his mind

15  and said I'm only talking --

16         THE COURT:  So, I guess, counsel -- and I understand,

17  right, as against Dr. Zlateski you have the breach of contract

18  claim, right?

19         MR. CHERNY:  Correct.

10:19 20       THE COURT:  And the breach -- and the non-disclosure

21  includes, the provision of the agreement includes not just

22  non-disclosure of trade secrets but confidential information,

23  right?

24         MR. CHERNY:  Correct.

25         THE COURT:  So let's put the breach of contract aside

1    for a moment.

2         On the trade secrets -- and, counsel, I apologize if

3    your colleague is getting to this part -- I'm still -- again,

4    you know, my lens trying to work through all of your advocacy

5    and all of the technical information is, you know, if this goes

6    to trial, what am I telling the jury are the trade secrets?

7         MR. CHERNY:  Okay, so that will be something

8    Mr. Curran will address specifically.

9         No, but what will happen is that you'll talk -- we've

10:20 10   identified the trade secrets, they contest it --

11        THE COURT:  But what's the basis?  What's the basis in

12   the possession of -- you know, what is the possession in the

13   evidence that Neural Magic had these trade secrets such that

14   Dr. Zlateski took them --

15        MR. CHERNY:  Okay.

16        THE COURT:  -- and gave them to Meta?

17        MR. CHERNY:  So I'm going to deal with the took them

18   and gave them to Meta, and Mr. Curran will deal with the

19   possession issue.

10:20 20        But I will say even from the record you've seen, you

21   can see that he had something notable in terms of the code that

22   he had written that Matveev and Shavit are reacting to.  And he

23   himself is saying, Wow, this is much better than I expected,

24   and that's SDGEMM.

25        You can see that he comes immediately to Meta and is

1  transmitting that, and he's going to get more specific on that

2  issue.

3        And then in the terms of specifics of showing

4  possession, in terms of showing where it existed in the record

5  and the code, Mr. Curran is going to address that for the

6  Court.

7        THE COURT:  Okay.

8        MR. CHERNY:  So, as I said, Dr. Park immediately --

9  remember, he's not working for Dr. Park, and if he doesn't have

10:21 10  anything, it's amazing.  He shows up three days after he's been

11  having -- he has this conversation his last day at Neural

12  Magic, three days later he's having dinner with Park.  Park

13  says, Wow, we had dinner, we're talking about SDGEMM, and all

14  this stuff in his experience, which I submit includes what he

15  did at Neural Magic.  And if he had nothing, what's amazing is

16  immediately Park says, "I encouraged Dr. Zlateski to write some

17  code for a fast sparse matrix multiplication, which could speed

18  convolution and fully connected layers of a neural network."

19  Now, Mr. Lumish will say, in my view, that's just old stuff or

10:22 20  generic or whatever.

21        But from my perspective, especially in light of

22  descriptions of the dinner, it's not old stuff.  It's the very

23  surprising stuff that Zlateski said was unexpected to him and

24  that Shavit said was amazing and that Smelyanskiy said, I tried

25  to do something like that and it failed.

1          So we're here having the construct that shows

2     certainly nobody is acting like this is old or there's not

3     something there or what he's going to give them is some old

4     technique.

5          So then what happens is Zlateski says the same thing

6     in his declaration, which Mr. Lumish made a comment about

7     people being lawyers and people not writing their own

8     declarations, he uses exactly the same language as Dr. Park,

9     was that it occurred to him and Dr. Park in my experience with

10:23 10    the optimization of neural networks and GEMM processes might be

11    useful in FBGEMM, which mirrors exactly what Dr. Park's

12    declaration says.  Now, again, that experience includes the

13    very things that we say he did at Neural Magic, which

14    Mr. Curran will go into more specifics, and that he took and

15    gave to Facebook.

16          And so we had this question about whether he was in

17    Massachusetts --

18          THE COURT:  But it has -- right.  It has to be an

19    item, not an experience.

10:23 20    MR. CHERNY:  Not -- it's not just that he's

21    experienced, remember he says, Aha, I've got something; and he

22    wrote code for Neural Magic that achieves those speedups that

23    everyone, including him, finds amazing, that is different from

24    his prior -- his own code.

25          He now comes to Facebook --

1          THE COURT:  Again, that's -- and I forget the file

2     number, but that's the file.

3          MR. CHERNY:  avx512, exactly.

4          So then he comes to Facebook days later talking to the

5     people who are not in the area who he's supposed to be working

6     with, and it just occurs to him, based on his experience, which

7     includes at that point -- when I say "experience," he's the one

8     that's using his experience; I'm not relying on his experience.

9     It just occurs to him, relying on his experience, which is his

10:24 10    experience writing code for Neural Magic, that he is going to

11    write some code for Jongsoo Park.  Okay.

12         So we talked about -- I'm trying to go through this

13    chronologically.

14         So was he in Massachusetts?  Well, here's

15    Dr. Gelashvili, who actually testified in a way that

16    Mr. Lumish -- he elited this part of the testimony, where he

17    says, And scrolling down to the bottom of Bates stamp 68102, do

18    you see Dr. Zlateski writes at 3:29, By the way as, I told

19    Rati, I will be here for the next two weekends.

10:24 20         I see this message.

21         And this was conversation was on July 5, 2019?

22         That was the date under the message, yes.

23         And Dr. Zlateski says he will be there, as in the

24    Boston area, for the next two weekends?

25         I suppose that's how I would take that, yes.

1          Now, look, there may be a factual issue whether about

2     he was or wasn't in Massachusetts, but certainly the Court is

3     entitled, viewing the evidence most favorable to Neural

4     Magic -- and it's not surprising, he went to be on-boarded at

5     Facebook from the 8th through the 12th, that's when he has the

6     dinner with Park; his wife and child are still here in

7     Massachusetts on the 13th.

8          He comes back after -- on the weekend, and he's here.

9     And there's testimony certainly supporting that he was in

10:25 10   Massachusetts on July 13th.  Now, we may have a dispute about

11    that, it's certainly not a summary judgmentable thing about

12    where he was on July 13th.

13         So what was he doing?  He was accessing FBGEMM and

14    actually was writing the code.

15         Now --

16         THE COURT:  And how do we know he's writing the code?

17         MR. CHERNY:  We're going to see that in a second.

18         You know what happens is, five days later he delivers

19    the code to Jongsoo Park.

10:25 20        And so certainly the jury could take the conclusion

21    that he has agreed -- Park has encouraged him to write code.

22    He's gone home after his time at Facebook, meeting with people

23    in the area he wasn't supposed to be working in.  He goes back

24    to Massachusetts.  He immediately accesses FBGEMM, which is

25    outside the area he's supposed to be working in, and, as you're

1    going to see in a couple of slides, he then delivers the code

2    to Jongsoo Park and others.

3           Now, whether he's accessing it to kind of figure it

4    out and then he does some of the writing afterwards, that's for

5    the jury to decide.  But whatever he's doing, he's clearly

6    doing this, and certainly the record supports an inference, to

7    write the code that Jongsoo Park has asked him to write at the

8    dinner beforehand.

9           Okay.  So we know Zlateski was in Massachusetts on

10:26 10   July 13th.  Certainly there is evidence sufficient to support

11   that taking all inferences in the plaintiff's favor.

12          Okay.  July 18th.  Remember, he's left Neural Magic on

13   July 5th to seek out his fortune.  He goes to Facebook on July

14   8th.  He's immediately meeting with Jongsoo Park and Andrew

15   Tulloch, who are in the area he's definitely not working in,

16   okay.  Regardless of whether you want to describe Facebook as

17   this mammoth company that has the greatest AI in the world,

18   somehow he's immediately working with the guys, and Park knows

19   who he is and he knows who he worked for.

10:27 20          And what does Park say?  And this goes to knew or

21   should have known, which Mr. Lumish didn't address, but I'll

22   use some of my time.  You would think at some point Park would

23   be like, wait a second, you're going to write code based on

24   your experience in this area, which is what you were doing at

25   the company you just came from three days ago.  Instead, he

says, no, write me up some code.  And guess what happens?  Five

days later, Aleks Zlateski delivers the code in remarkable

time, and part of it you can see he's doing in Massachusetts.

        And so he goes here, a very dirty prototype of sparse

density matrix multiplication.

        Now, the other side is going to say that's just a

generic term; we disagree.  We think that this is, and we think

that Dr. Scott will go up and show, as he did in his expert

report, that what this is is our trade secrets embodied in code

he has just written for FBGEMM.

        And then he adds Jongsoo Park onto this chat, and

that's how he delivers it, and that's highlighted.  And he

goes, ██████████████████████████████ and you can see the

highlighted part --

        THE COURT:  And remind me, counsel, for Dr. Scott, is

he -- which are the codes that he was comparing?

        MR. CHERNY:  Can Mr. Curran answer that question?

        THE COURT:  Yes.

        MR. CURRAN:  Your Honor, Patrick Curran for plaintiff.

        Dr. Scott was comparing Neural Magic code and Facebook

code at the assembly level.  He also did and extensive analysis

of Facebook source code as well, and there are multiple layers

of code that Dr. Scott was looking at.

        THE COURT:  So I guess my question is:  When we talk

about what's delivered here versus the file that Dr. Zlateski

```
 1    delivered at Neural Magic, are those the two things being
 2    compared or is it at some other level?
 3              MR. CURRAN:  It's at the level of what they create.
 4    These two files are for a compiler, and these are compilers
 5    that generate code.  They are source code to generate assembly
 6    code.
 7              THE COURT:  Okay.
 8              MR. CURRAN:  So Dr. Scott is comparing the outputs of
 9    these to say are they the same.  I can see from what they
10    build, are they doing it the same way.
11              THE COURT:  Right.  The principal idea is testing
12    these two things.  Meaning --
13              MR. CURRAN:  That's correct.
14              THE COURT:  What I'm trying to get at is, although the
15    parties have much to say that is different, there seems to be a
16    focus now on these two particular files.  Like even if the
17    processes -- the process of analyzing them happens above or
18    below them.
19              MR. CURRAN:  Absolutely, your Honor.
20              THE COURT:  Thank you.
21              MR. CHERNY:  I think, as your Honor has figured out
22    admirably, when it comes to anything related to computer
23    science that Mr. Curran is a much better source.
24              THE COURT:  No worries.  I didn't mean to jump to your
25    co-counsel --
```

          1           MR. CHERNY:  No, no, it's better that way.

          2           THE COURT:  It's usually better to know what I'm

          3     struggling over.

          4           MR. CHERNY:  It's better.  I'm really going through

          5     the chronology.

          6           So we're at July 18th.  Remember, he's left Neural

          7     Magic on July 5th.  Remember, at Neural Magic, he did

          8     something.  They want to denigrate and say this was all prior

          9     work that Zlateski did.  But you can see from the reactions of

10:30    10     some of the great computer scientists at M.I.T., including

         11     himself, that no one believes that.  He's done something new,

         12     SDGEMM.  And now he's gone to Facebook, he's met with Jongsoo

         13     Park immediately and Andrew Tulloch.

         14           Jongsoo Park says, yeah, why don't you write code in

         15     an area that you weren't even going to be working on, and he

         16     delivers it up.  The specifics that I've highlighted below are

         17     reflective of our trade secret.

         18           And so now we're at July 18th.  You can see in the

         19     span of not very long we've gone from Neural Magic, to him

10:30    20     being at Facebook to work in another area, to immediately

         21     meeting with the very people who could best benefit from the

         22     transmission of this work.  They know where he's from.  They

         23     know what he's done in the past.  They don't say, Don't do

         24     anything; don't write -- immediately he is writing up code for

         25     them in the exact same area.

1          So Andrew Tulloch immediately says, This is neat.  I

2    was trying something similar in the block sparse case, it

3    helped in small cases but not large ones, "a very dirty

4    prototype" is the title.

5          Right away, Andrew Tulloch is, Wow, this is something

6    different, this is something neat.

7          And we're going to see further on -- remember, they

8    keep going back and forth.  Either there's nothing there or

9    there's something there, it's just somehow inchoate -- all the

10:31 10   stuff these people are getting excited about apparently is

11   something inchoate, even though you're talking about some of

12   the most skilled programmers at both M.I.T. and Facebook.

13         So fast-forward to September, and Bram Wasti, another

14   programmer in that same group that he's is not working in,

15   says, "Met with Aleks just now -- his stuff is wild."

16   Approximately 2x speedup over mkdlnn.

17         And the reason the speeds are different is because

18   it's being compared, this is to an IBM, and the speedups that

19   Aleks was talking about at Neural Magic were over his prior

10:32 20   code.

21         But everyone is agreeing you're having these massive

22   speedups, which is the whole point.  These people -- they're

23   talking with each other, are not saying, Well, it's a

24   difference of putting a new sole on a shoe.  Everyone here is

25   looking at the code.  They know why it's happening, whether

1    it's Nir Shavit at M.I.T. or the people at Facebook.

2            And Dr. Scott will tell you it's the same reason.  So

3    it's not a matter of cream.  Everyone can see it.  And

4    Dr. Scott goes at length through what it is.  He talks

5    endlessly about Neural Magic's trade secrets, which of course

6    is in the possessive, about what he says they are, and then he

7    talks about where they're to be found in Facebook's code.

8            And so then Tulloch says, "Yeah, it's such a clear

9    win."

10:33 10     Does anyone really believe this is old stuff that

11   Aleksandar Zlateski had done years before?

12           And so Daya Khudia, who is giving his review and is

13   talking to Yoram Talmor.  Who is Yoram Talmor?  He's head of

14   all of FAIR, that is the whole AI at Facebook.  And he says, In

15   the very beginning when Aleks joined Facebook -- that's that

16   July 8th time frame -- we had a great discussion how to do

17   sparse matrix dense matrix multiplication.  That's SDGEMM.

18           And the thing is, why are they having that

19   conversation?  Why?  He's not working in that area.  He's told

10:33 20    the Court that he wasn't working in the area, and he told Nir

21   Shavit that.

22           And Aleks' approach ███████████████████████████

23   ████████████████████████████████████

24           ████████████████████████████████

25   ████████████████████████████████████

1    ████████████████████   He left that part out.  And if he

2    wants to have someone come and say, well, people did do it in

3    the past, I guess he can have it, but it's not believable,

4    because when you see the reactions of everybody on both sides

5    to what he is doing, the stuff that he took from Neural Magic

6    and gave in that code to Facebook, it's not believable.  But,

7    yet, at this point we don't have to determine what's

8    believable.  We just have to determine it's sufficient for the

9    jury to believe it.

10:34 10        And so Khudia now says this would be our way now write

11   sparse matrix dense matrix multiplication.

12        Why didn't they just look at the work that was done

13   three, four years ago or the Liu paper?

14        I'm really looking forward to further collaboration on

15   shipping the sparse kernels to production and score some

16   production performance wins.

17        Now Zlateski gets his midyear review.  Remember, he's

18   only been there since July.  And one of the things that they're

19   focusing on is all these people from the group that he's

10:34 20   allegedly not working for and that he told the Court in a sworn

21   declaration that he's never worked for, peer review, Jongsoo

22   Park, technical lead manager, AI systems, submitted January

23   6th.

24        "I spent a good chunk of my life optimizing sparse

25   kernels" -- the very thing that -- this is what Aleks did with

 1   Matveev and Shavit at Neural Magic, okay.

 2          It is amazing that his kernel can beat the dense

 3   kernels only at the less than 50 percent sparsity.  When I

 4   initially heard his approach, I thought it would too hard.

 5          Now, these people aren't just talking about results;

 6   they all see the very code that Dr. Scott has seen.

 7          Aleks brilliantly overcame the challenges and

 8   showcased this approach actually works for the first time.

 9          That should tell you about whether this ever happened

10   before.

11          Jongsoo Park, who is one of the great minds at

12   Facebook, says, I tried this and failed, and this work

13   brilliantly overcame the challenges.

14          The problem is, this is work that was done at Neural

15   Magic.  It's not inchoate.  It's not just about speedup.  It's

16   about the way it's done.  And the way he did it is exactly what

17   he was doing three days before at Neural Magic.

18          Bram Wasti:  These kernels were integrated with

19   FBGEMM.  Performance-wise the results of the kernels are

20   incredibly inspiring and will likely push model developers to

21   utilize sparsity more in the future.

22          This is not interrogatory responses, these aren't

23   excerpts from briefs, this is the record.  And when you look at

24   the record as what happened from the time that Aleks Zlateski

25   went -- what he was doing at Neural Magic, the work he was

1   doing there, the reaction, the code that he wrote there, SDGEMM

2   that Alex Matveev actually did go through with them at the

3   deposition, and then he goes to Facebook, is immediately told,

4   Hey, why don't you write code in an area that you're not hired

5   for.  Immediately delivers it up, and everyone is like "wow."

6          And then we've heard in the span of this case this is

7   all old stuff, I'm going to show you this is all old stuff he

8   was doing before, even though he said it was better than what

9   he had done before.

10:36 10          Aleks used a novel technique to generate these

11   kernels.  The novel technique.  That's the novel technique

12   we're talking about.

13          The integration was impressively quick, meaning it's

14   amazing how fast he did this.  Well, it's not hard to do it if

15   you've done it before.

16          Now, they're going to say we disagree.  I think the

17   jury is entitled to determine the speed at which he generated

18   this for Facebook, which even the people at Facebook were

19   astounded by, shows this is the same work he was doing at

10:37 20   Neural Magic.

21          Okay.  Meta says, Optimizations in dispute were

22   well-known.

23          Now, look at Facebook.  Yes, if you keep everything at

24   the generic level, which my colleague, Mr. Lumish, did during

25   his argument, and you say, well, this is all well-known, it's

okay.  And when you write a paper to the Court, you say,
optimizations in dispute were well-known.  Not these
optimizations.  Not the specifics here, that everybody in this
court really knows what happened.

        The work that he did at Neural Magic, which you will
hear about from Dr. Shavit, that you will hear about from
Dr. Matveev, that you will hear about and the jury from
Dr. Scott, and you will hear about from Dr. Zlateski, the
reactions here from Facebook, does this like look -- is the
jury entitled to think these were not well-known optimizations?
I guess if you put something at the generic level and then say,
Okay, they were well-known.  But not what he did.  He didn't do
something, just genetically optimize it.  He did something new.
It's just something new that he took from Neural Magic.

        They say this was all used in Dr. Zlateski's pre-NMI
code, which we did not admit, despite what they say here.  They
say, Well, it can be improper means because he's a great
computer scientist and the optimizations in dispute were well
known and they were used in this pre-NMI code.

        Look at the record.  The record is, Wow, this is way
better than my pre-NMI code.  And that code exists.  This is
not like an abstraction.

        Everything that Mr. Lumish said was at the level,
like, well, they don't really show you.  Now, Mr. Curran is
going to tell you where we showed them, but I'm showing you the

1   record that shows how unbelievable it is that the idea that

2   somehow Zlateski spent a year and a half at Neural Magic, they

3   achieved all these great results, these people are, like,

4   highly trained computer scientists.  Everyone is like, Wow.  He

5   immediately goes to Facebook, tells them about his experience.

6   They say, Yeah, why don't you write us some code; he does it,

7   and they're similarly astounded.  And that somehow this is just

8   old optimizations and old loop unrolling and old.

9          And then they say to the extent he relied on resources

10:39 10  outside of Meta, those resources were his prior research; other

11  public domain references, Liu paper; and his general education.

12  That's their story; we dispute that.  We don't think it's a

13  fair assertion given that he spent a year and a half working at

14  Neural Magic and achieving something.

15         But then they say, Don't worry about that.  Even

16  though they say it as part of some type of optic that Zlateski

17  didn't do something wrong, it's like, Oh, well, we didn't move

18  on those issues, those are jury issues.

19         And so I'm going to end my part and we're going to

10:40 20  give to Mr. Curran the part where he's going to actually answer

21  your questions.

22         I think when one looks at the record, the jury is

23  entitled to certainly see that Zlateski, along with the people

24  at Neural Magic, came up with something special.  Everyone

25  recognizes something special.

```
 1              He told Dr. Shavit that he wasn't going to be working
 2     in this area.  Dr. Shavit said, Okay, let's keep collaborating.
 3     And Zlateski led him to believe that they we're going to be
 4     collaborating.  He says, Okay, so only for that reason I said
 5     I'd let you keep the laptop.  But it doesn't make a difference,
 6     because no one believes that Aleksandar Zlateski, this great
 7     programmer, couldn't do this without the laptop.  He then
 8     immediately shows up at Facebook and is immediately talking to
 9     the very people that he's not supposed to be working for and
10:40 10 apparently spends the next couple of months working with them
11     and immediately writes up in record time the FBGEMM code, which
12     you will hear from Dr. Scott is exactly what encompasses the
13     trade secrets that Zlateski worked on at Neural Magic.
14              With that, I am very gladly going to hand it over to
15     Mr. Curran.  Thank you, your Honor.
16              THE COURT:  Thank you, counsel.  Thank you.
17              MR. CURRAN:  Thank you, your Honor.
18              I'll start, if I can go to summary judgment opposition
19     page 13 --
10:41 20         THE COURT:  I think, counsel, you have about 10
21     minutes.
22              MR. CURRAN:  Thank you, your Honor.
23              During Facebook's presentation, we saw the top of this
24     screen.  We were talking about statement of fact 23, 31, 32.
25     What we didn't see was what falls below that, and I think this
```

1    resolves a lot of questions from today.

2            During his deposition, Dr. Matveev unambiguously

3    testified the source code identified by Neural Magic embodies

4    the trade secrets.  And it's the same file we're been talking

5    about, your Honor, avx512.hpp.  And Dr. Matveev stepped through

6    that in detail.

7            Can we go back to the slides and to 49, please.

8            Who is Dr. Matveev?  He is the co-founder and chief

9    technology officer.  He was involved in the creation of this

10:41 10   source code file, the development of optimizations that it

11   embodied.  And he testified at length in his deposition -- go

12   to -- he testified at length to the -- he testified at length

13   to the source code, how it was used, and the fact that it

14   embodied of all of these ideas.

15           And same thing here.  Chapter and verse, he went

16   through source code identifying which lines were working to

17   implement trade secrets.

18           So we have extensive testimony from a witness talking

19   about a specific source code file to say where are the trade

10:42 20   secrets.  That resolves all of the arguments we heard earlier

21   about possession.

22           Facebook certainly may disagree that this is present

23   in the file, but we have here a specifically identified source

24   code file.

25           Can we go to the next slide, 2.

1            THE COURT:  Counsel, I'm not going to go back over all

2       of the descriptions of the trade secrets, but I'll put the same

3       question to you that I put to your brother.

4            If you think about this to a jury, if you put the file

5       that you seem all in agreement with next to your description of

6       each of the trade secrets, that code contains all of the trade

7       secrets?

8            MR. CURRAN:  That's correct, your Honor.

9            So the source code here, we'll identify very specific

10:43 10  source code -- if I could have slide 55 please.

11           For every one of the trade secrets that's at issue, a

12      discrete set of source code files have been identified, a

13      handful, six to eight files, for each one of these.  And the

14      reason it's more than one file, your Honor, part of it is the

15      discussion we had earlier today was classes versus files versus

16      lines.  The source code, when it's written, is written in

17      libraries that are then drawing on importing statements from

18      each other.  So functionally these files work together.  And

19      the authors of this source code will explain how they work

10:44 20  together, including this file, avx512, and different files with

21      dependencies and libraries that it draws with to work together

22      and implement each one.

23           THE COURT:  I'm sorry, so what are the files on the

24      right on the screen?

25           MR. CURRAN:  These files on the right are files that

1    were specifically identified as embodying the trade secrets.

2    So we've identified --

3          THE COURT:  But the only one -- is the only one --

4    well, maybe I should ask an open-ended question.

5          All the files there, are those files that were in the

6    possession of Dr. Zlateski at the time he was at Neural Magic?

7          MR. CURRAN:  Yes, your Honor.  That's correct, your

8    Honor, written by.

9          So the first one is the one we've seen for that

10:44 10   breakthrough moment on May 28th, and later ones are iterations

11   that are writing this, for example, for different instruction

12   sets, like avx2 is the next one, a different instruction set

13   from avx512.  He writes the groundbreaking work, he builds on

14   that work, that work embodied from different instruction sets,

15   different machines and different libraries is what we've

16   identified trade secret by trade secret.

17         The authors of this code will be here to testify,

18   including Dr. Zlateski.  We have his contemporaneous documents

19   that admit this includes the optimizations at issue.

10:45 20        If we look at slide 54.

21         This email we've looked at, it doesn't just say that

22   this code is done.  He actually uses some of the language of

23   the trade secrets here.  Nearly all optimizations we had

24   discussed, ██████████████████████████████████████████████

25   ████████████████████████████████████████████████████████

1          There's not only an admission of where this code came

2    from and who was doing it and when, and where this code lived

3    is discussed by the PhD computer scientists that worked with

4    him, including Dr. Matveev, who is copied here.  But this code

5    is the code that shows possession of each of these ideas, and

6    you can compare that code, as the witnesses did, to show

7    exactly where the code lives.

8          And really the dispute in the papers is not about

9    whether there's a witness who is going to do this.  The dispute

10:46 10   we've had is, am I, Facebook, convinced?  I wanted you to

11   reduce it to a line, I wanted you to reduce it to a function.

12   The witness said, No, you have to look at the whole class.

13   That's a dispute that the jury can look to, but everyone seems

14   to be in violent agreement --

15          THE COURT:  What is meant by "class" here?

16          MR. CURRAN:  Yes, your Honor.  A class is a high-level

17   library that may include within it multiple different

18   functions.  So one class might be developed that could be

19   called here avx512, for example.  And within that class there

10:46 20   could be multiple different functions.  They're sort of like

21   verbs.  You could think of the class as kind of the book and

22   then within the book this larger class construct, the things

23   that it contains are variables, which are basically places to

24   put things; and then functions, which are the actions that you

25   do with those variables that will save data or information.

1           And so when you construct a source code class, you're
2    building within that lines of code that implement functions,
3    lines of code that implement variables that will save areas of
4    data or memory, but the class is just the code.
5           And these are all different words really for code,
6    code at different levels of generality.
7           And everyone is in violent agreement about what code
8    implemented this.  There's a dispute about how specific some
9    people wanted to get, but there's no dispute about what code's
10:47 10   at issue, what documents we say show the possession of the
11   code, and which witnesses will come to trial and testify about
12   that.
13          A lot of the dispute we have is now actually saying
14   it's the wrong witness.  There needed to be an expert, they
15   say.  You couldn't actually have the author of the code, the
16   chief technology officer, point to this code and step through
17   this because they know he did do that.
18          So much of the papers are about supposedly needing an
19   expert.  There's no legal requirement for that at all.  It's
10:47 20   not a requirement someone pay an expert to say the same thing a
21   percipient witness can say.
22          In fact, this expert did it anyway.  Even if there
23   were such a rule -- slide 57 -- Dr. Scott has testified
24   extensively that these are Neural Magic's trade secrets.  He
25   said this in his deposition, and that just echoed what was in

```
 1    his report.
 2            If we look at slide 58 --
 3            THE COURT:  I apologize.  Is your 57 on the screen
 4    seems to be different than my 57, but --
 5            MR. CURRAN:  I apologize.  We have a fresh printout if
 6    I could provide one.  There may be a numbering --
 7            THE COURT:  Counsel, it's okay, I don't want to break
 8    up your flow here because I'm following you, but it looks like
 9    my 57 --
10:48 10         MR. CURRAN:  Apologize, your Honor, we'll fix that.
11            THE COURT:  Thank you.
12            MR. CURRAN:  Apologize, your Honor.
13            On slide 57, Dr. Scott confirms that he possessed the
14    trade secrets -- that Neural Magic possessed the trade secrets.
15    That's all throughout his report.
16            THE COURT:  I found where we are.
17            MR. CURRAN:  Thank you, your Honor.
18            And there are pages and pages in that report comparing
19    the Neural Magic assembly code and the Facebook assembly code,
10:48 20    these things that are generated by the source code.  He does
21    extensive comparisons and talks about how those are evidence of
22    the trade secrets.
23            Slide 58.
24            This is from his report as well.  He's talking about
25    the first iterations of the trade secrets, identifying where
```

those trade secrets are, citing to those same May 28

discussions that we've just been looking at.  He is confirming

what the fact witnesses are also saying.  This is where the

source code is and where the trade secrets live in Neural

Magic.

So there isn't actually a requirement any of kind

expert testimony.

I'll just note -- slide 56 -- this is the only case

they cite.  It's not even about trade secret possession.  This

is about whether the other guy could have independently

developed a product.  It's not even for the cited proposition.

So there is no rule, but even if there were, it's been done

here.

THE COURT:  And you would essentially say, as a

factual matter, Dr. Scott is substituting for the role of

Dr. Zlateski if he was not an adverse witness.

MR. CURRAN:  Absolutely.  That's very well put, your

Honor, absolutely.

So I want to turn to reasonable measures, if that's

each acceptable.

Actually, before we do that, your Honor, there were

also some discussions about combinations and some discussion

about possessing combinations.  This is a red herring as well.

First, the law is very clear that combinations are entirely

fine.  In this district, Judge Burroughs was affirmed by the

1   Federal Circuit for allowing a trade secret in the CardiAQ case
2   that we cite.  This is almost identical to these types of trade
3   secrets.  So, definitionally, the Federal Circuit has said
4   there's no problem expressing a trade secret as a combination.
5          Then we get the argument, Well, you didn't show you
6   possessed the combination.  But that's also not really --
7   something that makes sense logically.  We've shown each of the
8   individual elements of the combination of things we possessed.
9   They're in the same source code files.  We've shown the
10  combination of these elements were in our possession.
11         THE COURT:  I guess my question is, is it the same
12  trade secret?
13         MR. CURRAN:  That's a good question, your Honor.
14         If we can go to slide -- let me take a look at them --
15  slide 84.
16         So it's not exactly the same trade secret because
17  we're talking about different levels of a software stack.  One
18  would be --
19         THE COURT:  Counsel, I think you're at time, but I'll
20  let you finish your thought.
21         MR. CURRAN:  I'm sorry, your Honor.  Thank you.
22         One would be the source code to implement an idea,
23  another would be a technique, regardless of whether it's
24  expressed in source code to implement that same technique.
25         Go to the next slide.

1          The other is assembly code, a different level of

2    technology.  The assembly code generated by a JIT compiler that

3    embody the same technique.

4          Another would be a sequence of executable actions.

5          So what possessed these was shown with the individual

6    trade secrets, and then they are expressed in the combinations

7    just at different layers of where you can find them in a

8    software stack, either as executables, as assembly code, as

9    source code, or even at a higher level at a series of

10:51 10   instructions someone might write on a whiteboard.

11         If you're doing these steps either in English, in

12   source code, in assembly code, or as a series of executable

13   instructions at a processor level, you're using the trade

14   secrets.

15         THE COURT:  And I guess, counsel -- and I'll just ask

16   you one last question, which is more a question of law -- is it

17   the same trade secret if you start -- if you start on this

18   process, right, of optimizing speed, and you get to a certain

19   point where you've done it, what, I think wasn't the email like

10:52 20   four times as fast, but you haven't done it any faster and you

21   sort of stop there because you leave for another company,

22   you're taking your personal expertise with you, right, you're

23   taking your knowledge of -- and then you go to another company.

24   You have conversations with their expert, whatever, you

25   spitball how you might solve that, and then you improve upon

1    your experience there.  Is that the same trade secret?  Is the

2    result of that the same trade secret?

3            MR. CURRAN:  If you start from where you left off,

4    yes, your Honor.  So if you start from the work that you did

5    that was independently economically valuable that was not

6    published, that derived its value from its secrecy because it

7    wasn't public what you had just done where you left off, then

8    you are using that trade secret.  And the law is clear that you

9    cannot try to get around that by either tweaking the work you

10:53 10   just did -- we cite law on derivations about this, particularly

11   on Trade Secret 12 where they said, Oh, I only stole it

12   halfway, then I didn't misappropriate.  The law is the

13   opposite.  If you derive from -- if you use as a starting

14   point, you use the value of what you knew in that head start

15   from the secret information from your prior employer, that is

16   using a trade secret and misappropriating it.

17            THE COURT:  Thank you.

18            MR. CURRAN:  Thank you, your Honor.

19            THE COURT:  Counsel, I think you had about eight

10:53 20   minutes.

21            MR. LUMISH:  Thank you, your Honor.

22            If I may have slide 28 from my deck up, please,

23   Mr. Schmoller.

24            So I'll start with Mr. Cherny's presentation, your

25   Honor.

1        I think the argument you heard actually illustrates

2   why summary judgment is so important in this case.  Because the

3   science is hard, the math is hard, the computer science is

4   impenetrable to a lay jury.  And it shouldn't be enough to get

5   up and put up grim pictures of Facebook and say, Look, they

6   were all very, very impressed by Dr. Zlateski so they must have

7   stolen our trade secrets.

8        And the argument you heard over and over again, I

9   think he said it six or seven times, was my argument today is

10:54 10   that it wasn't new, it wasn't new, it wasn't new.  That's not

11   what I said.

12        I put up on the screen slide 28.  I like to think in

13   Venn diagrams sometimes.  This to me is the problem that they

14   have.  Zlateski did work at NMI, we all agree with that.  He

15   worked on sparse matrix multiplication, we all agree on that.

16        Let's assume, because we're in a summary judgment

17   proceeding, that he also had new and creative ideas there, he

18   came up with something brilliant and different, so what?  They

19   have to show your Honor that those are their trade secrets that

10:55 20   are now being used by Meta.

21        They've told us what the trade secrets are, that's the

22   red circle on the right.  They've enumerated those as Nos. 1

23   through 12.  They have to show you that those are in the green

24   circle, and they haven't done it.  There's no evidence.

25        I challenged them today, we challenged them in our

1  briefing, we challenged their witnesses.  We have asked over

2  and over again for them to put up or shut up and show us where

3  in their materials they can show those 12 alleged trade secrets

4  originated with them, were in their possession or something

5  that they had as a trade secret and that meets the

6  requirements.  And they've done nothing today to show you that.

7        Mr. Cherny shows you slide after slide of people at

8  Facebook saying Dr. Zlateski is brilliant, he's great.  All

9  true, we'll proudly embrace that, your Honor.  I think he

10:55 10  impresses everybody he works with because he's got a brilliant

11  mind.  That has nothing to do with whether any of those

12  accolades or statements relate to the alleged trade secrets,

13  and they had to show that to your Honor and they don't and they

14  can't.

15        So that's that point.

16        Can I have slide 16, please, Mr. Schmoller.

17        These are the alleged trade secrets.  This is what

18  they had to show, each of these subparts and components, all of

19  the colored pieces.  Where is the evidence that they actually

10:56 20  possessed these things before they accused us of stealing them

21  from them?

22        They showed you nothing, your Honor.  The closest they

23  got was Dr. Matveev -- and I don't have their slide numbers --

24  but each of those pieces of testimony from Dr. Matveev say,

25  Well, not avx512, that file, but it plus this class.  And the

1    class is enormous, it's just like a book, it's an encyclopedia.

2         The Calendar Rsch. case that we cited to your Honor

3    and others tell you it is not your job to go through that book

4    of evidence and try to sift through it and find where these

5    things line up.  Where's the yellow part from my slide?

6    Where's the purple part?  Where's the gray part?  They had to

7    show that to you, and they don't even try.  They just say take

8    our word for it, Dr. Matveev is smart, he's an eminent

9    professor, he knows it's in the code.  Well, he's not their

10:57 10   expert.  They had to have expert testimony on this; they

11   didn't.  He didn't submit, Dr. Matveev, a Rule 26 report to put

12   us on notice that he's going to get up and tell the jury that

13   he can map any lines of the class or the avx file to the

14   alleged trade secrets and all of their many subcomponents.

15        We showed him the code in his deposition and said, Do

16   it now.  He said, Oh, it's in there somewhere, it's in some of

17   these lines, it's in the class.  That, your Honor, is not even

18   close to sufficient to survive summary judgment.

19        And it's the exact problem in this case, is the jury

10:57 20   is not going to be able to do it, but they're going to be

21   impressed by the fact that people think Dr. Zlateski is smart,

22   and, okay, he went from one company to the other and Facebook

23   is a big company and they can afford it.  That's their hope

24   here.

25        They have to show these are actually their trade

secrets.  That's a fundamental predicate to the case, and they

didn't, they can't.

May I have slide 7, please, Mr. Schmoller.

So -- I just wanted to hit this really quickly.  At

one point Mr. Cherny said to you that something that showed

that he had completely unrolled the loops, Dr. Zlateski had

completely unrolled the loops.  He said, This is the trade

secret.  They want to shift something that high level to the

jury.  We have the three labels that are too high level, and

now they want to shift to that.  It cannot be squared with what

they told your Honor.  It's not a question of whether it's old

or new.  My point is, it's been disclaimed by them.

This is slide 7, Dr. Scott's reply declaration,

paragraph 29, where he says, ███████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████  And, yet, in their brief and

here again today, they've told you that's what they want to

tell the jury their actual trade secret is, and they shouldn't

be permitted.

Let me end on this, your Honor, which is Dr. Scott.

So what you heard from Mr. Curran I thought was

important.  What he told you he compares is the assembly code

output of the programs.  That's the results.  That's something

a compiler kicks out is what the computer itself is now going

to execute.  That is not the source code that Dr. Zlateski

1    wrote, that's not the source code in avx512, it's not the
2    source code in the class.  That's an acknowledgment tacitly
3    that Dr. Scott didn't do what he had to do, which was compare
4    their source code and show us where it allegedly has Trade
5    Secrets 1 through 12, piece by piece, subcomponent by
6    subcomponent.  He never does it.  He doctors our code, he
7    doctors their code, and then he compares outputs, which are not
8    where you're going to find avx512 or the class, it's the output
9    of those programs.
11:00 10         THE COURT:  Was that your point before in regards to
11   what makes something go faster?  Meaning focusing on the
12   outputs versus the code?
13        MR. LUMISH:  No, I think what I was saying before is
14   lots of things make code go faster when you have sparse
15   operations.  You can make them faster just using sparse matrix
16   multiplication.  There's always optimizations when you use it.
17        THE COURT:  I guess -- let me understand your argument
18   about the outputs versus the code.
19        MR. LUMISH:  My point here, your Honor, is a simpler
11:00 20  one, I think, which is -- goes back to possession.  We don't
21   think they've shown you any evidence.  We think they have a
22   failure of proof to show that these alleged trade secrets were
23   ever in their possession or owned by them as something now they
24   can claim was taken from them.
25        And the way to show that would have had to have been

1    either in the source code or what you and I discussed before,

2    something leading up to the source code -- a flow chart, a

3    specification.  He doesn't compare those.

4         What they're asking you to do is take him at his word

5    that because the two outputs of FBGEMM and their code are the

6    same after he's altered them, that means they both have the

7    trade secrets.  That doesn't answer any of the questions.  He

8    doesn't show you in the assembly code of theirs where the

9    alleged trade secrets are.  He doesn't show you in the source

11:01 10   code of theirs where the alleged trade secrets are.  And that's

11   where I started, and I think that's the critical point.

12        They have to own them before we can misappropriate

13   them.  And he's shown you nothing in either of their forms of

14   code, assembly or source, Dr. Scott, to establish that in fact

15   the alleged trade secrets with all of the various subcomponents

16   are in that code.

17        When you don't have an expert, as we showed in our

18   slides before, you should be out; and Dr. Matveev shouldn't be

19   able to come in now and try to fill that gap without a report

11:01 20   and having disclaimed that avx512 file at his deposition.

21        THE COURT:  Thank you.

22        Thank you, counsel.

23        MR. LUMISH:  Thank you, your Honor.

24        THE COURT:  Counsel, I appreciate the arguments on

25   both sides.  Obviously even before this hearing you've given me

1    a lot to think about, and I want to give it some more thought.

2             I obviously have in mind the motions to strike as

3    well.  I will endeavor to issue a ruling.  If I think I need to

4    see you on any of the motions to strike, I'll certainly let you

5    know.

6             Thank you, counsel.

7             THE CLERK:  All rise.

8             (Court adjourned at 11:02 a.m.)

9                  - - - - - - - - - - - -

10                        CERTIFICATION

11            I certify that the foregoing is a correct transcript

12   of the record of proceedings in the above-entitled matter to

13   the best of my skill and ability.

14

15

16

17   /s/Debra M. Joyce                 November 29, 2022
     Debra M. Joyce, RMR, CRR, FCRR    Date
18   Official Court Reporter

19

20

21

22

23

24

25